D. Victoria Baranetsky (Cal. Bar No. 311892)
Alexandra M. Gutierrez (DC Bar No. 1619149)
THE CENTER FOR INVESTIGATIVE
REPORTING
1400 65th St., Suite 200
Emeryville, CA 94608
vbaranetsky@revealnews.org
Telephone: (510) 982-2890

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE CENTER FOR INVESTIGATIVE REPORTING and ANAYANSI DIAZ-CORTES, <br><br> Plaintiffs, <br><br> v. <br><br><br> UNITED STATES DEPARTMENT OF JUSTICE, and UNITED STATES DEPARTMENT OF STATE, <br> Defendants. | Case No. 3:20-cv-6649-JSC <br><br> **OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND** <br><br> **NOTICE OF CROSS MOTION AND CROSS MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT** <br><br> Date:  June 3, 2021 <br> Time: 9:00 AM <br> Place: Courtroom E, 15th Floor |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 1

I.    INTRODUCTION .......................................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................................. 2

    A.   The 2014 Ayotzinapa Mass Kidnapping .............................................................. 2

    B.   The Mexican and United States Responses to the 2014 Ayotzinapa Incident ..................... 3

    C.   The United States' Mutual Legal Assistance Treaty with Mexico. ...................................... 5

    D.   The MLAT Requests Following the 2014 Ayotzinapa Incident. ......................................... 7

    E.   The Center for Investigative Reporting's FOIA Requests. ................................................... 8

III.  LEGAL STANDARD .................................................................................................. 11

IV.   ARGUMENT ............................................................................................................... 12

    A.   A Glomar Response is Improper Where Underlying Exemptions Do Not Apply .............. 12

        1.   Exemption 3 Does Not Apply Because Disclosure Does Not Contravene the MLAT
Treaty, Where the Fact of the Requests is Not Confidential. ............................................ 13

        2.   Exemptions 6 and 7(C) Do Not Apply Because Plaintiffs Agree to Substantial Redaction.
16

    B.   Glomar is Improper Where There is Official Acknowledgment. ....................................... 18

        1.   The Mexican Government and Members of the U.S. Congress Have Acknowledged
Collaboration on the Ayotzinapa Investigation. .............................................................. 19

        2.   The U.S. Government Has Disclosed Other MLAT Requests. ..................................... 20

    C.   CIR's FOIA Request to the EOUSA is Properly Before This Court. ............................... 22

        1.   CIR's EOUSA Request Reasonably Described the Requested Records. ....................... 22

        2.   The EOUSA Failed To Offer a Determination Regarding CIR's FOIA Request, Thus
Excusing the Administrative Exhaustion Requirement. ..................................................... 24

V.    CONCLUSION ............................................................................................................ 25

-ii -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

1

2

## TABLE OF AUTHORITIES

**CASES**

*ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013) ................................................................. 19

*ACLU v. DOJ*, 418 F. Supp. 3d 466 (N.D. Cal. 2019) ...................................................... 12

*Anguiano v. United States Immigration and Customs Enforcement*, No.18-cv-01782-JSC, 2018 U.S. Dist. LEXIS 193479 (N.D. Cal. Nov. 13, 2018)........................................................ 18

*Animal Legal Def. Fund v. United States FDA*, 836 F.3d 987 (9th Cir. 2016) .............................. 11

*Bartko v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018) ...........................................................12, 22

*Birch v. USPS*, 803 F.2d 1206 (D.C. Cir. 1986)............................................................. 11

*Bloomer v. U.S. Dep't of Homeland Sec.*, 870 F. Supp. 2d 358 (D. Vt. 2012) .............................. 14

*Campbell v. DOJ*, 164 F.3d 20 (D.C. Cir. 1998)............................................................. 11

*Castaneda v. United States*, 757 F.2d 1010 (9th Cir. 1985) ................................................ 18

*CIA v. Sims*, 471 U.S. 159 (1985)........................................................................ 13

*Citizens for Responsibility & Ethics in Wash. v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ...........12, 18

*Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180 (D.C. Cir. 2013) .............24, 25

*Ctr. for Investigative Reporting v. DOJ*, 982 F.3d 668 (9th Cir. 2020)........................................ 13

*Dep't of State v. Ray*, 502 U.S. 164 (1991)................................................................. 18

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ...............................................11, 13, 14

*Dobronski v. Fed. Commc'n Comm'n*, 17 F.3d 275 (9th Cir. 1994)............................................ 16

*Dongkuk International, Inc. v. United States Department of Justice*, 204 F. Supp. 3d 18 (D.D.C. 2016) ...............................................................................15, 21, 22

*EFF v. ODNI*, 639 F.3d 876 (9th Cir. 2010).................................................................. 17

*Elec. Frontier Found. v. DOJ*, 384 F. Supp. 3d 1 (D.D.C. 2019) ........................................... 12

*FBI v. Abramson*, 456 U.S. 615 (1982) .................................................................... 16

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) .....................................................19, 20

*Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016) ................................................................ 12

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019)........................................13, 14

*Founding Church of Scientology v. Bell*, 603 F.2d 945 (D.C. Cir. 1979)..................................... 13

*Grynberg v. United States Department of Justice*, 302 F. Supp. 3d 532 (S.D.N.Y. 2018)...13, 15, 22

*Hamdan v. DOJ*, 797 F.3d 759 (9th Cir. 2015)...........................................................12, 13

*Hayden v. NSA*, 608 F.2d 1381 (D.C. Cir. 1979) ............................................................ 11

*In re Search of the Premises Located*, 634 F.3d 557 (9th Cir. 2011)........................................ 13

*James Madison Project v. DOJ*, 302 F. Supp. 3d 12 (D.D.C. 2018)........................................... 19

*Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108 (D.C. Cir. 2004)............................................... 16

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93 (D.D.C. 2009).............. 16

*Lahr v. NTSB*, 569 F.3d 964 (9th Cir. 2009)................................................................ 11

*Lane v. Dep't of the Interior*, 523 F.3d 1128 (9th Cir. 2008) ............................................. 11

*Langton v. United States Dep't of Homeland Sec.*, No. CV-20-00099-PHX-JZB, 2020 U.S. Dist. LEXIS 143622 (D. Ariz. Aug. 11, 2020).............................................................. 11

*Lawyers' Comm. For Civil Rights v. Dep't of the Treasury*, 2008 WL 4482855 (N.D. Cal. Sept. 30, 2008) ...................................................................................... 16

*Marks v. United States*, 578 F.2d 261 (9th Cir. 1978)...................................................23, 24

*Mobil Oil Corp. v. EPA*, 879 F.2d 698 (9th Cir. 1989) ..................................................... 13

*Nation Mag. v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995)........................................... 22

*North v. Walsh*, 881 F.2d 1088 (D.C. Cir. 1989)............................................................ 11

*Open Soc'y Justice Initiative v. CIA*, 2020 U.S. Dist. LEXIS 230260 (S.D.N.Y. Dec. 8, 2020)....19, 20

*Pac. Pictures Corp. v. United States Dist. Court*, 679 F.3d 1121 (9th Cir. 2012) ......................... 14

-iii-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*Pickard v. DOJ*, 653 F.3d 782 (9th Cir. 2011) ............................................................... 12
*Poulsen v. DOD*, 373 F. Supp. 3d 1249 (N.D. Cal. 2019) ............................................. 18
*Roth v. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ........................................................12, 22
*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ..................................................... 14
*Senate of Puerto Rico v. DOJ*, 823 F.2d 574 (D.C. Cir. 1987) ..................................... 13
*Sims v. CIA*, 642 F.2d 562 (D.C. Cir. 1980) ................................................................. 16
*Stern v. F.B.I.*, 737 F.2d 84 (D.C. Cir. 1984) ............................................................... 18
*Tooley v. Bush*, No. 06-306 (CKK), 2006 U.S. Dist. LEXIS 92274 (D.D.C. Dec. 21, 2006) ......... 24
*Tooley v. Napolitano*, 556 F.3d 836 (D.C. Cir. 2009) ................................................... 24
*U.S. DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) .................11, 16, 18
*United States v. Marquez*, No. 10CR3044 WQH, 2012 U.S. Dist. LEXIS 12429 (S.D. Cal. Feb. 2, 2012) ......... 6
*United States v. Pablo Vega Cuevas*, No. 1:14-cr-00705 (N.D. Ill. Dec. 8, 2014) ......................... 4
*Van Bourg, Allen, Weinberg & Roger v. N.L.R.B.*, 656 F.2d 1356 (9th Cir. 1981) ....................... 11
*Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009) ................................................................. 14
*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ...........................................................12, 19
*Yagman v. Pompeo*, 868 F.3d 1075 (9th Cir. 2017) ..................................................22, 23

**FEDERAL STATUTES**

5 U.S.C. § 552(a)(3)(A) ...........................................................................22, 23, 24
5 U.S.C. § 552(a)(6)(A)(i) .............................................................................24, 25
5 U.S.C. § 552(b) ........................................................................................... 1
5 U.S.C. § 552(b)(6) ..................................................................................... 16
5 U.S.C. § 552(b)(7) ..................................................................................... 16
5 U.S.C. § 552(b)(7)(C) ............................................................................... 9, 16
Mutual Legal Assistance Cooperation Treaty with Mexico, U.S.-Mex., Dec. 9, 1987, S. Treaty Doc. No. 100-13, 1987 WL 890783 ...........................................................2, 5, 6, 13

**OTHER AUTHORITIES**

Black's Law Dictionary (rev. 4th ed. 1968) ................................................................. 14
Bruce Zagaris & Jessica Resnick, *The Mexico-U.S. Mutual Legal Assistance in Criminal Matters Treaty: Another Step Toward the Harmonization of International Law Enforcement*, 14 ARIZ. J. INT'L & COMP. LAW 1 (1997) ......... 5
DOJ, *FOIA Update: OIP Guidance: Privacy "Glomarization"* (Jan. 1, 1986) https://perma.cc/NU96-DS2F ......... 12
Fiscalía General de la República, *Expediente Caso Iguala* (Nov. 28, 2018) https://www.gob.mx/fgr/acciones-y-programas/expediente-caso-iguala .................................. 4
Ignacio A. Boulin Victoria, *Back to Politics: Lessons from the Crisis of the Inter-American Commission on Human Rights*, 22 BUFF. HUM. RTS. L. REV. 21 (2016) ....................................... 3
Kirk Semple, Paulina Villegas & Natalie Kitroeff, *Years After 43 Mexican Students Vanished, a Victim's Remains Are Found*, N.Y. TIMES (July 7, 2020) https://nyti.ms/3wDZpZm ................. 3
Madeleine Wattenbarger, *For Mexico's President, Forced Disappearances Could Make or Break the Justice System*, FOREIGN POL. (Oct. 4, 2019) https://perma.cc/B3K9-V5YU ........................ 2
Mary Wisniewski, *Alleged Head of Chicago Branch of Mexican Drug Cartel Arrested*, REUTERS (Dec. 10, 2014) https://reut.rs/39WSNeV .................................................................. 4
Maureen Meyer, *Ayotzinapa Fact Sheet: Investigating the Enforced Disappearance of 43 Students in Mexico*, WASH. OFFICE ON LATIN AM. (Feb. 24, 2016)  https://perma.cc/5ZNQ-UHBA .......... 4

-iv-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

*Mexico missing students: Suspect detained in 2014 case*, BBC NEWS (June 30, 2020)
  https://bbc.in/39RGIYf.............................................................................................................. 2

Office of Information Policy, *DOJ FOIA Reference Guide*, DOJ (Jan. 21, 2020)
  https://perma.cc/3ELA-YRXM ............................................................................................ 23

Paulina Villegas, *An Old Sore for Mexico's Next President: The 43 Missing Students*, N.Y. TIMES
  (Sept. 3, 2018)  https://nyti.ms/3wNYxBJ ...................................................................... 2, 3

Rodolfo D. Saenz, *Confronting Mexico's Enforced Disappearance Monsters: How the ICC Can
  Contribute to the Process of Realizing Criminal Justice Reform in Mexico*, 50 VAND. J.
  TRANSNAT'L L. 45 (2017) .................................................................................................. 3

USAO N.D. Ill., *Eight Defendants Charged with Distributing Heroin in Chicago Area on Behalf of
  Guerrero Unidos Mexican Drug Cartel* (Dec. 10, 2014) https://perma.cc/298J-TPA5 ............... 4

Webster's Third New International Dictionary (1961).................................................................. 14

## RULES

Fed. R. Civ. P. 56(a) ................................................................................................................. 11

## REGULATIONS

28 CFR § 16.3(b)................................................................................................................22, 23

## LEGISLATIVE MATERIALS

*Ahead of VP Pence Visit to Mexico, Menendez, Leahy, Kaine, and Bennet Encourage U.S.
  Commitment To Improving U.S.-Mexico Relations*, U.S. SENATE COMM. ON FOREIGN RELATIONS
  (Nov. 30, 2018) https://perma.cc/HAB7-NN4G ............................................................... 20

*Cardin Calls for Justice on 2nd Anniversary of Mexican Students' Disappearance*, U.S. SENATE
  COMM. ON FOREIGN RELATIONS (Sept. 29, 2016) https://perma.cc/VUF3-UFRS....................... 5

*Chairman Menendez Joins Group of Bipartisan Senators in Letter to Sec. Kerry on Missing
  Mexican Students*, U.S. SENATE COMM. ON FOREIGN RELATIONS (Nov. 25, 2014)
  https://perma.cc/KQG7-K5PX ............................................................................................ 4

Congressman Alan Lowenthal, *Congressman Lowenthal and Seven House Colleagues Call for
  Truth and Justice on the 6th Anniversary of Mexican Students' Disappearance* (Sept. 25, 2020)
  https://perma.cc/P3ZL-MVJX ........................................................................................ 5, 20

Congressman Norma Torres, *Congressional briefing on disappeared Mexican students peers into
  Mexican government investigation* (May 26, 2016) https://perma.cc/J54K-XNYP..................... 5

Letter from Sixty-Nine Representatives, to the Hon. John Kerry, Sec'y of State (Aug. 9, 2016)
  https://perma.cc/LER9-DADU ............................................................................................. 5

S. Rep. No. 93-854, 93d Cong., 2d Sess. 10 (1974)................................................................... 24

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 3, 2021, at 9:30 a.m., or as soon thereafter as the

matter may be heard in Courtroom E, located on the 15th floor of United States District Court for the

Northern District of California, San Francisco Division, 450 Golden Gate Ave., 94102, before the

Honorable Magistrate Judge Jacqueline Scott Corley, Courtroom E, 15th Floor, 450 Golden Gate

Ave., San Francisco, CA 94102, the Plaintiff The Center for Investigative Reporting and Anayansi

-v -

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

Diaz-Cortes ("CIR") will, and hereby does, oppose the motion filed by Defendants United States Department of Justice ("DOJ") and the United States Department of State ("State" and, together with DOJ, "Defendants"), and cross move the Court for an order granting for summary judgment in Plaintiffs' favor.

Pursuant to Federal Rule of Civil Procedure 56, CIR respectfully asks that this Court issue an order requiring the government to acknowledge and release all records, including any necessary redactions, improperly withheld from the public under the Freedom of Information Act Exemptions 3, 6, and 7(C), 5 U.S.C. § 552(b)(3), (6), and (7)(C). This opposition and cross motion is based on this notice of cross motion and motion, the memorandum of points and authorities in support of this opposition and cross motion, the Declarations of D. Victoria Baranetsky ("Baranetsky Decl."), Anayansi Diaz-Cortes, and Megan DeTura, and attached exhibits, all papers and records on file with the Clerk or which may be submitted prior to or at the time of the hearing, and any further evidence which may be offered.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**RELIEF SOUGHT BY PLAINTIFFS**

Plaintiffs seek an order dismissing Defendant's claims and granting Plaintiffs' motion.

**ISSUES TO BE DETERMINED**

Did Defendants improperly issue *Glomar* responses under the Freedom of Information Act ("FOIA"), 5 U.S. § 552(b)(3), (6), and (7)(C) exemptions?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

In this action, Plaintiffs make a limited request for records seeking to keep not just one but *two* governments accountable for their responses to the 2014 disappearance of 43 Mexican students.

While Plaintiffs The Center for Investigative Reporting and Anaysansi Diaz-Cortes (collectively "CIR") originally requested "all records" related to this incident, CIR now significantly narrows its request.  Plaintiffs clarify that they request the disclosure of documents redacted *in full*, with the exception that the **date** and **subject heading** of each document be left unredacted.  Although CIR's request is limited to nearly blacked-out records, CIR's brief assumes the Government will still assert that the requested records must be withheld under various FOIA exemptions.  In its brief, the Government claims that the mere existence of the records is secret, that the records are private under Exemptions 6 and 7(C), and that a *Glomar* response refusing to confirm or deny the existence of any records is thus appropriate.  Additionally, the Government erroneously contends that one request did not comply with agency guidelines.  Here, the Court should order disclosure of the records, because none of FOIA's Exemptions apply and CIR's request followed proper procedures.

First, the Government incorrectly asserts that the records cannot be acknowledged, because their mere existence is a secret.  (Gov't Br. Supp. Summ. J. [Doc. # 20] at 9.)  The Court should reject this argument because Exemptions 3, 6, and 7(C) do not apply, and courts routinely hold that the *Glomar* doctrine is inapplicable where the underlying exemptions are not justified.  Additionally, the Government's assertion that *Glomar* applies here is especially dubious, as the Mexican Government has repeatedly acknowledged that the records exist in various official statements.

To wit, the Government asserts the records are categorically protected under Exemption 3 through the Mutual Legal Assistance Cooperation Treaty with Mexico, U.S.-Mex., Dec. 9, 1987, S.

Treaty Doc. No. 100-13.  Whether and how this treaty requires withholding is a question of first impression for courts within this Circuit.  According to principles of statutory interpretation, this Court should determine the MLAT Treaty does not apply under Exemption 3 because the requesting government, Mexico, has already publicly and officially admitted to seeking the United States Government's assistance and the treaty requires "[t]he requested State shall keep confidential" the request.  Where confidentiality has been officially and repeatedly broken, the Treaty does not apply, according to its own requirements.  Furthermore, disclosure is also necessary because there are no Exemptions 6 and 7(C) privacy interests, as Plaintiffs request nearly entirely redacted documents, with the exception of the date and the subject heading.

Alternatively, a *Glomar* response is inappropriate because the requested records have been officially acknowledged.

Last, all four requests clearly followed statutory and agency requirements.

Accordingly, this Court should deny the Government's motion for summary judgment and grant CIR's cross motion.

## II.     STATEMENT OF FACTS

### A.     The 2014 Ayotzinapa Mass Kidnapping

This FOIA request pertains to the U.S. and Mexican response to the forced disappearance of forty-three Mexican students in 2014.  This event has "prompted global outrage" and attracted scrutiny from the United Nations.  Paulina Villegas, *An Old Sore for Mexico's Next President: The 43 Missing Students*, N.Y. TIMES (Sept. 3, 2018)  https://nyti.ms/3wNYxBJ.  Global, public interest in this event continues to today.  *See, e.g., Mexico missing students: Suspect detained in 2014 case*, BBC NEWS (June 30, 2020) https://bbc.in/39RGIYf.

The disappearance occurred in Ayotzinapa, a town located near the city of Iguala in the southwestern Mexican state of Guerrero.  Madeleine Wattenbarger, *For Mexico's President, Forced Disappearances Could Make or Break the Justice System*, FOREIGN POL. (Oct. 4, 2019) https://perma.cc/B3K9-V5YU.  On September 26, 2014, approximately 100 students from the local teachers college "left the school to hijack several buses for transportation to a march in Mexico City, a longstanding tradition that was mostly tolerated by bus companies and law enforcement officials."

Villegas, *supra*.  But this time, law enforcement officials responded with violence: "police officers and other gunmen pursued the stolen buses and opened fire on the students in a coordinated assault in and around the city of Iguala." *Id.*  "According to the testimonies, the city police surrounded the buses, detained many of the students, and afterwards, the students were handed to a criminal gang related with drug trafficking."  Ignacio A. Boulin Victoria, *Back to Politics: Lessons from the Crisis of the Inter-American Commission on Human Rights*, 22 BUFF. HUM. RTS. L. REV. 21, 59 (2016).

Since the disappearance occurred, the Mexican Government has publicly acknowledged its investigation into the case.  In January 2015, former Mexican Attorney General Murillo Karam offered an official but questioned version of the Ayotzinapa events, "publicly declar[ing] that, following the gunfire, members of the Iguala municipal police detained the students and turned them over to the drug cartel 'Guerreros Unidos,' all under the orders of Iguala mayor."  Rodolfo D. Saenz, *Confronting Mexico's Enforced Disappearance Monsters: How the ICC Can Contribute to the Process of Realizing Criminal Justice Reform in Mexico*, 50 VAND. J. TRANSNAT'L L. 45, 49 (2017).  According to this version, "after this transfer, members of the drug cartel slaughtered and incinerated the students and tossed their remains into the San Juan River." *Id.*

**B.      The Mexican and United States Responses to the 2014 Ayotzinapa Incident**

Today, questions around government accountability in the aftermath of the Ayotzinapa incident persist.  From the outset of the case "many individuals, including the President of the Mexican Commission for the Defense and Promotion of Human Rights . . . contested the accuracy of the story, claiming that 'Iguala is not a closed case,' because they suspected greater collusion between the Guerreros Unidos and federal officials." *Id.*  International investigators, invited by the Mexican Government, also "contradicted the official version of events."  Villegas, *supra*.  In 2018, a Mexican court "ordered the Mexican government to investigate the case again, calling the first inquiry 'neither prompt, effective, independent nor impartial.'" *Id.*    In 2018, shortly after his election, Mexican President Andrés Manuel López Obrador "established a special presidential commission to support the families of the victims and get to the bottom of the case."  Kirk Semple, Paulina Villegas & Natalie Kitroeff, *Years After 43 Mexican Students Vanished, a Victim's Remains Are Found*, N.Y. TIMES (July 7, 2020) https://nyti.ms/3wDZpZm.  His administration also published

1    its investigatory case file on an official, public-facing state website.  *See* Fiscalía General de la

2    República, *Expediente Caso Iguala* (Nov. 28, 2018) https://www.gob.mx/fgr/acciones-y-

3    programas/expediente-caso-iguala.   This file contains acknowledgments of Mexico's efforts to

4    obtain relevant information from the United States through a mutual legal assistance treaty, discussed

5    in more detail below.

6        Questions of accountability are not limited to the Mexican government, but fairly extend to

7    the U.S. involvement in this case. Of particular relevance is a related case pending in the United

8    States, *United States v. Pablo Vega Cuevas*, No. 1:14-cr-00705 (N.D. Ill. Dec. 8, 2014).  In December

9    of 2014, several prominent members of Guerreros Unidos—including Pablo Vega Cuevas, alleged

10   to be the leader of their Chicago operations—were charged with several federal crimes in the

11   Northern District of Illinois.  Mary Wisniewski, *Alleged Head of Chicago Branch of Mexican Drug*

12   *Cartel Arrested*, Reuters (Dec. 10, 2014) https://reut.rs/39WSNeV.  These defendants were alleged

13   to have "used commercial passenger buses to conceal and transport drugs from Mexico," and it has

14   been speculated that this operation was linked to the disappearance of the students in Iguala, who

15   were on commercial buses when the ambush began.   Maureen Meyer, *Ayotzinapa Fact Sheet:*

16   *Investigating the Enforced Disappearance of 43 Students in Mexico*, Wash. Office on Latin Am.

17   (Feb. 24, 2016)  https://perma.cc/5ZNQ-UHBA.  Due in part to the association between Guerreros

18   Unidos and the Ayotzinapa disappearance, the criminal case against Vega Cuevas and his co-

19   defendants has received substantial public attention, which the Department of Justice itself has

20   encouraged.  USAO N.D. Ill., *Eight Defendants Charged with Distributing Heroin in Chicago Area*

21   *on Behalf of Guerrero Unidos Mexican Drug Cartel* (Dec. 10, 2014) https://perma.cc/298J-TPA5.

22       The Ayotzinapa incident has been a foreign policy priority for the United States.  *See, e.g.*,

23   *Chairman Menendez Joins Group of Bipartisan Senators in Letter to Sec. Kerry on Missing Mexican*

24   *Students*, U.S. Senate Comm. on Foreign Relations (Nov. 25, 2014) https://perma.cc/KQG7-

25   K5PX (letter issued by fourteen Senators urging Secretary of State John Kerry to "do everything

26   possible to support the Mexican government by making additional investigative and forensic

27   resources available to assist in locating the missing students."); Letter from Sixty-Nine

28   Representatives, to the Hon. John Kerry, Sec'y of State (Aug. 9, 2016) https://perma.cc/LER9-

DADU (urging "the United States' ongoing engagement with the Government of Mexico on this case" in order "to discover[] what happened to the 43 students and hold[] the perpetrators accountable.").  For example, Sen. Ben Cardin, the ranking member of the Senate Committee on Foreign Relations, issued a statement on the second anniversary of the Ayotzinapa disappearance, "calling upon the State Department and our Embassy in Mexico City to use their diplomatic discussions with the Mexican government to offer all relevant assistance" on the matter and noting that the United States "must stand ready to support of our Mexican partners as they pursue justice in these critical cases, which have touched the lives of too many Mexicans and, in turn, our constituents here in the United States." *Cardin Calls for Justice on 2nd Anniversary of Mexican Students' Disappearance*, U.S. SENATE COMM. ON FOREIGN RELATIONS (Sept. 29, 2016) https://perma.cc/VUF3-UFRS.  Congress has continued to request briefings on the disappearance and highlight its importance, addressing the disappearance as recently as September 2020.  *See, e.g.*, Congressman Alan Lowenthal, *Congressman Lowenthal and Seven House Colleagues Call for Truth and Justice on the 6th Anniversary of Mexican Students' Disappearance* (Sept. 25, 2020) https://perma.cc/P3ZL-MVJX; Congressman Norma Torres, *Congressional briefing on disappeared Mexican students peers into Mexican government investigation* (May 26, 2016) https://perma.cc/J54K-XNYP.

### C.  The United States' Mutual Legal Assistance Treaty with Mexico.

Since 1977, the United States has entered into Mutual Legal Assistance Treaties ("MLATs") with other nations with the intent of formalizing a "variety of mechanisms for cooperation in criminal matters" between countries.  Bruce Zagaris & Jessica Resnick, *The Mexico-U.S. Mutual Legal Assistance in Criminal Matters Treaty: Another Step Toward the Harmonization of International Law Enforcement*, 14 ARIZ. J. INT'L & COMP. LAW 1, 6 (1997).

The United States maintains one such bilateral treaty with Mexico, which was made effective in 1991.  *Id.* at 23.  As stated in the President's transmitting message to the Senate, the purpose of this MLAT is to "counter more effectively trans-border criminal activities."  Mutual Legal Assistance Cooperation Treaty with Mexico, U.S.-Mex., Dec. 9, 1987, S. Treaty Doc. No. 100-13, 1987 WL 890783 at *1 [hereinafter MLAT].  This MLAT "provides a broad range of cooperation in criminal

matters including but not limited to the taking of testimony or statements of witnesses and the provision of documents, records and evidence." *United States v. Marquez*, No. 10CR3044 WQH, 2012 U.S. Dist. LEXIS 12429, at *13–*14 (S.D. Cal. Feb. 2, 2012).  It also "provides that the government of one nation may request the assistance of the other nation on a broad range of matters related to the 'investigation, prosecution, and prevention of crimes.'" *Id.* at *14 (quoting MLAT art. 1 § 1).  To make an MLAT request, a party must, in writing, provide "the following data":

> a) the name of the competent authority conducting the investigation, prosecution or proceeding to which the request relates;
> b) the subject matter and nature of the investigation, prosecution or proceeding;
> c) a description of the evidence or information sought or the requested acts of assistance;
> d) the purpose for which the evidence, information, or other assistance is sought; and
> e) the method of execution to be followed.

MLAT art. 4 § 2.

The United States Government has disclosed requests that it has made pursuant to the MLAT on a number of occasions.  For example, on July 19, 2004, the American Embassy in Mexico sent a cable to the Department of State that discusses collaboration between the United States and Mexican Governments in their efforts to reduce human trafficking and references a request made pursuant to the MLAT.  (*See* Ex. 1 (2004 Cable) [Doc. # 29-4] at 1.)  This cable, which has been declassified and which was obtained pursuant to FOIA, notes that an MLAT request made by federal prosecutors was in the process of being approved.  (*Id.* at 3 ("[P]rosecutors were not able to speak with the victims on their first trip to Mexico . . . [as a] result of showing up to speak with the victims before their MLAT request was actually approved by the Office of the Attorney General (PGR) and SRE.").)  A declassified May 6, 2011 cable from the Secretary of State goes into considerable detail about another MLAT request by the United States Government.  (*See* Ex. 2 (2011 Cable) [Doc. # 29-4] at 1.)  The cable identifies various documents such as "sworn declarations" of four named defendants in a United States criminal matter "that were provided to the United States in response to a Mutual Legal Assistance Treaty request."  (*Id.* at 2.)

The United States has also disclosed requests made by counterpart nations pursuant to Mutual Legal Assistance Treaties, including Mexico under the Mexican MLAT.   For example,

- On June 21, 2010, the American Embassy in Mexico sent a since-declassified cable to the Secretary of State that described "a meeting . . . regarding the June 7 death of [a] Mexican teenager . . . who was killed after a U.S. CBP agent at the El Paso - Ciudad Juarez border fired his service gun" and that stated the Mexican Government "has filed a request for information and evidence under the [MLAT] and continues to stress the "urgent need" for information, such as the identity of the CBP agent, and in particular footage of the event which they understand that CBP has in its possession."  (Ex. 3 (2010 Cable) [Doc. # 29-4] at 1.)  That cable further discussed an inquiry "about the timeframe for DOJ to respond to [the Mexican Procuraduria General de la Republica's] request under our MLAT agreement for information in regards to the incident," noted that the "Embassy understands an MLAT request has in fact been received by DOJ." (*Id.*)

- In 1997, the American Embassy in Switzerland described the Swiss Attorney General's plan to travel to Texas "to conduct interviews authorized by the Department of Justice, pursuant to a Mutual Legal Assistance Treaty Request" related to an investigation of the family of a former Mexican president.  (Ex. 4 (Switzerland Cable) [Doc. # 29-4] at 1.)

- In 2004, the American Embassy in Honduras sent a cable stating that the "Honduran Public Ministry requested information from the U.S. authorities by means of an MLAT (Mutual Legal Assistance Treaty) to substantiate their claim" certain assets that it had seized were "derived from illegal activities."  (Ex. 5 (Honduras Cable) [Doc. # 29-4] at 1.)

- More recently, in 2010, an officer with the State Department's Office of Children's Issues sent correspondence referencing MLAT requests handed from the Guatemalan Government to then-Secretary of State Clinton:

  > [T]he former First Lady of Guatemala handed Secretary Clinton a packet containing adoption files and copies of MLAT requests for three children adopted by American citizen parents and living in the U.S. who are now alleged by Guatemalan women to be their abducted children. As a result of these allegations, Cl/ Adoption, PRI, L/CA and the Guatemalan desk officer have met with Guatemalan Embassy officials to discuss the requests for DNA samples. DOJ has the lead and has met but not yet responded to this request.

(Ex. 6 (Guatemala E-mail Correspondence) [Doc. # 29-4] at 13–14.)

### D.    The MLAT Requests Following the 2014 Ayotzinapa Incident.

Over the course of its investigation into the Ayotzinapa disappearance, the Mexican Government has disclosed that it requested United States assistance pursuant to the MLAT.  The Mexican Government released this information on an official website, publishing a case file containing a copy of the Mexican Government's "Procedural Agreement Ordering Documentation to be Submitted to Request International Legal Assistance from the United States Department of Justice" in "relation to the investigation of the acts against the students of the Raúl Isidro Burgos Rural Teachers' School of Ayotzinapa," which is dated September 12, 2016, and signed by a member

of the Public Ministry of Mexico.  (Ex. 7 (Mexico MLAT Procedural Agreement) [Doc. # 29-4] at 2, 10.)  That agreement expressly references "article 1 point 1, and point 4, article 4 of the Cooperation Treaty between Mexico and the United States of America regarding Mutual Legal Assistance."  (*Id.*)  The agreement is accompanied by a letter from a Mexican public minister to the Legal Attaché of the United States Federal Bureau of Investigation on the subject of a "Request for Collaboration."  (*Id.* at 7, 15.)  In addition to these records, correspondence sent on June 16, 2017, from the Mexican Prosecutor's Office of Legal and International Affairs to the United States Department of Justice makes clear references to "request[s] . . . based on Articles 1, numerals 1 and 4 and subsection b); 2 and 4, numerals 1, 2, and 10 of the Cooperation Treaty between Mexico and the United States of America regarding Mutual Legal Assistance."  (Ex. 8 (Mexico MLAT Correspondence) [Doc. # 29-4] at 28, 56, 85, 113.)

### E.   The Center for Investigative Reporting's FOIA Requests.

On June 9, 2020, The Center for Investigative Reporting's staff reporter Anayansi Diaz-Cortes submitted four FOIA requests related to the Ayotzinapa disappearance.  (*See* Exs. A (Crim. Div. Request), E (DEA Request), H (EOUSA Request), I (State Dep't Request) to Compl. [Doc. # 1-1].)  The requests were filed by Plaintiffs to merely identify whether the United States and Mexican government responded quickly and efficiently to this matter of public interest. The requests were submitted to the Department of Justice's Criminal Division, the Department of Justice's Drug Enforcement Administration ("DEA"), the Department of State, and the Department of Justice's Executive Office for United States Attorneys ("EOUSA").  (*See id.*)  Each request sought:

> [A]ll records related in whole or in part to a request for assistance from the Mexican government - whether by the Mutual Legal Assistance Treaty (MLAT), letter rogatory, or some other diplomatic communication - regarding the criminal case "United States of America v. Pablo Vega Cuevas et al." (14 CR 705).

> We seek documents and communications created during the period of March 1, 2015, to April 1, 2018, that pertain to Mexico's interest in accessing information obtained in the course of the Vega investigation.

> . . .

> [T]his FOIA request concerns . . . whether Mexico could have access to the [United States] material for its own, internal law enforcement purposes.

1   (*See id.* at 1.)

2       The Department of Justice's Criminal Division responded first, denying the request on June

3   24, 2020.  (*See* Ex. B (Crim. Div. Resp.) to Compl. [Doc. # 1-1].)  The Criminal Division declined

4   to do a search for the records, concluding that "disclosure of law enforcement records concerning an

5   individual could reasonably be expected to constitute an unwarranted invasion of personal privacy"

6   and that the records were thus categorically exempt under 5 U.S.C. § 552(b)(7)(C).  (*Id.* at 1.)  The

7   Criminal Division did not cite Exemption 3 as a basis for its denial.  (*See id.*)  CIR appealed this

8   denial to the Office of Information Policy ("OIP") on July 7, 2020, arguing that "[b]ecause no

9   cognizable privacy harm exists in this case, DOJ has improperly issued a *Glomar* response based on

10  Exemption 7(C)."  (*See* Ex. C (Crim. Div. Appeal) to Compl. [Doc. # 1-1].)  The OIP denied CIR's

11  appeal on July 9, 2020.  (*See* Ex. D (Crim. Div. Appeal Resp.) to Compl. [Doc. # 1-1].)

12      The DEA sent its response on July 30, 2020.  (*See* Ex. F (DEA Resp.) to Compl. [Doc. # 1-

13  1].)  This DEA response was substantially similar to that of the Criminal Division, stating that, "[t]o

14  the extent that non-public responsive records exist, without consent, proof of death, or an overriding

15  public interest, disclosure of law enforcement records concerning an individual could reasonably be

16  expected to constitute an unwarranted invasion of personal privacy" under 5 U.S.C. § 552(b)(7)(C).

17  (*Id.*)  CIR appealed the DEA denial to the OIP on August 13, 2020.  (*See* Ex. G (DEA Appeal) to

18  Compl. [Doc. # 1-1.)  The OIP affirmed the DEA's denial on September 22, 2020.  (*See* Ex. D (DEA

19  Appeal Resp.) to Hertel Decl. [Doc. # 24-4].)

20      On September 23, 2020, CIR initiated this FOIA action.  (*See* Compl. [Doc. # 1].)  CIR sought

21  review of its Criminal Division and DEA requests, having exhausted the administrative appeals

22  process.  (*Id.* ¶¶ 4, 6.)  CIR also sought review of its requests to the Department of State and EOUSA

23  on the basis that they had been constructively denied, as more than twenty days had passed from the

24  date of the request without a determination from either entity.  (*Id.* ¶ 5.)

Following the initiation of this litigation, CIR received additional correspondence from the custodian agencies.  On March 3, 2021, the Criminal Division issued a "supplemental final response," asserting for the first time that "this Office has decided to neither expressly confirm nor deny the existence of such records pursuant to Exemptions 3, which concerns matters specifically exempted from release by statute, including, in this instance, the Mutual Legal Assistance Treaty with Mexico."  (Ex. 9 (Crim. Div. Suppl. Resp.) [Doc. # 29-4] at 1.)  The DEA also justified its position by relying on 5 U.S.C. §§ 552(b)(6) and (b)(7)(C), taking the position that "acknowledg[ing] the existence of law enforcement records on another individual could reasonably be expected to constitute an unwarranted invasion of personal privacy."  (*Id.*)

On March 4, 2021, CIR received a determination from the Department of State that it was "unable to provide any information in response to your request," as the "fact of the existence or non-existence of [the requested] records" was "exempt from disclosure under Exemption 3 . . . [and] Exemptions 6 and 7(C)" of the FOIA.  (Ex. 10 (State Resp.) [Doc. # 29-4] at 1.)

In December 2020, CIR was separately informed that the EOUSA considered the matter to be closed and that it believed that it had effectively communicated its determination to Ms. Diaz-Cortes.  (Diaz-Cortes Decl. [Doc. # 29-2] ¶ 8.)  However, she was unable to locate any e-mail or postal correspondence from the EOUSA beyond a "generic confirmation" receipt from June 9, 2020.  (*Id.* ¶ 9.)  Ms. Diaz-Cortes, who had not previously registered for FOIAOnline account, then searched the database using her EOUSA tracking number.  (*Id.* ¶ 10.)  Ms. Diaz-Cortes discovered, for the first time, that the EOUSA had closed her request June 11, 2020, on the basis that the records were not "[r]easonably [d]escribed."  (Ex. 11 (EOUSA FOIAOnline Portal) [Doc. # 29-4].)[1]

Plaintiffs now clarify that their request is narrowed to the subject headings and the dates of the responsive documents.  Although the use of FOIA materials is irrelevant to the propriety of

---

[1] The FOIAOnline Portal reveals no further information beyond the fact of closure.  The more detailed message appended to the Smith Declaration (*see* Ex. F (EOUSA Message) to Smith Decl. [Doc. # 23-6] at 3–4) does not appear on the FOIAOnline Portal.

disclosure, Plaintiffs share that this material is necessary to confirm whether the United States swiftly aided Mexico in response to this incident. *See North v. Walsh*, 881 F.2d 1088, 1096 (D.C. Cir. 1989) ("In sum, [the FOIA requester's] need or intended use for the documents is irrelevant.").

### III.    LEGAL STANDARD

"Most FOIA cases are resolved by the district court on summary judgment, with the district court entering judgment as a matter of law." *Animal Legal Def. Fund v. United States FDA*, 836 F.3d 987, 989 (9th Cir. 2016).  "The Ninth Circuit employs its usual summary judgment standard in FOIA cases." *Langton v. United States Dep't of Homeland Sec.*, No. CV-20-00099-PHX-JZB, 2020 U.S. Dist. LEXIS 143622, at *4 (D. Ariz. Aug. 11, 2020).  Thus, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled as to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "District Court decisions in FOIA cases must provide statements of law that are both accurate and sufficiently detailed to establish that the careful de novo review prescribed by Congress has in fact taken place." *Van Bourg, Allen, Weinberg & Roger v. N.L.R.B.*, 656 F.2d 1356, 1358 (9th Cir. 1981) (quotation omitted).

FOIA's "basic purpose reflect[s] a general philosophy of full agency disclosure unless information is exempt[] under clearly delineated statutory language." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976) (citations and quotations omitted).  FOIA exemptions are interpreted narrowly.  *Lahr v. NTSB*, 569 F.3d 964, 973 (9th Cir. 2009).  The agency "bears the burden of demonstrating that the exemption properly applies," *id.*, and must show more than "substantial evidence[,]" *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989).  Rather, the agency must demonstrate that withheld information is "clearly exempt," *Birch v. USPS*, 803 F.2d 1206, 1209 (D.C. Cir. 1986) (quotation and citation omitted).  Although the agency may meet its burden by providing clear, factual, and specific declarations, *see Lane v. Dep't of the Interior*, 523 F.3d 1128, 1135–36 (9th Cir. 2008), conclusory and generalized allegations are insufficient.  FOIA claims are reviewed *de novo* by the court.  *Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).  While courts must provide some deference to agency expertise, *see id.*, "deference is not equivalent to acquiescence," *Campbell v. DOJ*, 164 F.3d 20, 30 (D.C. Cir. 1998).

## IV.   ARGUMENT

### A.   A *Glomar* Response is Improper Where Underlying Exemptions Do Not Apply.

"*Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information." *Roth v. DOJ*, 642 F.3d 1161, 1178 (D.C. Cir. 2011) (citation omitted).  This judge-made exception is "permitted only when confirming or denying the existence of records would itself **cause harm cognizable under a FOIA exception**." *Hamdan v. DOJ*, 797 F.3d 759, 779 n.6 (9th Cir. 2015) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)) (alteration omitted and emphasis added).  "In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374.

As is standard in FOIA actions, an agency asserting a *Glomar* response **bears the burden of proving that an underlying exemption applies in the first instance**. *See ACLU v. DOJ*, 418 F. Supp. 3d 466, 471 (N.D. Cal. 2019).  A *Glomar* response is "justified only in unusual circumstances, and only by a particularly persuasive affidavit[,]" *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016), attesting that "in that rare situation" confirming or denying "would 'cause harm cognizable under a FOIA exception,'" *Bartko v. DOJ*, 898 F.3d 51, 63–64 (D.C. Cir. 2018) (quoting *Roth*, 642 F.3d at 1178); *accord Pickard v. DOJ*, 653 F.3d 782, 785–86 (9th Cir. 2011).  These "extraordinary response[s] can be justified only when the confirmation or denial of the existence of responsive records, would, in and of itself, reveal *exempt information*."  DOJ, *FOIA Update: OIP Guidance: Privacy "Glomarization"* (Jan. 1, 1986) https://perma.cc/NU96-DS2F (emphasis added).

Here, Government cannot carry its burden of showing that *Glomar* applies, because "disclosure would not cause any harm under the FOIA exemption invoked." *Elec. Frontier Found. v. DOJ*, 384 F. Supp. 3d 1, 11 (D.D.C. 2019); *see also Citizens for Responsibility & Ethics in Wash. v. DOJ* ("*CREW*"), 746 F.3d 1082, 1091 (D.C. Cir. 2014).  Exemption 3 does not apply because the Mexican government did not keep its request confidential, and Exemptions 6 and 7(C) do not apply because CIR does not seek any private or identifying information.

**1.     Exemption 3 Does Not Apply Because Disclosure Does Not Contravene the MLAT Treaty, Where the Fact of the Requests is Not Confidential.**

Exemption 3 allows an agency to withhold information "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3).  This inquiry requires the Court to "determine: (1) whether there is a statute within the scope of Exemption 3; and (2) whether the requested information falls within the scope of such a statute." *CIA v. Sims*, 471 U.S. 159, 167 (1985).  Courts must first ask "whether the statute identified by the agency is a statute of exemption within the meaning of Exemption 3." *Hamdan*, 797 F.3d at 776; (*citing Sims*, 471 U.S. at 167).  "If so, courts assess 'whether the withheld records satisfy the criteria of the exemption statute.'" *Ctr. for Investigative Reporting v. DOJ*, 982 F.3d 668, 679 (9th Cir. 2020) (quoting *Hamdan*, 797 F.3d at 776).  As to this central question of scope, the ambit of an exemption must be construed *narrowly*, given FOIA's "dominant objective" of "disclosure, not secrecy." *Rose*, 425 U.S. at 361.  Accordingly, courts have generally refused to draw expansive "veil[s] of secrecy" covering all records connected to a withholding statute. *Senate of Puerto Rico v. DOJ*, 823 F.2d 574, 582 (D.C. Cir. 1987).

Here, the requested records are outside the scope of the MLAT, because the Mexican Government—which the treaty's confidentiality provision seeks to protect—has waived its confidentiality by publicly disclosing the existence of its MLAT request.[2] *See Mobil Oil Corp. v. EPA*, 879 F.2d 698, 700 (9th Cir. 1989) ("Voluntary disclosure of documents, either in whole or in part, to third parties has sometimes been held to waive FOIA exemptions for those documents."); *see also Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (explaining that, in the Exemption 4 context, disclosure is required where a third party that holds the confidentiality privilege has waived it by publicizing the requested information).  According to the plain language of the Treaty, the MLAT provisions do not apply where confidentiality has been broken.

Under Article 4, Section 5 of the U.S.-Mexico MLAT, T.I.A.S. 91-503, "[t]he requested State shall **keep** confidential a request and its contents unless otherwise authorized by the Coordinating

---

[2] While "Exemption 3 is explicitly confined to materials exempted from disclosure 'by statute,'" *Founding Church of Scientology v. Bell*, 603 F.2d 945, 952 (D.C. Cir. 1979), and while the question of whether "materials received through an MLAT qualify under Exemption 3 has not been widely analyzed," *Grynberg*, 302 F. Supp. 3d at 539, Plaintiffs concede the MLAT Treaty qualifies as a statute, as the Ninth Circuit has found a ratified self-executing treaty generally "stands on the same footing as a federal statute," *In re Search of the Premises Located*, 634 F.3d 557, 568 (9th Cir. 2011).

Authority of the requesting Party" (emphasis added).[3]  This language, on its face, requires the requesting state maintain the secrecy of its MLAT request for the provision to apply.  Common dictionary definitions of the word "confidential" also support this plain reading of the provision.  *See, e.g.*, Webster's Third New International Dictionary 476 (1961) ("known only to a limited few" or "not publicly disseminated"); Black's Law Dictionary 370 (rev. 4th ed. 1968) ("intended to be held in confidence or kept secret").  Moreover, hornbook principles in other areas of law also support the notion that information must be kept secret to qualify as "confidential," and that confidentiality is lost once the information is shared.  *See Argus Leader*, 139 S. Ct. at 2635 (2019) ("[I]t is hard to see how information could be deemed confidential *if its owner* shares it freely." (emphasis added)); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."); *Pac. Pictures Corp. v. U.S. Dist. Court*, 679 F.3d 1121, 1126–27 (9th Cir. 2012) (noting that there are "several ways by which parties may waive the [confidentiality] privilege" including "voluntarily disclosing privileged documents to third parties will generally destroy the privilege" in the attorney-client context).

This interpretation is further supported by the fact that courts have repeatedly stated that the scope of a statute must be construed *narrowly* given the FOIA's "dominant objective" of "disclosure, not secrecy."  *Rose*, 425 U.S. at 361.  "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue [is] the inclusion of the withheld material within the statute's coverage."  *Bloomer v. U.S. Dep't of Homeland Sec.*, 870 F. Supp. 2d 358, 365 (D. Vt. 2012) (quoting *Wilner v. NSA*, 592 F.3d 60, 72 (2d Cir. 2009)).  Here, the Treaty clearly states that "[t]he requested State ***shall* keep confidential"** the MLAT records for its protections to apply, which the Mexican Government has plainly not done.

In this instance, the Mexican Government has waived its confidentiality under the MLAT because it has publicly disclosed its September 12, 2016 request, releasing a copy of the "Procedural Agreement Ordering Documentation to be Submitted to Request International Legal Assistance from the United States Department of Justice" in "relation to the investigation of the acts against the

---

[3] Here, the United States is the "requested party" and Mexico is the requesting party.

students of the Raúl Isidro Burgos Rural Teachers' School of Ayotzinapa." (Mexico MLAT Procedural Agreement at 2, 10.) This constitutes a clear waiver of confidentiality, thus foreclosing the applicability of the MLAT's confidentiality provision to CIR's FOIA request.

The only two other cases interpreting MLAT Treaties as applied to FOIA requests support this interpretation by implication. For instance, in *Dongkuk International, Inc. v. United States Department of Justice*, 204 F. Supp. 3d 18 (D.D.C. 2016), the court affirmed the DOJ's denial of MLAT material on the basis that the requesting state, South Korea, specifically asked that the United States keep the information confidential, under a similar provision to the provision in the Mexican MLAT. There, the Court noted that the U.S.–Korea MLAT was adopted with understanding that it required the "United States to use its 'best efforts' to maintain confidentiality." *Id.* at 28. Similarly, in *Grynberg v. United States Department of Justice*, 302 F. Supp. 3d 532 (S.D.N.Y. 2018), the Court noted that "Switzerland produced these documents pursuant to the MLAT's confidentiality provisions, with an understanding that they would not be used in other proceedings or produced in response to FOIA requests. It also included an application requesting they be kept private, as shown through the cover letters." *Grynberg*, 302 F. Supp. 3d at 540.

Here, in contrast, the Mexican Government has not acted with similarly careful levels confidentiality, but has instead shared the fact of its request publicly by publishing its Ayotzinapa investigation file on a government website. *See* Fiscalía General de la República, *supra*. Not only does the published investigation file acknowledge the Mexican Government's efforts to obtain relevant information from the United States Government through the MLAT, it actually contains a copy of the MLAT request at issue in this FOIA action. (*See* Mexico MLAT Procedural Agreement at 2, 10.) Additionally, correspondence sent on June 16, 2017, from the Mexican Prosecutor's Office of Legal and International Affairs to the United States Department of Justice makes clear references to "request[s] . . . based on Articles 1, numerals 1 and 4 and subsection b); 2 and 4, numerals 1, 2, and 10 of the Cooperation Treaty between Mexico and the United States of America regarding Mutual Legal Assistance." (Mexico MLAT Correspondence at 28, 56, 85, 113.)

Where the existence of materials is no longer kept confidential by the requesting party, the fact that such materials exist does not fall under the scope of the MLAT's secrecy requirements

because the Treaty's confidentiality provision is inapplicable.   Accordingly, such materials are outside of the scope of Exemption 3 and must be disclosed by the United States Government.

### 2. Exemptions 6 and 7(C) Do Not Apply Because Plaintiffs Agree to Substantial Redaction.

Exemptions 6 and 7(C) both exempt the release of records which would constitute an invasion of personal privacy.  *See* 5 U.S.C. §§ 552(b)(6), (b)(7)(C).  Exemption 6 covers "personnel and medical files and similar files," where disclosure "would constitute a *clearly* unwarranted invasion of personal privacy."  *Id.* § 552(b)(6) (emphasis added).  "[A]n agency's burden under Exemption 6 . . . is an 'onerous' one."  *Lawyers' Comm. For Civil Rights v. Dep't of the Treasury*, 2008 WL 4482855, at *19 (N.D. Cal. Sept. 30, 2008) (quoting *FBI v. Abramson*, 456 U.S. 615, 629 (1982)). Exemption 7(C) covers "records or information compiled for law enforcement."  *Id.* § 552(b)(7)(C).[4] In enacting 7(C), Congress adopted Exemption 6's language such that the privacy inquiries "under Exemptions 6 and 7(C) are 'essentially the same.'"  *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 96 n.1 (D.D.C. 2009) (quoting *Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1125 (D.C. Cir. 2004)).[5]  In considering whether Exemptions 6 and 7(C) apply, courts consider: "(1) the plaintiff's interest in disclosure; (2) the public interest in disclosure; (3) the degree of the invasion of personal privacy; and (4) the availability of any alternate means of obtaining the information." *Dobronski v. Fed. Commc'n Comm'n*, 17 F.3d 275, 278 (9th Cir. 1994).

#### (a) The Privacy Interests Are *De Minimis* Because Plaintiffs Request Heavily Redacted Documents.

Exemptions 6 and 7(C) only "protect intimate details of personal and family life."  *Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980) (discussing Exemption 6).  The Government asserts that because the "Requests seek not only requests from Mexico for assistance under the U.S.-Mexico MLAT, but also any other 'request for assistance from the Mexican government . . . regarding the

---

[4] CIR concedes that the requested records were "compiled for law enforcement purposes," thus satisfying this baseline requirement of Exemption 7.  5 U.S.C. § 552(b)(7).

[5] While Exemptions 6 and 7(C) are essentially the same, the main distinction is the standard of review.  Exemption 6 protects against a "clearly unwarranted" invasion of privacy, while Exemption 7(C) requires agencies only demonstrate disclosure "could reasonably" invade privacy.  *Reporters Comm.*, 489 U.S. at 756–57.

criminal case' *Pablo Vega Cuevas*, such as requests for assistance by 'letter[s] rogatory' or 'some other diplomatic communication[s],'" that Exemptions 6 and 7(C) justify withholding.  (Gov't Br. at 13.)  The Government continues that "[g]overnment records containing information that applies to particular individuals satisfy the threshold test of Exemption 6."  (*Id*. at 14.)

However, here, there is no privacy factor at issue because CIR does not seek *any* material containing individuals' private information, but instead merely reveals government action.  **To be clear, CIR has narrowed its request and only seeks fully redacted documents responsive to the request with the limited exception that the subject heading and the date of the records be disclosed**.  Given that the only material disclosed would be blacked-out documents with subject headings and dates revealed, there is no reason that the information sought here would disclose intimate details of an individual defendant's life, triggering Exemptions 6 and 7(C).  Such heavily redacted documents are still materially important to CIR and the public because they show when the U.S. Government was in communication with foreign authorities around these matters permitting the public to hold the U.S. Government accountable over whether it responded to the MLAT request.

Here, all Plaintiffs seek is the subject and the date of the requested records, obviating any privacy concerns.

### (b)     Any *De Minimis* Privacy Concerns are Outweighed by the Immense Public Interest in Disclosure.

Even assuming *arguendo* that a *de minimis* privacy concern exists, it is outweighed by the immense public interest in the largely redacted documents (excluding the subject heading and date).  The Government flatly states that "[e]ven if a public interest existed here, which it does not, it would not outweigh the weighty privacy of the *Pablo Vegas Cuevas* defendants."  (Gov't Br. at 21.)  This statement is too glib, given that knowledge of if and when the United States Government responded to the Mexican Government's MLAT is information vital to public accountability, which is why CIR is conducting an investigation about this matter.

As the Ninth Circuit has stated, the interest in disclosure is paramount where it could shed light on why the Government takes certain actions.  *See EFF v. ODNI*, 639 F.3d 876, 886 (9th Cir. 2010) (explaining that courts "typically find in favor of disclosure" in cases involving efforts to influence the Government to adopt a policy or action); *Castaneda v. United States*, 757 F.2d 1010,

-17 -

1012 (9th Cir. 1985) (public interest in disclosure of investigator's name where doing so would "ensur[e] both the integrity and reliability" of investigations); *see also Dep't of State v. Ray*, 502 U.S. 164, 178 (1991) (public interest in "knowing whether the State Department has adequately monitored Haiti's compliance with its promise not to prosecute returnees"); *Stern v. F.B.I*, 737 F.2d 84, 92 (D.C. Cir. 1984) (public interest "in knowing how public employees are performing their jobs"); *CREW*, 746 F.3d at 1093 (public interest "in the manner in which the DOJ carries out substantive law enforcement policy").

Here, the public interest in government accountability clearly outweighs any reasons for withholding the heavily redacted materials. Various public sources have questioned what the United States and Mexican governments' responses were to the disappearance of the 43 students in Iguala, Mexico. *See supra* Section II.B. Any possible privacy interest that exists in the disclosure of redacted documents that reveal substantive information regarding the U.S.-Mexico dialogue or the activities of the Guerreros Unidos is clearly outweighed by the substantial public interest in the minimal information that would show when the two governments were in communication about a case that had international public attention. Moreover, disclosure would advance an important public interest in showing that the United States is complying with its treaty obligations and cooperating with international investigations that themselves may touch the United States interests.[6] The very limited information requested by CIR would only show that the United States was acting in a timely fashion, ensuring our governors are kept accountable. *See Reporters Comm.*, 489 U.S. at 773 (explaining "[o]fficial information that sheds light on an agency's performance" merits disclosure).

## B.   *Glomar* is Improper Where There is Official Acknowledgment.

Alternatively, an agency may not issue a *Glomar* response "when an agency has officially acknowledged otherwise exempt information through prior disclosure." *Poulsen v. DOD*, 373 F. Supp. 3d 1249, 1267 (N.D. Cal. 2019) (citation omitted). "In other words, 'when information has been "officially acknowledged," its disclosure may be compelled even over an agency's otherwise

---

[6] This interest—which concerns foreign affairs with an ally and focuses on an internationally significant incident—is more akin to the public interest at stake in *CREW*, where the "documents sought concerned . . . [a] wide-ranging investigation," than the public interest asserted in *Anguiano v. United States Immigration and Customs Enforcement*, No.18-cv-01782-JSC, 2018 U.S. Dist. LEXIS 193479, *31–32 (N.D. Cal. Nov. 13, 2018), which was to "shed light on [a] specific incident."

1  valid exemption claim.'" *ACLU v. CIA*, 710 F.3d 422, 426–427 (D.C. Cir. 2013) (quoting *Wolf*, 473

2  F.3d at 378).   "In the *Glomar* context, the 'specific information' at issue is not the contents of a

3  particular record, but rather 'the existence *vel non*' of any [responsive] records.  *Id.* at 427 (quoting

4  *Wolf*, 473 F.3d at 379).

5      Moreover, an "official acknowledgement can occur directly or indirectly, the latter occurring

6  when the 'substance of an official statement and the context in which it is made permits the

7  inescapable inference that the requested records in fact exist.'"  *Open Soc'y Justice Initiative v. CIA*,

8  2020 U.S. Dist. LEXIS 230260, at *12 (S.D.N.Y. Dec. 8, 2020) (quoting *James Madison Project v.

9  DOJ*, 302 F. Supp. 3d 12, 22 (D.D.C. 2018)).  "A Court can simply infer from an agency's repeated

10  public statements about a government program that the agency possesses at least some documents

11  related to that program."  *Id.*  Accordingly, a plaintiff "can overcome a *Glomar* response by showing

12  that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records,

13  since that is the purportedly exempt information that a *Glomar* response is designed to protect."

14  *ACLU*, 710 F.3d at 427.  To satisfy the official acknowledgment test, the plaintiff need only show

15  that 1) "prior disclosure establishes the existence (or not) of records responsive to the FOIA request"

16  where the "'information requested . . . [is] as specific as the information previously released,'" and

17  2) "'information requested must already have been made public through an official and documented

18  disclosure.'"  *James Madison Project*, 302 F. Supp. 3d at 20 (quoting *Fitzgibbon v. CIA*, 911 F.2d

19  755, 765 (D.C. Cir. 1990)) (clarifying that "in the *Glomar* context, the first and second prongs of

20  *Fitzgibbon* merge into one and the third prong continues to operate independently").

21      The official acknowledgment test is satisfied here, as Mexico itself has specifically disclosed

22  the MLAT request at issue here, Congress has referenced providing investigative aid to Mexico, and

23  the United States has otherwise repeatedly acknowledged past MLAT requests.

24      **1.    The Mexican Government and Members of the U.S. Congress Have
        Acknowledged Collaboration on the Ayotzinapa Investigation**.

25

26      Here, the requirements of the *Fitzgibbon* test are satisfied by Mexico's prior and official

27  disclosure of its MLAT request and by the repeated references made by members of Congress to the

28  United States' cooperation with Mexico on the Ayotzinapa disappearance.  From these "repeated

-19-

public statements," Court can more than "infer" that the U.S. Government "possesses at least some documents" related to that MLAT request, *Open Soc'y*, 2020 U.S. Dist. LEXIS 230260, at *12; *see also supra* Part IIB (discussing Mexican Government's repeated acknowledgment of its submission of an MLAT request on this very subject).

Indeed, the Mexican Government has released the September 12, 2016 "Procedural Agreement Ordering Documentation to be Submitted to Request International Legal Assistance from the United States Department of Justice" in "relation to the investigation of the acts against the students of . . . Ayotzinapa" on a public website.  (Mexico MLAT Procedural Agreement at 2, 10.) This is as an official a disclosure as any that Mexico made an MLAT request to the United States.

Moreover, members of Congress have frequently discussed providing support to Mexico in its Ayotzinapa investigation.  First, in 2016 sixty-nine members of the U.S. House of Representatives urged "the United States' ongoing engagement with the Government of Mexico on this case."  Letter from Sixty-Nine Representatives, *supra*.  Just two years later, in a 2018 letter signed Vice President Mike Pence ahead of his visit with President Andrés Manuel López Obrador, four Senators wrote, "We believe that U.S. investigative and financial support for these initiatives [including the Ayotzinapa incident] can be beneficial."  *Ahead of VP Pence Visit to Mexico, Menendez, Leahy, Kaine, and Bennet Encourage U.S. Commitment To Improving U.S.-Mexico Relations*, U.S. SENATE COMM. ON FOREIGN RELATIONS (Nov. 30, 2018) https://perma.cc/HAB7-NN4G.  And in a joint statement in 2020, eight members of Congress stated, "As the Mexican government works to bring answers to the families of the disappeared, we believe U.S. support for these efforts should continue to be a key element of our bilateral cooperation . . . [and] call on our Departments of State and Justice to support Mexican authorities in their work to resolve the case of the 43 students."  Congressman Alan Lowenthal, *supra*.

## 2.   The U.S. Government Has Disclosed Other MLAT Requests.

In addition, the fact that that the United States Government has previously had no issue with disclosing the existence of MLATs further demonstrates that the information that CIR has requested has already "been made public through an official and documented disclosure."  *Fitzgibbon*, 911 F.2d at 765.  Indeed, the Government has routinely disclosed the existence of MLAT requests,

including one from Mexico and others from Honduras, Switzerland, and Guatemala. (*See* 2010 Cable; Honduras Cable; Guatemala Cable; Guatemala E-mail Correspondence.) In addition to acknowledging the existence of these MLAT requests, these disclosures identified the subject and substance of the individual MLAT requests. (*See, e.g.*, 2010 Cable at 1 (Mexican MLAT request regarding the "death of [a] Mexican teenager who was killed after a U.S. CBP agent . . . fired his service gun"); Honduras Cable at 1 (Honduran request concerning seized assets); Switzerland Cable at 1–2 (Swiss MLAT request concerning an investigation into $103 million associated with the family of former Mexican President Salinas de Gotari); Guatemala E-mail Correspondence at 13 (Guatemalan request regarding "three children adopted by American citizen parents and living in the U.S. who are now alleged by Guatemalan women to be their abducted children").) The Government has also disclosed details as to the content of MLAT requests, such as specific requests for DNA samples from minor children, (*see* Guatemala Cable at 13–14), and footage of a fatal shooting by a CPB officer, (*see* 2010 Cable at 1). By the fact of these disclosures, it is self-evident that none of these FOIA requests triggered *Glomar* responses or the assertion of Exemption 3. CIR has otherwise been unable to identify any instance where the Government has issued a *Glomar* response to maintain the absolute confidentiality of an MLAT request.

Notably, the very cases that the Government cites in support of its principal argument—that a *Glomar* response is necessary where a FOIA request involves an MLAT—themselves disclose the existence of such requests. In *Dongkuk*, the Government sought to withhold a "verified copy of portions of a Request for Assistance letter (the 'RFA Letter') sent by the Korean Ministry of Justice to Defendant United States Department of Justice (DOJ) pursuant to an MLAT between the United States and the Republic of Korea." 204 F. Supp. 3d at 20. However, the DOJ did not issue a *Glomar* response to the plaintiffs' FOIA request. Rather, "DOJ lawyers orally advised Plaintiffs' counsel that DOJ could not provide the RFA Letter under the terms of the U.S.-Korea MLAT and DOJ policy and that the letter likely would be subject to FOIA exemptions." *Id.* at 23. When the matter proceeded to litigation, the Government did not deny the request through a *Glomar* response. Instead, the Government acknowledged the existence of the Republic of Korea's MLAT request and only sought to "justify its withholding of the RFA Letter in full or in part." *Id.* at 24–25. *Grynberg*

is similar.  In *Grynberg*, the Government asserted that some of the FOIA-requested documents "'were obtained either from Switzerland via the [Mutual Legal Assistance Treaty with Switzerland (the "U.S.-Swiss MLAT" or "MLAT")],'" and therefore exempt.  302 F. Supp. 3d at 537.  Although *Grynberg* was in a somewhat different posture insofar as it concerned an MLAT request by the United States Government rather than a counterpart, it is still noteworthy that the Government candidly acknowledged that it was in possession of "bank records and BP [British Petroleum records . . . obtained from Switzerland via the MLAT" without resorting to a *Glomar* response.  *Id.* at 539.

Finally, it is important to mention that a contrary conclusion would run afoul of another requirement of *Glomar*: that it only be used "in that rare situation when [confirming or denying] would 'cause harm cognizable under a FOIA exception.'"  *Bartko*, 898 F.3d at 63–64 (quoting *Roth*, 642 F.3d at 1178).  Because the United States Government has generally not understood the disclosure of MLAT requests to cause any cognizable harm and because the Mexican Government itself has publicized that it has sought the United States Government's assistance with the Ayotzinapa matter through the MLAT and disclosed that its request pertained to the *Pablo Vega Cuevas* case, no cognizable harm would occur if the Government were to acknowledge the request's existence.

## C.    CIR's FOIA Request to the EOUSA is Properly Before This Court.

### 1.    CIR's EOUSA Request Reasonably Described the Requested Records.

FOIA provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).  DOJ's FOIA regulations advise requesters to "include specific information that may assist a component in identifying the requested records, such as the date, title or name, author, recipient, subject matter of the record, *case number*, file designation, or reference number." 28 CFR § 16.3(b) (emphasis added).  "Although a requester must reasonably describe the records sought, an agency also has a duty to construe a FOIA request liberally." *Nation Mag. v. U.S. Customs Serv.,* 71 F.3d 885, 890 (D.C. Cir. 1995) (cleaned up); *accord Yagman v. Pompeo*, 868 F.3d 1075, 1080 (9th Cir. 2017) ("[A] duty of liberal construction accords with the basic purpose of FOIA[.]").  Records are reasonably described so long as the description "enable[s] a professional

employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort." *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978) (cleaned up).  "The requirement in § 552(a)(3) . . . is properly viewed as an ingredient of the claim for relief, rather than a question of subject matter jurisdiction."  *Yagman*, 868 F.3d at 1082 (concluding that a request did not "reasonably describe" records but "remand[ing] to the district court with instructions to allow [plaintiff] to reframe his request for documents in light of our holding").

CIR's request to the EOUSA reasonably described the requested records, and accordingly may be considered by this Court.  Contrary to the Government's assertions, (*see* Gov't Br. at 23), CIR did comply with the DOJ's regulations.  CIR stated that it sought records "regarding the criminal case 'United States of America v. Pablo Vega Cuevas et al.' (14 CR 705) . . . created during the period of March 1, 2015, to April 1, 2018."  (EOUSA Request at 1.)  In doing so, CIR provided the subject matter of the record, the specific case number, and a date range, as instructed by 28 CFR § 16.3(b), which satisfies § 552(a)(3)'s reasonable description requirement, read liberally or not.

The Government argues that CIR's request was nonetheless inadequate because it "does not include the judicial district or city in which Pablo Vega Cuevas is or was being handled." (Gov't Br. at 24.)  In making this argument, it elides the difference between DOJ regulations and agency guidance, relying on the DOJ FOIA Reference Guide's recommendation that "requests for United States Attorney records . . . *should* indicate the particular judicial district or city in which the matter was handled."  Office of Information Policy, *DOJ FOIA Reference Guide*, DOJ (Jan. 21, 2020) https://perma.cc/3ELA-YRXM (emphasis added).[7]  This guidance is equivocal, advising only that a requester "should" specify the relevant judicial district rather than mandating that a requester "*must*" or "*shall*" specify that district.  Indeed, requiring such precision would be unduly burdensome for the requester and in fact go against the meaning of "reasonably describe" records within 5 U.S.C. §

---

[7] Guidance "is not binding on the courts." *Graff/Ross Holdings LLP v. Fed. Home Loan Mortg. Corp.*, No. 07-796 (RJL)(AK), 2010 U.S. Dist. LEXIS 141399, at *16 (D.D.C. Aug. 27, 2010); *see also Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) ("For a purported guidance document, the basic question is whether the challenged agency action is best understood as a non-binding action, like a policy statement or interpretive rule, or a binding legislative rule.  Policy statements are binding on neither the public nor the agency[.]" (cleaned up)).

552(a)(3)(A).  Neither that provision of FOIA nor any agency guidelines "be used to obstruct public access to agency records."  S. Rep. No. 93-854, 93d Cong., 2d Sess. 10 (1974).

The Government's position that the records are not reasonably described is particularly over-exacting in that CIR provided the specific caption and docket number for the relevant case.  Surely, this information would have allowed the EOUSA to establish that the relevant jurisdiction was the North District of Illinois.  To argue that a "professional employee of the [EOUSA] who was familiar with the subject area of the request" would not be able "to locate the record with a reasonable amount of effort" would be to take an exceedingly dim view of EOUSA's staff, who presumably are familiar with the basics of the judiciary's record system.  *Marks*, 578 F.2d at 263 (cleaned up).[8]

Accordingly, CIR's request reasonably described the relevant records, and thus the request was entitled to a proper determination from the EOUSA.

### 2.    The EOUSA Failed To Offer a Determination Regarding CIR's FOIA Request, Thus Excusing the Administrative Exhaustion Requirement.

FOIA requires each agency receiving a valid request to "determine within 20 days . . . after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination."  5 U.S.C. § 552(a)(6)(A)(i).  "If the agency does not make a 'determination' within the relevant statutory time period, the requester may file suit without exhausting administrative appeal remedies."  *Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 185 (D.C. Cir. 2013).  "[I]n order to make a 'determination' and thereby trigger the administrative exhaustion requirement, the agency must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse."  *Id.* at 188.

---

[8] The use of a docket number distinguishes this case from *Tooley v. Bush*, No. 06-306 (CKK), 2006 U.S. Dist. LEXIS 92274, at *8–*9 (D.D.C. Dec. 21, 2006), *rev'd and remanded on other grounds Tooley v. Napolitano*, 556 F.3d 836 (D.C. Cir. 2009), where a plaintiff's request to the EOUSA was deemed to be insufficiently descriptive because it broadly sought "all filings, correspondence, [etc.] that refer to . . . Scott Tooley" without providing any information as to a specific case.

-24-

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.

CIR's FOIA request to the EOUSA is properly under this Court's consideration because the EOUSA failed to provide a valid determination within the twenty-day statutory timeframe.  The EOUSA's June 11, 2020 message through the FOIAOnline platform fails to qualify as a determination within the meaning of FOIA because it failed to effectively notify Ms. Diaz-Cortes of the status of her request and because it failed to inform her of her statutory right of appeal.

First, the EOUSA's June 11, 2020 message failed to trigger the administrative exhaustion requirement because it did not effectively "notify" her of the agency's action toward her request, as is required by 5 U.S.C. § 552(a)(6)(A)(i).  Ms. Diaz-Cortes did not receive an e-mail or a physical letter by post informing her of the status of her request.  Rather, she learned in December 2021 that the agency had corresponded with her through the FOIAOnline website, even though she did not have an account registered with that platform.[9]  There is no statutory requirement that a FOIA requester maintain a FOIAOnline account to receive a determination, nor is there any guidance that a requester must establish such an account to receive a determination.  *See generally* 5 U.S.C. § 552; Office of Information Policy, *supra*.  It would be Kafkaesque if an agency were allowed to deny a FOIA request by a sending message that is not reasonably calculated to reach the requester.

Second, even if the June 11, 2020 message had been received, that message did not qualify as a "determination" under FOIA because it did not "inform the requester that it can appeal whatever portion of the 'determination' is adverse." *FEC*, 711 F.3d at 185.  The EOUSA merely notified Ms. Diaz-Cortes that it considered its message to qualify as a "final determination" and stated that her "request for information has been closed."  (EOUSA Message at 4.)  Without a mention of her right to appeal, does not qualify as a determination under 5 U.S.C. § 552(a)(6)(A)(i).  Accordingly, CIR was entitled to treat the request as constructively denied and initiate this action.

## V.    CONCLUSION

For the foregoing reasons, the Government's motion for summary judgment should be denied, and CIR's cross motion for summary judgment should be granted.

[9] Notably, the EOUSA's Attorney-Advisor acknowledges that "sm . . . did not provide for the sending of delivery receipts or read receipts for communications sent via its incorporated e-mail feature," and that he "cannot declare under penalty of perjury that plaintiffs received the EOUSA's response." (Smith Decl. [Doc. # 23] ¶ 12.)

1

2    DATED: April 8, 2021

Respectfully submitted,

3                                          *s/ D. Victoria Baranetsky*
                                           D. Victoria Baranetsky
4                                          Alexandra Gutierrez (*pro hac vice*)
                                           THE CENTER FOR INVESTIGATIVE REPORTING
5                                          1400 65th St., Suite 200
                                           Emeryville, CA 94608
6                                          vbaranetsky@revealnews.org
                                           Telephone: (510) 982-2890
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP. TO DEF'S MOT. SUMM. J.; NOT. OF CROSS MOT. AND CROSS MOT.
SUMM. J.; MEM. IN SUPP. OF CROSS MOT. SUMM. J.