# Exhibit 1

ACTION INL-00

INFO  LOG-00  NP-00  AID-00  AMAD-00  CIAE-00  DODE-00  DOEE-00
WHA-00  DS-00  EB-00  UTED-00  H-00  TEDE-00  INR-00
IO-00  L-00  AC-00  NSAE-00  NSCE-00  OIC-00  PA-00
PER-00  PRS-00  ACE-00  P-00  SP-00  SS-00  STR-00
TEST-00  TRSE-00  FMP-00  ECA-00  DSCC-00  PRM-00  DRL-00
G-00  NFAT-00  SAS-00  /000W
------------------4214B0  192037Z /38
P 192028Z JUL 04
FM AMEMBASSY MEXICO
TO SECSTATE WASHDC PRIORITY 8704
INFO ALL US CONSULATES IN MEXICO COLLECTIVE
AMEMBASSY GUATEMALA

UNCLAS  MEXICO 005572

SENSITIVE

| RELEASED IN FULL |

| DECONTROLLED |

PLEASE PASS TO G/TIP

E.O. 12958: N/A
TAGS: MX, PHUM, PREL
SUBJECT: WORKING SUCCESSFULLY WITH MEXICO TO FIGHT
TRAFFICKING IN PERSONS

REF: A. MEXICO 1877
     B. GUATEMALA 798

| REVIEW AUTHORITY:  Oscar Olson, Senior Reviewer |

1. (SBU) Summary: Mexico has confirmed its desire to work
with the US on the Global Initiative TIP Project. The task
is now to successfully coordinate the details, determining
how and where projects will be implemented. Separately, post
received a document from G/TIP outlining a watch list plan
for Mexico. The watch list plan could be perceived as
offensive to a nation that has been working hard to battle
the scourge of trafficking in persons. We are certain that
if the plan is presented in this manner we will be alienating
an ally in our fight against this terrible crime. The
possibility of providing funding for joint projects to
prevent trafficking in persons is a huge incentive to develop
further our cooperative working relationship and provides
resources to begin to make substantive progress. We urge
G/TIP Director Miller to visit Mexico in the near future to
begin this consultative process on the proposals personally
with GOM officials and NGOs. End summary.

2. (SBU) Ambassador Garza sent a letter on May 13 to Geronimo
Gutierrez, the Undersecretary for North America in the SRE in
which he asked for Mexican support for the TIP funding
initiative and outlined the programs we want to implement.
On June 22, post received a response (copy provided to WHA
and G/TIP) from Gutierrez in which he agreed that Mexico
wanted to work with the U.S. on these projects and confirmed
GOM support for efforts to combat this crime. Gutierrez

noted that Mexico is interested in finding out more about the details of the projects. He emphasized that Mexico wants a say in how and where the programs are implemented (see paragraph 14).

3. (SBU) The Gutierrez letter was drafted after extensive contact between the Embassy and SRE. It was clear to us that SRE was concerned about the U.S. attempting to dictate the terms of cooperative law enforcement projects in Mexico. To ensure the success of these projects, we must frame them in a manner that appears more cooperative and less coercive. Action request: We urge G/TIP Director Miller to visit Mexico in the near future in order to discuss the breadth of the problem, Mexico's efforts thus far, and how our two countries can work together to fight this terrible crime. Embassy Mexico wants to implement the anti-TIP projects in close cooperation with the law enforcement officials and NGOs in Mexico and believes a visit by Director Miller could greatly enhance understanding of our concerns and our desire to work together. End Action Request.

MEXICO: A HISTORY OF COOPERATION IN TIP PROSECUTIONS

4. (U) Mexico has a history of cooperating with the US on trafficking prosecutions. This cooperation has led to prosecutions in the US (reftel A). Also, Mexico is cooperating with a current high-profile prosecution case in New York involving the Carreto sex ring that operated both in Mexico and the US.

5. (U) In 2003, the Federal Preventive Police (PFP) conducted five operations in Acapulco, Mexico City, and the State of Mexico related to trafficking. These operations yielded 24 arrests. Of those, two were trafficking in minors; 20 were part of an international child pornography ring; and another was a distributor of child pornography. Fourteen minors were rescued during these operations. The PFP also has an active cybercrime unit that shut down 200 sites dedicated to child pornography in 2003 (reftel A).

6. (U) In 2004, the GOM cooperated with the US in the prosecutions and convictions of Tim Julian in Indiana and Steven Irving in New York. Both had traveled to Acapulco to engage in sex with minors. One case saw a PFP officer go to the US to testify in court.

7. (U) In January 2004, authorities in the State of Mexico arrested a teacher who committed sexual abuse against some of his students and took pornographic photos of them.

8. (U) In the Spring of 2004, the GOM requested extradition from the United States of Jean Sucar Kuri, a nationalized Mexican citizen, who faces charges in Quintana Roo state courts for operating a Cancun child pornography and child prostitution ring (reftel A). According to Mexican authorities, there could be as many as 700 cases of child

exploitation in the state of Quintana Roo and Succar Kuri's network was apparently a part of that.

9. (SBU) In March of 2004, Mexico signed a memorandum of understanding with Guatemala to protect female and minor TIP victims in both countries (reftel B). This MOU includes pledges to respect the human rights of victims while they are in custody, and promises not to incarcerate TIP victims. They also agreed to form a technical commission consisting of the General Directorate of Protection and Consular Affairs of the SRE as well as the Coordinator of International and Inter-institutional Relations of the National Immigration Institute and the Attorney General's office. On the Guatemalan side, the members would be the Ministry of Foreign Affairs, The Ministry of Government, the Attorney General's office, and the General Directorate of Immigration. Specifically, the commission is charged with:

--developing an action plan to train public officials in both countries to prevent and support minors and females who are TIP victims

--conducting a study about TIP and the areas in Mexico and Guatemala where it most frequently occurs.

--establishing mechanism for the voluntary return of women and minors to reunite them with their families.

--exchanging information regarding TIP victims

--developing information and prevention campaigns in the area where trafficking occurs.

10. (U) Just last month, authorities in Monterrey arrested an Amcit couple who came to Mexico for the sole purpose of stealing a child to "replace" their daughter who died recently. Although authorities discounted any possible link to trafficking organizations, it serves as an example of willingness to combat related crimes.

11. (SBU) In early August, US prosecutors are returning to Mexico to speak with victims of the Carreto sex ring, or "Los Lenones," as the case is known in Mexico. Although the prosecutors were not able to speak with the victims on their first trip to Mexico in April 2004, post's Judicial Attache stated this was the result of showing up to speak with the victims before their MLAT request was actually approved by the Office of the Attorney General (PGR) and SRE. The Judicial Attache has stated that this has been resolved and the US prosecutors will be able to speak to the victims.

THE TOOLS MEXICO ALREADY HAS TO PROSECUTE TIP CASES

12. (U) Although there is not a national trafficking law per

se, Mexico does have several laws that permit it to prosecute traffickers. There are several statutes in Mexican law that prohibit the trafficking of undocumented migrants, use physical violence or moral suasion to force someone into unpaid labor, transport a minor outside the country for financial benefit, and the corruption of minors. The laws exist to punish trafficking and post believes that Mexico can be convinced to use these laws to better combat trafficking in persons.

13. (U) In addition, during a meeting between Laura Lederer, G senior advisor and Marie Claire Acosta, an internationally recognized human rights expert and ex-Undersecretary for Human Rights in the SRE, Acosta indicated a willingness of the Mexican government to work with the US on this issue. Mexican authorities and NGOs across the board have indicated a desire to work together to rid our countries of this blight.

EMBASSY MEXICO PROPOSALS FOR THE TIP INITIATIVE

14. (SBU) Mexico is very sensitive about its sovereignty and is unlikely to respond with the enthusiasm and commitment we want if we do not respect their views as we work out the details of the TIP projects. They have signaled a desire to work with us, but they want to be in charge of the process. Our suggestions are:

--that we work to energize NGOs further on this issue. Doing so would raise awareness about the issue and Mexico has shown a demonstrated willingness to cooperate with NGOs. For example, last year it invited the UNHRC to come and review the human rights situation in the country.

--training prosecutors, police, and migration authorities with a focus on the federal level as well as the law enforcement community and judiciary in the northern and southern border states. Such training will help them to spot TIP when they see it and to deal with it effectively.

--the Embassy will undertake a lobbying effort with congress to help them create more effective federal-level anti-TIP legislation. There are already a number of good recommendations for federal legislation being considered by the Mexican congress. One of the most in-depth studies on existing state laws and best approaches to creating a federal law was written and published by the local office of the International Labor Organization with funding support from the US Department of Labor under its efforts to eradicate the worst forms of child labor, such as child prostitution.

--outreach to faith-based organizations in Mexico, also to help raise awareness and create other lobbying possibilities on the issue. Embassy suggests a partnering with faith-based organizations in the US to increase international understanding while working together on anti-TIP projects.

--engagement with the relevant agencies of the GOM on the details of the TIP projects. As it is for us, this will be an interagency effort for the GOM, and we must allow for the complexities of interagency coordination on the Mexican side. We must also genuinely solicit GOM input on the projects and, to the extent possible consistent with our fundamental objectives for the projects, be prepared to modify the projects to accord with the GOM's views.

15. (SBU) The unofficial translation of the letter from Geronimo Gutierrez to Ambassador Garza follows:

Thank you for your letter dated May 13, asking for Mexico's support for programs to promote multilateral cooperation to combat trafficking, exploitation and sale of persons, particularly women and children.

The Government of Mexico supports all efforts to combat this crime, which offends our societies and challenges our institutions. The Government of Mexico welcomes this initiative, which will doubtless give our governments better tools to combat this complex phenomenon in an integrated fashion, within a framework of shared responsibility.

For these reasons, the Government of Mexico is interested in learning more about the basic and ancillary objectives of this initiative, the mandate it seeks to shape, the identity of its members and leaders, and a description of its contractual commitments. I must clarify that the Government of Mexico would expect to establish the operative themes for the initiative, and to determine the geographic areas of priority for our country.

With warm regards,

Sincerely,

Geronimo Gutierrez
Undersecretary for North America

16. (SBU) We have reservations about the draft watch list action plan we have seen. These reservations go to both the process and substance. On process, we understand the plan is to be presented to the GOM, but that the GOM's views on it will not be sought. We cannot unilaterally impose a plan on Mexico and expect them to execute it. This will only cause resentment that will get in the way of the cooperation we hope to achieve on TIP. If the plan is, as it appears to us, rather a checklist that will be used to guide the Department's assessment of Mexico's progress in February, then it ought reasonably to consist of things that stand some chance of being accomplished by February. The latest version we have seen does not meet this test. Requiring Mexico to open a dialogue with China and Japan is not relevant to the TIP problem. Most of the people trafficked come from Eastern

Europe and Central America. The Chinese being trafficked through Mexico involve, as far as we can tell, migrant smuggling, not trafficking in persons. Also, requiring Mexico to implement anti-TIP legislation between now and February is unrealistic. President Fox has had numerous problems getting his initiatives through Congress so requiring the GOM to do this is asking too much.

COMMENT

17. (SBU) Mexico already possesses a political will to fight trafficking in persons. Mexican society, as in many Latin American societies, places a high value on women and children and deplores exploitative acts against them. As the above examples note, they have shown a disposition to prosecute cases involving TIP and also a willingness to take a preventative stance, as the PFP cybercrime unit's efforts

against child pornography show. It is also true that there are improvements that can be made. Post believes that engaging them in a cooperative manner and cultivating NGOs and faith-based groups will produce long-term and lasting results. The Gutierrez letter demonstrates that we need to present our proposals in a cooperative spirit that will inspire commitment to work together to rid our countries of this crime against the most vulnerable in our societies.

Visit Mexico City's Classified Web Site at
http://www.state.sgov.gov/p/wha/mexicocity

Garza

NNNN

# Exhibit 2

E 7

ORIGIN L-00

```
INFO   LOG-00    EEB-00    AID-00    AMAD-00    A-00     RPPR-00   CA-00
       CIAE-00   CPR-00    INL-00    DEAE-00    DODE-00  WHA-00    DS-00
       DHSE-00   AVC-00    OIGO-00   FBIE-00    UTED-00  FRB-00    H-00
       TEDE-00   INR-00    LAB-01    MOFM-00    MOF-00   M-00      NSAE-00
       OCS-00    OMB-00    NIMA-00   PA-00      DOHS-00  SSO-00    SS-00
       VO-00     NCTC-00   ASDS-00   FMP-00     R-00     ECA-00    DSCC-00
       PRM-00    DRL-00    G-00      SAS-00     FA-00    SWCI-00   /001R
```

043728

SOURCE:    CLTGRD.007698                                              B6
DRAFTED BY: L LEI:[                    ]-- 05/06/11                    B7(C)
APPROVED BY: L/LEI [                ]
WHA/MEX-HST:[                    ]DOJ/OIA:[              ](SUBS)
           -----------------706BBD  062105Z /38

O R 062055Z MAY 11
FM SECSTATE WASHDC                        ┌─────────────────────────────────┐
TO AMEMBASSY MEXICO IMMEDIATE            │ APPEALS PANEL ACTION: RELEASED IN PART │
INFO DEPT OF JUSTICE WASHINGTON DC       │ B7(E),B7(C),B7(A),B6            │
                                         └─────────────────────────────────┘

UNCLAS STATE 043728


~~SENSITIVE~~
PRIVACY                                                              B6
POST FOR POL AND DOJ - [                            ]                B7(C)

E.O. 13526: N/A
TAGS: PGOV, CJAN, CVIS, SNAR, KCRM, MX
SUBJECT: EXTRADITION: MEXICO:[                ]and 7 others          B6
(Ciudad Juarez Case)                                                B7(A)

~~SENSITIVE BUT UNCLASSIFIED~~.  LAW ENFORCEMENT SENSITIVE.

                                                                    B6
1.  ~~(SBU)~~  Supplemental documents, duly certified, authenticated B7(C)
and translated, were sent to Embassy, attention to [
         ] on Wednesday, May 4, via FedEx (tracking numbers:  8747
2974 5280 (Nevarez); 8747 2974 5290 [              ]  8747 2974 5305  B6
(Valles de la Rosa); 8747 2974 5316 (Nunez Payan); 8747 2974  5327   B7(A)
(Gallegos Castrellon); 8747 2974  5338 [            ]; 8747 2974
5349 (Hernandez Celis);  and 8747 2974 5350 [             ] Upon
receipt of the documents, please present them to the appropriate
Mexican officials supplementing the formal request for the
extradition for [                                              ]
ARTURO GALLEGOS CASTRELLON, alias Benny, alias Farmero, alias 51,
alias Guero, alias Pecas, alias Tury, alias 86; RICARDO VALLES DE
LA ROSA, alias Chino, alias Come Arroz, alias 99; ALBERTO NUNEZ
PAYAN, alias Fresa, alias Fresco, alias Alberto Payan Nunez, alias
Carlos Rodriguez Ramirez, alias El Tio, alias 97; [               ]
```

B6
B7(A)

LUIS HUMBERTO HERNANDEZ CELIS,
alias Pac, alias Pak, alias Pacman, alias 84; and MIGUEL ANGEL
NEVAREZ, alias Lentes, alias 94.

2.    (SBU) The documents submitted include a copy of the Third
Superseding Indictment and the arrest warrants attached to the
supplemental affidavit of Trial Attorney [             ]  Also                    B6
attached to [                ] supplemental affidavit is a supplemental          B7(C)
affidavit from a Cooperating Witness, which describes lawfully
recorded radio transmissions between various Barrio Azteca leaders,
members and associates that occurred at the time of the March 13,
2010 murders in Ciudad Juarez.  Transcripts of those recordings are
also attached to the Cooperating Witness?s affidavit.  The
documents also include a second supplemental affidavit from Mr.
Skaret, which attaches sworn declarations of GALLEGOS CASTRELLON,
NUNEZ PAYAN, HERNANDEZ CELIS and CAUDILLO given to SIEDO that were
provided to the United States in response to a Mutual Legal
Assistance Treaty request; and a signed statement from the Human
Resources Office of the United States Embassy in Mexico City
regarding the employment status of Leslie Enriquez and Hilda
Antillon at the United States Consulate in Ciudad Juarez, Mexico.

3.    (SBU)  Embassy is asked to provide the following information in
the diplomatic note presenting the supplemental documents:
A Third Superseding Indictment has been filed in the case against
[            ] GALLEGOS CASTRELLON, VALLES DE LA ROSA, NUNEZ                      B6
PAYAN, [                        ] HERNANDEZ CELIS and NEVAREZ.  The              B7(A)
Third Superseding Indictment replaces the Second Superseding
Indictment in this case.  The charges contained in the Third
Superseding Indictment against [              ] GALLEGOS CASTRELLON,
VALLES DE LA ROSA, NUNEZ PAYAN, [                    ] HERNANDEZ
CELIS, and NEVAREZ are identical to those in the Second Superseding
Indictment.  The primary difference between the Third Superseding
Indictment and the Second Superseding Indictment is the addition of
twenty-three (23) new co-defendants, members and associates of the
Barrio Azteca criminal Enterprise, who are charged along with
[            ] GALLEGOS CASTRELLON, VALLES DE LA ROSA, NUNEZ
PAYAN, [                    ] HERNANDEZ CELIS, and NEVAREZ in
Counts One, Two, Three and Four.

[            ] GALLEGOS CASTRELLON, VALLES DE LA ROSA, NUNEZ
PAYAN, [                    ] HERNANDEZ CELIS and NEVAREZ are
wanted to stand trial in the United States for organized crime
offenses.  They are the subjects of Third Superseding Indictment
EP10CR2213, filed on March 2, 2011, in the United States District
Court for the Western District of Texas, charging them with the
following offenses: in Count One with conspiracy to conduct the
affairs of an enterprise through a pattern of racketeering

activity, in violation of Title 18, United States Code, Section
1962(d); in Count Two with conspiracy to distribute and possess
with the intent to distribute one kilogram or more of heroin, five
kilograms or more of cocaine, and 1000 kilograms or more of
marijuana, in violation of Title 21, United States Code, Sections
846, 841(a)(1), and 841(b)(1)(A)(i), 841(b)(1)(A)(ii), and
841(b)(1)(A)(vii); in Count Three with conspiracy to import into
the United States one kilogram or more of heroin, five kilograms or
more of cocaine, and 1000 kilograms or more of marijuana, in
violation of Title 21, United States Code, Sections 963, 952,
960(b)(1)(A), 960(b)(1)(B), and 960(b)(1)(G); and in Count Four
with conspiracy to launder monetary instruments, in violation of
Title 18, United States Code, Sections 1956(a)(1)(A)(i)(B)(i) and
1956(h).

The Third Superseding Indictment also charges ⬚
GALLEGOS CASTRELLON, VALLES DE LA ROSA, ⬚
HERNANDEZ CELIS and NEVAREZ, and others, in Count Five with
conspiracy to kill persons in a foreign country, in violation of
Title 18, United States Code, Section 956(a)(1); in Counts Six,
Seven, and Eight with murder resulting from the use and carrying of
firearms during and in relation to crimes of violence and drug
trafficking, in violation of Title 18, United States Code, Sections
924(-c-) and 924(j), and 2; and in Counts Nine, Ten, and Eleven
with murder in aid of racketeering activity, in violation of Title
18, United States Code Sections 1959(a)(1) and 2.

B6
B7(A)

Heroin and marijuana are Schedule I controlled substances, and
cocaine is a Schedule II controlled substance, as defined by Title
21, United States Code, Section 812.

Based on the charges in the Third Superseding Indictment, on March
3, 2011, the United States District Court for the Western District
of Texas issued warrants for the arrests of ⬚
ARTURO GALLEGOS CASTRELLON, RICARDO VALLES DE LA ROSA, ALBERTO
NUNEZ PAYAN, ⬚ LUIS
HUMBERTO HERNANDEZ CELIS, and MIGUEL ANGEL NEVAREZ.  These arrest
warrants remain valid and executable to apprehend these fugitives
to stand trial for the crimes charged in the Third Superseding
Indictment.

The facts that establish probable cause to believe that ⬚
⬚ ARTURO GALLEGOS CASTRELLON, RICARDO VALLES DE LA
ROSA, ALBERTO NUNEZ PAYAN, ⬚
⬚ LUIS HUMBERTO HERNANDEZ CELIS and MIGUEL ANGEL NEVAREZ are
responsible for the crimes charged in this case include the
following, in addition to the facts described in the previous
diplomatic notes in this case, which are incorporated herein by
reference:

Barrio Azteca requires its leaders and ranking members to carry handheld radios, and virtually all communication between the Barrio Azteca leaders and leaders of La Linea occur over these radios. Some of these radio transmissions were lawfully recorded. As explained by the Cooperating Witness and the transcripts of the recordings, GALLEGOS CASTRELLON told other Barrio Azteca members to be on the lookout for a White Honda Pilot for an assassination. The recordings also revealed that on March 13, 2010, GALLEGOS CASTRELLON and Luis Mendez confirmed that a female passenger should be killed, that NEVAREZ spotted the targets and Barrio Azteca members began to follow the victims? cars, and that [          ] and NEVAREZ chased a Toyota Rav4 while [          ] chased a white Honda Pilot. During the recorded radio transmissions, [          ] confirmed that his victim was killed, [          ] confirmed his hit on the white Honda Pilot, and VALLES DE LA ROSA confirmed with his contacts that the adult victims of the shootings had died, but that the children in the vehicles were not killed.

B6
B7(A)

In a sworn declaration to SIEDO, GALLEGOS CASTRELLON admitted that he is a Lieutenant in the Barrio Azteca in Juarez. He stated that he was in charge of radio communication between the Barrio Azteca and La Linea, and that he used his radio to issue orders to other Barrio Azteca members to kill people on behalf of the gang. In his statement, GALLEGOS CASTRELLON admitted that he trafficked marijuana and cocaine in Juarez, and that he supervised the importation of approximately 4,000 kilograms of marijuana from Juarez into the United States every month or two months, which resulted in a net profit of approximately $1 million dollars each month. In his sworn declaration, GALLEGOS CASTRELLON also stated that Barrio Azteca and La Linea work together to kill members of rival drug gangs, which they refer to as ?contras,? who are competing for drug trafficking rights in the Juarez corridor.

In a sworn declaration to SIEDO, NUNEZ PAYAN admitted that as a member of Barrio Azteca, he sold marijuana in Juarez and was in charge of security for specific Barrio Azteca leaders in Juarez. With respect to the murders in March 2010, NUNEZ PAYAN stated that he heard GALLEGOS CASTRELLON on the radio give the order to kill the people in the white truck, and that when issuing the order to kill, GALLEGOS CASTRELLON communicated with [          ] [          ]

In a sworn declaration to SIEDO, HERNANDEZ CELIS admitted that he worked as an assassin for La Linea, and that he was paid 4000 pesos a month for his work. He discussed several murders he committed, including murders of rivals from the Artistas Asesinos and people working for Chapo Guzman.

Organized crime (racketeering) offenses are extraditable offenses pursuant to Article 2(3) of the Treaty. Drug trafficking offenses

are extraditable offenses pursuant to Article 2(1) of the Extradition Treaty and Item 14 of the Appendix. Money laundering offenses are extraditable offenses pursuant to Article 2(1) of the Treaty and Item 12 of its Appendix; alternatively, they are covered as extraditable offenses pursuant to Article 2(3) of the Treaty. Murder is an extraditable offense pursuant to Article 2(1) of the Treaty and Item 1 of its Appendix. Firearms offenses are extraditable offenses pursuant to Article 2(1) of the Treaty and Item 19 of its Appendix. Conspiracy to commit an extraditable offense is an extraditable offense pursuant to Article 2(4)(a) of the Treaty. Participation in an extraditable offense, by aiding and abetting that offense (as provided in Title 18, United States Code, Section 2), is an extraditable offense pursuant to Article 2(4)(a) of the Treaty.

B7(A)
B7(E)

5. (U) Please also keep Department and DOJ apprised of all developments in this case. Cables should be captioned for L/LEI and DOJ/OIA. Please also send Department a copy of the final diplomatic note. Embassy's assistance is appreciated.
CLINTON


NNNN

# Exhibit 3

UNCLASSIFIED U.S. Department of State  Case No. FU-2014-05106  Doc No. C05637848  Date: 04/23/2015

CLASSIFICATION: UNCLASSIFIED
Page 1 of 2

| From: | | B6 |
| Sent: | 6/21/2010 10:40:26 AM | |
| To: | SMART Core | |
| Subject: | PGR Raises El Paso - Ciudad Juarez Border Incident . | |

**RELEASED IN PART**
**B7(C),B7(A),B6**

## UNCLASSIFIED

**DECONTROLLED**

**Classified by DAS, A/GIS, DoS on 04/20/2015 ~ Class: CONFIDENTIAL ~ Reason: 1.4(B), 1.4(D), B1 ~
Declassify on: 06/20/2035**

| MRN: | 10 MEXICO 2704 | |
| Date/DTG: | Jun 21, 2010 / 211439Z JUN 10 | |
| From: | AMEMBASSY MEXICO | |
| Action: | WASHDC, SECSTATE *IMMEDIATE* | |
| E.O.: | 12958 | |
| TAGS: | PGOV, MX | |
| Captions: | SENSITIVE, SIPDIS | |
| Subject: | ☐ Raises El Paso - Ciudad Juarez Border Incident | B6<br>B7(C)<br>1.4(B)<br>1.4(D)<br>B1 |

1. (SBU) ☐ requested a meeting with Legatt regarding the June 7 death of Mexican teenager Sergio Adrian Hernandez Guereca, who was killed after a U.S. CBP agent at the El Paso – Ciudad Juarez border fired his service gun.  Separately, ☐ told the Ambassador that under Mexican law, Mexico has jurisdiction over the case because the victim died on Mexican territory.  The GOM has filed a request for information and evidence under the Mutual Legal Assistance Treaty (MLAT) and continues to stress the "urgent need" for information, such as the identity of the CBP agent, and in particular footage of the event which they understand that CBP has in its possession.

2. (SBU) In the June 14 meeting with Legatt and Acting DOJ Attache, ☐ was advised of the current investigations into the incident, including the main FBI investigation and the internal investigations by CBP and DHS.  Neither details nor results of the investigations were disclosed.  During the meeting ☐ inquired about the timeframe for DOJ to respond to PGR's request under our MLAT agreement for information in regards to the incident (Note: Embassy understands an MLAT request has in fact been received by DOJ. End Note). ☐ requested the identity of the CBP agent involved.  Emboffs deferred on both of the questions, and advised ☐ USG will submit its own MLAT request ☐

*1.4(B)*
*1.4(D)*
*B1*

3. (SBU) ☐ noted that PGR will issue publicly an "official communication " about the incident and investigation. ☐

*1.4(B)*
*1.4(D)*
*B1*
*B7(A)*

| Signature: . | PASCUAL |

| Drafted By: | |
| Cleared By: | |

B6

### REVIEW AUTHORITY:   Adolph Eisner, Senior Reviewer

CLASSIFICATION: UNCLASSIFIED
Page 1 of 2

UNCLASSIFIED U.S. Department of State  Case No. FU-2014-05106  Doc No. C05637848  Date: 04/23/2015

UNCLASSIFIED  U.S. Department of State  Case No. FU-2014-05106  Doc No. C05637848  Date: 04/23/2015
CLASSIFICATION: UNCLASSIFIED
Page 2 of 2

B6

**Approved By:**
**Released By:**
**Info:**        NATIONAL SECURITY COUNCIL WASHINGTON DC*ROUTINE* ;
                 DEPT OF HOMELAND SECURITY WASHINGTON DC*ROUTINE* ;
                 DEPT OF JUSTICE WASHINGTON DC*ROUTINE* ;
                 CDR USNORTHCOM PETERSON AFB CO*ROUTINE* ; CDR USSOUTHCOM MIAMI FL
                 *ROUTINE* ; ALL US CONSULATES IN MEXICO COLLECTIVE *ROUTINE*

**Dissemination Rule:**     Archive Copy

**UNCLASSIFIED**

# Exhibit 4

E12

PTQ1853

DECLASSIFIED

UNCLASSIFIED          PTQ1853

Excuse
65

PAGE 01          BERN   01309   141500Z
ACTION DS-00

INFO  LOG-00    OASY-00    EUR-01    OIGO-01    UTED-00   IMMC-01   TEDE-00
      JUSE-00   L-01       ADS-00    PA-00      ASDS-01   DSCC-00   /005W
                ------------------A47116   141501Z /38
P 141454Z MAR 97
FM AMEMBASSY BERN
TO SECSTATE WASHDC PRIORITY 3271

UNCLAS BERN 001309


FOR DS/P/DP - JEFF BOZWORTH

E.O. 12958: N/A
TAGS: ASEC
SUBJECT: REQUEST FOR PROTECTION FOR SWISS ATTORNEY
GENERAL

1.  THIS IS AN ACTION CABLE, SEE PARAS 6 AND 8.

2.  CURRENTLY, THE ATTORNEY GENERAL OF SWITZERLAND HAS
APPROXIMATELY $103 MILLION BLOCKED IN SWISS BANK
ACCOUNTS.  THIS MONEY IS ASSOCIATED WITH RAUL SALINAS DE
GORTARI, THE BROTHER OF THE FORMER PRESIDENT OF MEXICO,
CARLOS SALINAS DE GORTARI.  TO CONCLUDE THE SWISS
INVESTIGATION, THE ATTORNEY GENERAL OF SWITZERLAND, CARLA
DEL PONTE, IS SCHEDULED TO TRAVEL TO THE TEXAS ON
TUESDAY, MARCH 25, 1997 TO CONDUCT INTERVIEWS AUTHORIZED
BY THE DEPARTMENT OF JUSTICE, PURSUANT TO A MUTUAL LEGAL
ASSISTANCE TREATY REQUEST.  IT IS ANTICIPATED THAT
                    UNCLASSIFIED




                    UNCLASSIFIED

PAGE 02          BERN   01309   141500Z

ATTORNEY GENERAL DEL PONTE WILL REMAIN IN THE UNITED
STATES UNTIL MARCH 30 OR MARCH 31 AT WHICH TIME THE
ATTORNEY GENERAL WILL DEPART FOR MEXICO.

3. ATTORNEY GENERAL DEL PONTE PROPOSES TO CONDUCT
ADDITIONAL INTERVIEWS IN MEXICO AND, IN ACCORDANCE WITH
SWISS LAW, WILL OFFICIALLY ADVISE RAUL SALINAS OF THE
STATUS OF THE SWISS INVESTIGATION.  IF THE ATTORNEY
GENERAL OBTAINS THE REQUIRED EVIDENCE DURING THE PROPOSED
TRAVEL, IT IS EXPECTED THAT THE CURRENTLY BLOCKED FUNDS
WILL BE FORFEITED BY SWISS AUTHORITIES AND THIS MATTER
CONCLUED.  SECURITY ARRANGEMENTS FOR THE MEXICAN PORTION
OF THIS TRAVEL ARE BEING COORDINATED WITH MEXICAN
AUTHORITIES WITH ASSISTANCE FROM OEA AND FBI PERSONNEL.
4. OF A HISTORICAL BASIS, SWISS ATTORNEY GENERAL DEL
PONTE IS INCLUDED ON A DEATH LIST OF SEVERAL CRIMINAL
ORGANIZATIONS RASED IN ITALY.  AS SUCH, ATTORNEY GENERAL
DEL PONTE IS THE SOLE SWISS OFFICIAL WHO IS AUTHORIZED A
24-HOUR SWISS GOVERNMENT PROTECTION DETAIL.

5. REGARDING THE CURRENT SITUATION, THE SALINAS
INVESTIGATION IS INTRICATELY INTERTWINED WITH BOTH THE
JUAN GARCIA-ABREGO AND MARIO RUIZ-MASSIEU INVESTIGATIONS
GARCIA-ABREGO WAS RECENTLY SENTENCED IN TEXAS TO 11
CONSECUTIVE LIFE SENTENCES.  THE RUIZ-MASSIEU TRIAL IS
CURRENTLY ON-GOING ALSO IN TEXAS.  WITNESSES IN THESE TWO
JUDICIAL TRIALS ARE BEING PROVIDED EXTENSIVE PROTECTION
IN LIGHT OF THE FACT THAT SOME WITNESSES HAVE BEEN KILLED
AND OTHERS INTIMIDATED, WHICH HAS DETERRED THE WITNESSES
TESTIMONY.  EXTENSIVE SECURITY MEASURES ARE BEING
IMPLEMENTED BY DEPARTMENT OF JUSTICE OFFICIALS TO PROTECT
                    UNCLASSIFIED


                    UNCLASSIFIED

PAGE 03          BERN  01309  141500Z
THE INTEGRITY AND WELL-BEING OF THESE WITNESSES.  THESE
ARE SOME OF THE SAME WITNESSES SWISS ATTORNEY GENERAL DEL
PONTE WILL BE INTERVIEWING.  THESE INTERVIEWS ARE ALSO
SCHEDULED TO OCCUR IN TEXAS.



8. DEFINITIVE TRAVEL PLANS FOR THE SWISS DOELEGATION WILL
BE DISCUSSED TUESDAY MORNING, MARCH 18.   POST WOULD
APPRECIATE AN EXPEDITIOUS REPLY TO THIS REQUEST SO THAT
THE SECURITY ISSUES MAY BE ADDRESSEO AT THIS TIME. KUNIN


                    UNCLASSIFIED




NNNN

# Exhibit 5

ACTION INL-00

```
INFO    LOG-00    NP-00     AID-00    AMAD-00    CA-00     CIAE-00   COME-00
        CPR-00    DODE-00   DOTE-00   WHA-00     DS-00     EB-00     OIGO-00
        FAAE-00   UTED-00   FRB-00    H-00       TEDE-00   INR-00    L-00
        AC-00     DCP-00    NSAE-00   NSCE-00    NIMA-00   GIWI-00   ACE-00
        SP-00     SSO-00    SS-00     ASDS-00    FMP-00    DSCC-00   PRM-00
        DRL-00    NFAT-00   SAS-00    /000W
                  ------------------985953  211358Z /38
```

P 211214Z DEC 04
FM AMEMBASSY TEGUCIGALPA
TO SECSTATE WASHDC PRIORITY 5715
INFO WHA CENTRAL AMERICAN COLLECTIVE
DEPT OF TREASURY WASHDC
DEPT OF JUSTICE WASHDC

UNCLAS  TEGUCIGALPA 002816


STATE for INL and WHA/CEN
Justice for OIA and AFMLS
Treasury for FinCEN

E.O. 12958: N/A
TAGS: KCRM, KTFN, KJUS, ECON, PGOV, PREL, HO
SUBJECT: HONDURAS: 2004-2005 INCSR PART II, MONEY LAUNDERING
AND FINANCIAL CRIMES.

REF: State 254401

1.  Post provides its submission for the 2004-2005
International Narcotics Control Strategy Report (INCSR) Part
II, Money Laundering And Financial Crimes.

Introduction and General Questions

Two years after passing a new law against money laundering,
the government of Honduras has made considerable progress in
implementing the law, establishing and training the entities
responsible for the investigation of financial crimes, and
improving cooperation among these entities.  In 2004, these
efforts began to pay off, with 16 money laundering-related
arrests, seizure of over $6 million worth of cash and goods,
and the first five convictions for money laundering crimes
in the country's history.  Sustained progress will depend
upon increased commitment from the government of Honduras to
prosecute financial crimes aggressively.

Honduras is not an important regional or offshore financial
center and is not considered to have a significant black

UNITED STATES DEPARTMENT OF STATE
REVIEW AUTHORITY: OSCAR J OLSON
DATE/CASE ID: 22 JUL 2011  201005874

Case 3:20-cv-00649-SCC  Document 20-4  Filed 04/20/21  Page 23 of 242

market for smuggled goods (though Honduras has seen recent high-profile smuggling cases involving gasoline and other consumer goods).  Money laundering, however, does take place in Honduras, primarily through the banking sector but also through currency exchange houses and front companies as well.  The vulnerabilities of Honduras to money laundering stem primarily from significant trafficking of narcotics, especially cocaine, through the region, though smuggling of contraband may also generate funds that are laundered through the banking system.  Money laundering in Honduras derives from both domestic and foreign criminal activity, and the proceeds are controlled by local drug trafficking organizations and organized crime syndicates.  Honduras is not experiencing an increase in financial crimes such as bank fraud.  It is not a matter of government policy to encourage, facilitate or engage in laundering the proceeds from illegal drug transactions, from other serious crimes, or from terrorist financing.  However, corruption remains a serious problem, particularly within the judiciary and law enforcement sectors.

Laws and Regulations to Prevent Money Laundering/Terrorist Financing

Money laundering has been a criminal offense in Honduras since 1998, when the passage of Law. No. 27-98 criminalized the laundering of narcotics-related proceeds and introduced various record keeping and reporting requirements for financial institutions.  However, weaknesses in the law, including a narrow definition of money laundering, made it virtually impossible to successfully prosecute the crime.

In 2002, Honduras passed Decree No. 45-2002, which greatly strengthened its legal framework and available investigative and prosecutorial tools to fight money laundering.  Under the new legislation, the definition of money laundering was expanded to include the transfer of assets that proceed directly or indirectly from trafficking of drugs, arms, human organs or people, auto theft, kidnapping, bank and other forms of financial fraud, and terrorism, as well as any sale or movement of assets that lacks economic justification.  The penalty for money laundering is a prison sentence of 15-20 years.  The law also requires all persons entering or leaving Honduras to declare, and if asked, present, money in cash and convertible securities ("titulos valores de convertibilidad inmediata") that they are carrying if the amount exceeds $10,000 or its equivalent.

Decree No. 45-2002 also created a financial information unit, the Unidad de Informacion Financiera (UIF), within the

Honduran National Banking and Insurance Commission. Banks and other financial institutions are required to report to the UIF any currency transactions over $10,000 in dollar denominated accounts or 200,000 lempiras (approximately $10,770) in local currency accounts. The law requires the UIF and reporting institutions to keep a registry of reported transactions for five years.  Banks are required to know the identity of all their clients and depositors, regardless of the amount of a client's deposits, and to keep adequate records of the information.  The law also includes banker negligence provisions that make individual bankers subject to two- to five-year prison terms if, by "carelessness, negligence, inexperience or non-observance of the law, they permit money to be laundered through their institutions."  All of the above requirements apply to all financial institutions that are regulated by the National

Banking and Insurance Commission, which include state and private banks, savings and loan associations, bonded warehouses, stock markets, currency exchange houses, securities dealers, insurance companies, credit associations and casinos.  The law does not, however, extend to the activities of lawyers or accountants.

Decree No. 45-2002 requires that a public prosecutor be assigned to the UIF. In practice, four prosecutors are assigned to the UIF, each on a part-time basis, with responsibility for specific cases divided among them depending on their expertise. The prosecutors, under urgent conditions and with special authorization, may subpoena data and information directly from financial institutions. Public prosecutors and police investigators are permitted to use electronic surveillance techniques to investigate money laundering.

Under the Criminal Procedure Code, reporting individuals such as bank officials are protected by law with respect to their cooperation with law enforcement authorities. However, some have alleged that their personal security is put at risk if the information they report leads to the prosecution of money launderers.  Officials of the Public Ministry, the National Banking and Insurance Commission and the private-sector banking association AHIBA are looking into ways that testimony from bank officials could be treated differently in order to protect the identity of the bank officials.

Until this year, there had been some ambiguity in Honduran law concerning the responsibility of banks to report

banks to keep customer information confidential. A new law passed in September 2004, the Financial System Law (Decree No. 129-2004) clarifies this ambiguity, explicitly stating that provision of information demanded by regulatory, judicial, or other legal authorities shall not be regarded as an improper divulgence of confidential information.

There have been no changes or additions to the Honduran laws governing money laundering or terrorist financing during 2004. However, four financial sector strengthening laws were passed in September, including the Financial System Law mentioned above, and reforms of the National Banking and Insurance Commission and the Central Bank. While these laws do not touch specifically on money laundering or terrorist financing, they improve the legal and operational capacity of the Honduran authorities to regulate the banking sector, and should therefore strengthen the authorities' ability to detect and counteract money laundering or terrorist financing. While some banks and political figures objected to certain parts of these laws, on the whole the laws were developed through close consultation with representatives of the banking sector, which generally supports the changes for their positive impact on greater regulatory clarity and effectiveness.

Prosecutions in 2004

Prior to 2004, there had been no successful prosecutions of money laundering crimes in Honduras. To date in 2004, however, the authorities have arrested 16 persons for money laundering crimes, issued six additional outstanding arrest warrants, and secured five convictions.

In April 2004, two Guatemalan citizens were caught crossing the border between Guatemala and Honduras carrying $247,000 in cash, suspected to be connected to narcotics trafficking activities. The two men were brought to trial in June, and one was convicted and sentenced to 16 years in prison, while the other was found not guilty. This was the first conviction of a money laundering offense since the 2002 law had been passed.

In December 2002, the fishing vessel Capitan Ryan was seized while departing a Honduran port and found to be carrying $467,000 in cash, believed to be connected to drug trafficking. The Hondurans on board the boat were arrested and, in June 2004, four of them were convicted of money laundering, while three others were found innocent and released. All four who were convicted are currently serving

terms of 19 years in prison and the boat and other items
(including the boat) seized at the time of the arrest were
ordered forfeited.  Another person connected to the same
case was apprehended in Panama by Panamanian authorities;
his case is still being processed in the Panamanian judicial
system.

In early 2004, a Honduran named Angela Platero was arrested
and charged with running an illegal lottery scheme and
laundering the proceeds.  Honduran authorities seized
approximately $1.6 million in cash and assets in connection
with this investigation.  The case was due to go to court in
October 2004, however defense attorneys filed a motion
claiming that the seizure was unconstitutional, which has
been referred to an appellate court.  A denial of the motion
is expected in early January 2005, in which case the case
will proceed to trial in February.

Measures to Prevent Terrorist Financing

The government of Honduras has been supportive of
counterterrorism efforts.  Decree No. 45-2002 states that an
asset transfer related to terrorism is a crime; however,
terrorist financing has not been identified as a crime
itself.  The law does not explicitly grant the government
the authority to freeze or seize terrorist assets; however,
on separate authority, the National Banking and Insurance
Commission has issued freeze orders promptly for the
organizations and individuals named by the UN 1267 Sanctions
Committee and those organizations and individuals on the
list of Specially Designated Global Terrorists designated by
the United States pursuant to Executive Order 13224 (on
terrorist financing).  The Ministry of Foreign Affairs is
responsible for instructing the Commission to issue freeze
orders. The Commission directs Honduran financial
institutions to search for, hold, and report on terrorist-
linked accounts and transactions, which, if found, would be
frozen. The Commission has reported that, to date, no
accounts linked to the entities or individuals on the lists
have been found in the Honduran financial system.

While Honduras is a major recipient of flows of remittances
(estimated at $1.1 billion in 2004), there has been no
evidence linking these remittances to the financing of
terrorism.  Remittances primarily flow from Hondurans living
in the United States to their relatives in Honduras.  Most
remittances are sent through wire transfer or bank services,
with some cash probably being transported physically from
the United States to Honduras.  There is no significant

Case 3:12-cv-06648-LGS  Document 29-4  Filed 04/03/21  Page 27 of 242

indigenous alternative remittance systems are now available

operating in Honduras, nor is there any evidence that charitable or non-profit entities in Honduras have been used as conduits for the financing of terrorism.

Honduras signed the 1999 International Convention for the Suppression of the Financing of Terrorism on November 11, 2001, and ratified the convention on March 25, 2003.

Free Trade Zones

Under Honduran legislation, companies may register for "free trade zone" status, and benefit from the associated tax benefits, regardless of their location in the country. Companies that wish to receive free trade zone status must register with the Office of Productive Sectors in the Ministry of Industry and Commerce.  As of December 2004, there are 337 companies, both Honduran and foreign, with free trade zone status operating in the country, mostly in the textile and apparel industry.  There is no indication that free trade zones are being used in trade-based money laundering schemes or by the financiers of terrorism.

International Cooperation

Honduras cooperates with U.S. investigations and requests for information pursuant to the 1988 UN Drug Convention. Honduras has signed memoranda of understanding to exchange information on money laundering investigations with Panama, El Salvador, Guatemala, Mexico, Peru, Colombia, and the Dominican Republic.  Honduras strives to comply with the Basel Committee's "Core Principles for Effective Banking Supervision," and the new Financial System Law (Decree No. 129-2004) passed in September 2004 is designed to improve compliance with these international standards.  At the regional level, Honduras is a member of the Central American Council of Bank Superintendents, which meets periodically to exchange information.

Honduras is a party to the 1988 UN Drug Convention, the UN Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, the UN International Convention against Transnational Organized Crime, and the UN International Convention for the Suppression of the Financing of Terrorism.  Honduras signed the OAS Inter-

American Convention on Terrorism in June 2002, ratified the agreement on September 22, 2004, and became a party to the agreement when it deposited its instruments of ratification

on November 23, 2003. Honduras signed the UN Convention Against Corruption on May 17, 2004. Honduras is a member of the Organization of American States Inter-American Drug Abuse Control Commission (OAS/CICAD) Group of Experts to Control Money Laundering and the Caribbean Financial Action Task Force (CFATF). Currently Spain and Panama are sponsoring the Honduran UIF for membership in the Egmont Group of Financial Intelligence Units; that membership is expected to be voted upon in 2005.

No specific written agreement exists between the United States and Honduras to establish a mechanism for exchanging adequate records in connection with investigations and proceedings relating to narcotics, terrorism, terrorist financing, and other crime investigations. However, Honduras has cooperated, when requested, with appropriate law enforcement agencies of the U.S. government and other governments investigating financial crimes.

Examples of cooperation between Honduran and U.S. authorities include the prosecution of the Capitan Ryan case described above, which was aided by support from the Department of Treasury's anti-money laundering technical assistance program, and by cooperation between the INL offices at Embassy Panama and Embassy Tegucigalpa: Embassy Panama provided funding travel so that Panamanian police and prosecutors could share critical evidence with Honduran authorities.

Another example of inter-governmental cooperation concerns an ongoing investigation into the assets of drug trafficker Juan Ramon Matta Ballesteros, currently serving a prison term in the United States. In June 2004, a tip from the Spanish authorities alerted the Honduran authorities that $550,000 was being transferred to a Honduran bank account in the name of Matta Ballesteros' wife. The Honduran authorities seized this money, but lack direct evidence that the money is connected to illegal activities, since a legal case was never brought against Matta Ballesteros in Honduras. Officials in the Honduran Public Ministry requested information from the U.S. authorities by means of an MLAT (Mutual Legal Assistance Treaty) to substantiate their claim that the money was derived from illegal activities. The Office of International Affairs in the U.S. Attorney's Office in Washington agreed to give the Honduran authorities access to the historical case files, and two Honduran officials from the Public Ministry will travel to Washington in January 2005 to examine the files, with INL funds supporting the trip.

Congress first enacted an asset seizure law in 1993 that subsequent Honduran Supreme Court rulings substantially weakened. Decree No. 45-2002 strengthened the asset seizure provisions of the law, establishing an Office of Seized Assets (OABI) under the Public Ministry. The law authorizes the Office of Seized Assets to guard and administer "all goods, products or instruments" of a crime, and states that money seized (or money raised from the auctioning of seized goods) should be transferred to the public entities that participated in the investigation and prosecution of the crime. Under the Criminal Procedure Code, when goods or money are seized in any criminal investigation, a criminal charge must be submitted against the suspect within sixty days of the seizure. If one is not submitted, the suspect has the right to demand the release of the seized assets.

Decree No. 45-2002 is not entirely clear on the issue of whether a legitimate business can be seized if used to launder money which derives from criminal activities. The Chief Prosecutor for Organized Crime maintains that the authorities do have this power, since once a "legitimate" business is used to launder criminal assets, it ceases to be "legitimate" and is subject to seizure proceedings. However, this authority is not explicitly granted in the law, and there has been no test case to date which would set an interpretation. There are currently no new laws being considered regarding seizure or forfeiture of assets of criminal activity.

The total value of assets seized in 2004 was $6.1 million, of which $4.1 million was in cash and $2.0 million was in goods. This marks a significant increase over 2003 figures of $2 million in cash and $584,000 in goods, for a total

value of seized assets of $2.6 million. Most of these seized assets are alleged to have derived from crimes related to drug trafficking; none of the seized assets are suspected of being connected to terrorist activity. The law allows for both civil and criminal forfeiture, and there are no significant legal loopholes that allow criminals to shield their assets.

However, OABI has not established firm control over the asset seizure and forfeiture process. Implementation of the existing law, and the process of equipping OABI to maintain control over seized assets and effectively dispose of them, has been slow and ineffective. The implementing regulations

UNCLASSIFIED

Case 3:10-cv-06649-JSG   Document 29-4   Filed 01/04/11   Page 30 of 242

than a year after the passage of the law.  Plans to build separate offices and a warehouse for this entity are still incomplete, resulting in seized assets currently being kept in various locations under dispersed authority.  Money seized is also kept in various accounts without clear records of control, or kept in cash as evidence.  Due to the absence of a clear chain of custody over seized cash, the Public Ministry on one occasion in 2004 used seized cash to pay certain employees' salaries, without the money's first having passed through a proper legal process for disposition.

Similarly, assets seized, such as vehicles, property, and boats, are in many cases left unused, rather than being distributed for use by government agencies.  In one case in 2004, a house seized in connection with a drug-trafficking investigation was nominally put under OABI's control, but was in fact left unguarded, and as a result was looted and severely damaged.  Cases such as this one have led some police agencies, which do not have the proper assets to conduct their operations, to use these assets, again without their first having passed through a legal process for their disposition.

While these actions are contrary to proper procedures set forth in the law, OABI lacks the necessary autonomy or power to resist such actions, since OABI is itself under the Public Ministry.  Furthermore, there is currently no external or independent audit of OABI's activities to guarantee transparency and proper handling of seized assets.

There is no evidence that traffickers, organized crime organizations, or terrorist organizations have taken retaliatory actions related to money laundering/terrorist financing investigations, government cooperation with the USG, or seizure/freezing of assets.

Conclusion

In 2004, the government of Honduras took positive steps to implement Decree No. 45-2002 by establishing and equipping the various government entities responsible for combating money laundering.  However, there are only limited resources available for training officials, most of whom lack experience in dealing with money laundering issues.  Further progress in implementing the new money laundering legislation will depend on the training and retention of personnel familiar with money laundering and financial crimes and improved ability and willingness of the Public

Ministry to aggressively investigate and prosecute financial
crimes.  The government of Honduras should continue to
support the developing government entities responsible for
combating money laundering and other financial crimes, and
ensure that resources are available to strengthen its anti-
money laundering regime.  The government should also
criminalize terrorist financing, and should ensure full
implementation and proper oversight of its asset forfeiture
program.

Palmer


NNNN

# Exhibit 6

**Helhowski, Kelly**                                                                                    *OS/90*

| | |
|---|---|
| **From:** | Larsen, Jill K     **RELEASED IN FULL** |
| **Sent:** | Thursday, July 01, 2010 1:26 PM |
| **To:** | Albrecht, Kelly R |
| **Subject:** | FW: PLEASE CLEAR: tasking for incoming managing director and also to be used for NCFA conference |
| **Attachments:** | Briefing book for incoming managing director_Vietnam.doc; Briefing book for incoming managing director_Cambodia.doc; Briefing Book for incoming Managing Director_China.doc |

I clear on the attached with no changes. Mike will need to clear all these, but would assume that he will do the whole book for CI once it is assembled.  Nyda is teleworking this afternoon, so please reach out to her to see how she wants to coordinate clearances.

*Jill Larsen*
Lead Specialist
Intercountry Adoptions
Office of Children's Issues
Phone: (202) 736-9113

---

**From:** Albrecht, Kelly R
**Sent:** Thursday, July 01, 2010 11:49 AM
**To:** Larsen, Jill K
**Subject:** PLEASE CLEAR: tasking for incoming managing director and also to be used for NCFA conference

Jill,

I have revised the country summaries for Vietnam, Cambodia and China. All three are attached in this email for your review and clearance. I understand these need to go up to Mike for his clearance as well prior to providing them to Nyda as they are for the incoming managing director, however, please let me know if this is incorrect.

Thank you,
Kelly

---

**From:** Budig, Nyda
**Sent:** Monday, June 28, 2010 3:23 PM
**To:** Lincoln, Ruth A; Leone, Christina A; Fuller, Gerry W; Moore, Angela L; McDonald, Thelma B; Shaffer, Sarah F; Albrecht, Kelly R; Ballas, Emily M
**Cc:** Larsen, Jill K; Stebbing, Mikiko D
**Subject:** tasking for incoming managing director and also to be used for NCFA conference

## Good Afternoon:

**We are being tasked to update the briefing book for incoming managing director, Jim Pettit.  Can you please review adoption country summaries below (we're missing Uganda, Sierra Leone and Colombia), for your countries and update and get to me by Thursday, July 1?  Thanks.  If you think there are additional countries that he should be aware of please let me know and we can add those as necessary.**

**REVIEW AUTHORITY:  Steve Blodgett, Senior Reviewer**

1

**Ruth:** Ethiopia, Nepal, Sierra Leone
**Tina:** Haiti
**Gerry:** Kyrgyzstan
**Emily:** Russia, Romania
**Kelly:** Vietnam, China, Cambodia
**Angela:** Brazil, Colombia
**Thelma:** Uganda
**Sarah:** South Africa
**Nyda:** Guatemala, Mexico


Nyda

<u>Country Summaries</u>

**Non-Hague Country Summaries**

**ETHIOPIA:**

 As was stated earlier in this briefing book, Africa is the quickly expanding new frontier in intercountry adoptions. Within Africa, Ethiopia is absolutely leading the way. Adoptions from Ethiopia have grown dramatically in recent years, from fewer than 300 in FY-2004 to more than 2,200 in FY-2009. Ethiopia remains the second highest source country for adoptions by American citizens.

 Embassy Addis Ababa is carefully scrutinizing adoption cases in light of recent allegations of child harvesting (a term used to describe adoption service providers actively soliciting birth parents to relinquish their child(ren) for adoption) in the media and an increasing number of cases where the information in the GOE documentation is incomplete or false. The Embassy is taking steps to ensure that birth parents who relinquish children for adoption fully understand that they are completely severing their parental rights and possibly will not see or have contact with their child(ren) once s/he immigrates to the United States.

 The Federal First Instance Court of Ethiopia announced that as of May 9, 2010, adoptive parents must appear at the federal court hearing for their adoptive child in order for the adoption to be approved. This new requirement will affect all pending and new adoption cases that have not yet been presented to the court. The court has indicated that it will make every effort to conclude adoption cases without the need to schedule more than one hearing.

 In addition, the Government of Ethiopia recently announced that they have revoked the licenses of nine orphanages in different regions of the country. The Government has informed

the Embassy that all children in those orphanages have been moved to accredited orphanages, and the Ministry of Women's Affairs has stated that those children should still be available to be matched for international adoption.  Prospective adoptive parents have been advised to contact their agency or the Ministry of Women's Affairs (MOWA) if they wish to confirm that the child with whom they were already matched is still available for adoption.

We continue to remind PAPs and ASPs that consular officers are required by law to conduct an orphan investigation (I-604) to verify the child's orphan status prior to the issuance of an IR-3 or IR-4 immigrant visa.  Depending on the circumstances of a case, this investigation may take up to several months to complete.  PAPs and ASPs are also reminded that TB screening and treatment (if indicated) and processing of medical waivers (where necessary) can cause processing delays.

The Government of Ethiopia has agreed to work with the Embassy and other groups such as the Joint Council on International Children's Services (JCICS) to enforce higher standards of practice for adoption service providers and all other participants in the adoption process.

## HAITI:

Haiti has been a critical fraud country with poor civil infrastructure.  In addition, many unlicensed and unregulated adoption service providers operate in Haiti.  They are often unethical. These conditions have historically required the Adoption Unit in the U.S. Embassy in Port au Prince to take extra care in verifying the validity of the documentation provided in relation to these cases.  The devastating earthquake of January 12, 2010, presented an unprecedented challenge in the area of intercountry adoption for the U.S. Government.  The American public responded to the situation with many expressions of interest in adopting a Haitian child who may have been orphaned by the earthquake.

In the immediate aftermath of crisis, however, efforts must first be focused on family reunification.  The Governments of both the United States and Haiti had to first determine that the child is indeed an orphan and is eligible for international adoption.  We understand that these efforts are still underway.  We continue to support the efforts of the Government of Haiti to ensure that safeguards under their adoption laws and procedures are upheld while determining which children are indeed eligible for intercountry adoption.  Our efforts since January 12, 2010, which closed on April 14, 2010, had been focused on the best possible solutions for children who have been permanently separated from their families as a result of the earthquake.

Between January 18, 2010 and April 14, 2010, over 1,000 children were brought to the United States from Haiti through the USCIS special Humanitarian Program.  With regard to the

3

USCIS special Humanitarian Program,  there were two categories of children who met specific criteria to allow them come to the United States:  children who have been legally confirmed as orphans eligible for intercountry adoption by the Government of Haiti, and who were in the process of being adopted by Americans prior to Jan. 12, 2010; or children who have been identified by an adoption service provider or facilitator as eligible for intercountry adoption, and were matched to prospective American adoptive parents prior to Jan. 12, 2010.  These children were also approved, under duly recognized emergency powers, by the Prime Minister of Haiti to depart the country before they entered the United States.

This program ended on April 14, 2010 and U.S. families, from that point on will have to commence the normal adoption procedure in Haiti, which must be done in accordance with Haitian adoption law and U.S. immigration law.

On April 29, CI announced on the adoption.state.gov website, that Haiti's adoption authority, the *Institut du Bien-être Social et de Recherches*(IBESR), has informed the U.S. Government that they are now accepting new adoption applications for Haitian children who were either documented as orphans before January 12, 2010, or who have been relinquished by their birth parent(s) since the earthquake.  CI further states in the announcement that the U.S. Embassy in Port-au-Prince has also resumed normal visa processing and that we encourage prospective adoptive parents to verify that their application is being processed in accordance with Haitian legal requirements and the procedures established by IBESR.

**KYRGYZSTAN:**

The Kyrgyz Republic is not party to the Hague Adoption Convention.  Changes to the Kyrgyz Family Code in 2006 led to a dramatic increase in the number of Kyrgyz children adopted by Americans.  In October 2008, the Kyrgyz government stopped processing all intercountry adoptions over allegations of corruption and fraud in the adoption process and launched a criminal investigation.  The cases of at least 65 American families were in progress when Kyrgyzstan imposed the moratorium.  According to reports, the Kyrgyz authorities arrested and released on bail two local adoption facilitators linked to two U.S. adoption agencies:  one worked for Christian World Adoption, the other worked for Nightlight Adoptions.

On March 19, 2010, the Kyrgyz Parliament passed a bill that would amend certain Family Code provisions on adoption.  The bill was not signed by President Bakiyev, who fled Bishkek on April 7 following deadly clashes between police and protesters.  Shortly thereafter, a provisional government headed by Roza Otunbayeva emerged in Bishkek.  It is unclear how the unrest and provisional government will affect the bill, related draft adoption regulations, and the pending cases in general.

The Department has argued that Kyrgyz government should complete its criminal investigation and resolve the pending cases expeditiously so that eligible children can join loving families. Many of the children have serious health problems. Faced with the children's medical conditions, distance, and a two-year wait to complete their cases, American families have remained committed to these children, as evidenced by their visits to Kyrgyzstan, financial support, and advocacy. The Department has also pressed for the strengthening of adoption safeguards and Kyrgyzstan's eventual accession to the Hague Adoption Convention.

Senior Department officials including CA A/S Jacobs, CA/OCS DAS Bond, and Ambassador Gfoeller have delivered these messages repeatedly. In summer 2009, the Department sponsored an International Visitor Program for Kyrgyz officials and an International Speaker Program featuring a U.S. adoption expert to convey these messages as well.

## NEPAL:

The GON signed the Hague Adoption Convention on April 30, 2009, but has not ratified the Convention and it is not in force. The Hague Conference on Private International Law recently released a report on its Intercountry Adoption Technical Assistance Program, based on a visit by a delegate from the Hague Conference's Permanent Bureau to Nepal in November 2009. This report is the result of an independent analysis of Nepal's intercountry adoption system under the new Terms and Conditions put in place in 2008. The report details a number of weaknesses in Nepal's current adoption system, including the falsification of documents, improper financial gain, and lack of a child protection system, and recommends that the GON suspend the application of the Terms and Conditions of 2008 until a proper legal framework is in place.

On February 24, 2010, the ad-hoc International Adoption Working Group (composed of representatives from the diplomatic missions which have adoption agencies, both private and state run, active or considering becoming active in Nepal) issued a joint statement strongly encouraging the GON to act swiftly to strengthen the adoption process by implementing all 1993 Hague Convention on Inter-Country Adoption regulations, including implementing measures aimed at ensuring authenticity and accuracy of documents, promoting family preservation and safeguarding children's well being. In its statement the Working Group reiterated its support of providing the GON technical assistance in this matter.

Germany, Sweden, Norway, France and Spain have suspended adoptions from Nepal, and the United Kingdom and Canada are in the process of doing so. The Department is strongly discouraging prospective adoptive parents from choosing Nepal as a country from which to adopt because of grave concerns over the reliability of Nepal's adoption system. We are also encouraging parents who have filed an application with the Ministry of Women,

Children and Social Welfare (MWCSW) in Nepal, but have not yet been matched with a child or received an adoption decree issued by the GON, to consider a change of countries as soon as possible.

On January 1, 2009, the Ministry of Women, Children and Social Welfare (MWCSW) announced procedures for processing adoptions pursuant to the Government of Nepal's (GON) new "Terms and Conditions" for adoptions. The initial announcement stated that only ten applications would be processed from each embassy, mission, or approved adoption agency each year.

The GON authorized 44 U.S. agencies to operate in Nepal and is considering others. The GON recently advised agencies that in order to continue operating in Nepal, they must sign a Memorandum of Understanding and to deposit USD 10,000 (USD 5,000 was due by March 1) to the Child Rights Fund to be able to continue operating in Nepal. The Child Rights Fund is managed by the solely by the Minister of Ministry of Women, Children and Social Welfare and the chairman of the Child NGO Federal of Nepal (CNFN), which sits on the investigation committee and whose members have included orphanage directors. This fund has been frozen and the Minister is under investigation by the GON for embezzling money from the fund.

The MOWCSW recently approved nearly 40 families to travel to Kathmandu to complete their adoptions and planned to match another 300 cases by the end of April, however this did not happen because of the political unrest occurring in Nepal and the allegations against the Minister Ojha.

The GON does not release the documents required by the Embassy to initiate the I-604 investigation until after the PAPs come to Nepal and have finalized their adoption. Therefore, the majority of PAPs file their I-600 application at the Embassy, adding pressure on the Consular Section to complete
I-604 investigations as expeditiously as possible. This pressure is expected to increase in the coming months as the GON invites more PAPs to Nepal to conclude their adoptions.

The Embassy has reminded PAPs that consular officers are required by law to conduct an I-604 orphan investigation which, depending on the circumstances of the case, could take an extended period of time.


**RUSSIA:**

In FY 2009, consistent with worldwide trends, intercountry adoptions from Russia declined for the fifth straight year. Embassy Moscow issued 1,586 immigrant visas to Russian

orphans compared to 1,857 in FY 2008, 2,303 in FY 2007, 3,702 in FY 2006, 4,631 in FY 2005, and 5,862 in FY 2004. Despite the decrease, Russia still sent more adopted children to the United States last year than any country except China or Ethiopia.

Russia began to accredit adoption service providers in 2000, though Russian law does not require the use of one of these accredited agencies. Russia remains concerned about independent adoptions, where PAPs attempt to adopt internationally without working with an agency that would otherwise guide them through the process, though it has done little to regulate them. Since 1996, 17 children have died while in the care of their American adoptive parents; 11 of the 17 were adopted independently.

There are strong anti-adoption forces in Russia. Various events have fueled calls to halt intercountry adoptions in Russia, including the August 2009 death of seven year old Nathaniel Craver whose U.S. adoptive parents were charged with criminal homicide in his death and the July 2008 death of 21-month-old Russian adoptee Chase Harrison (born Dmitry Yakolev), who died after being left in his adoptive American father's car in Virginia, and the father's subsequent acquittal on manslaughter charges in December 2008. In July 2009, the Russian Procuracy officially submitted its request under the Mutual Legal Assistance Treaty for information on the closed U.S. criminal case against the adoptive father. There have been other publicized cases involving the mistreatment of Russian adoptees in the United States. In the Duma, the Communist Party and the Liberal Democrats have lobbied for a ban on adoptions to the United States.

The Hague Adoption Convention provides an established framework to protect children and address the Russian government's concerns about the welfare of adoptees. Thus, we have urged Russia to ratify it. At present, however, there is insufficient support in the Duma for ratification.

On March 18, 2009, the Duma adopted a resolution calling on the Russian executive to conclude a bilateral agreement on intercountry adoption with the United States. Some adoption supporters in the Duma, such as Elena Mizulina, Chairwoman of the Committee on Family, Women, and Children's Issues, back the bilateral approach as a way of assuaging adoption foes.

In advance of the annual U.S.-Russia bilateral talks, which the Department hosted in June 2009, Russian Foreign Minister Sergey Lavrov sent Secretary Clinton a letter asking the United States to sign a bilateral treaty on intercountry adoption modeled on a treaty Russia concluded with Italy in 2008.

At a sidebar meeting, OCS DAS Michele Bond and Alina Levitskaya, Director of the Ministry of Education and Science Department of State Policy Concerning Youth, Education,

and the Social Protection of Children, identified positive steps forward: the Department agreed to send a letter to American adoptive families reminding them of the importance of the post-adoption requirements, and the Ministry of Education pledged to compare its domestic adoption laws to the provisions of the Convention as a step toward ratification.

In March 2010, seven year old Russian adoptee, Artyom Savleyev was sent back to Russia alone by his U.S. adoptive mother with a note claiming she did not want him any longer. This case, along with the stream of previous tragic cases, fueled enough media attention for Russia to call for a bilateral agreement on adoptions with the United States as the only alternative to a suspension of adoptions between our countries. The United States agreed to negotiate an interim bilateral adoption agreement with Russia in April 2010 until we are able to become Hague Partners. Expert-level discussions have followed to reach specific terms in an agreement.

Russia has asked for some specific provisions to be considered in an agreement including: psychological screening of prospective adoptive parents, a central authority to accredit and oversee adoption agencies, limits on the number of adoption agencies working in Russia, a proposal to prohibit independent adoptions, and monitoring children after placement. We have discussed several mechanisms we think would serve to provide better protections to adoptive children and families in Russia and Russia has noted that they would be willing to authorize only agencies who have been accredited through the U.S. Hague accreditation process. One of the more difficult issues to work through will be Russia's strong desire for monitoring children after placement in the U.S.

## VIETNAM:

Vietnam is not a party to the *Hague Convention on the Protection of Children and Co-Operation in Respect of Intercountry Adoption*. Our previous bilateral adoption agreement expired on September 1, 2008. In order for adoptions to resume between the United States and Vietnam, a new bilateral agreement must be signed or Vietnam must accede to and implement the Hague Adoption Convention. Though Vietnamese Decree 69/2006 contains language that could allow for relative and special needs adoptions without a bilateral agreement or accession to the Hague Convention, there is currently no implementing regulation or infrastructure to process such cases. We strongly believe that reopening any adoption processing can only come if Vietnam implements procedural and regulatory changes that result in a transparent and ethical adoption system.

The U.S. Embassy in Hanoi has received I-600s for all pending cases where an official match was made by DIA before September 1, 2008. Most of these cases are being processed to completion; however, several families have received RFEs, NOIDs, or have withdrawn or cancelled before filing. Vietnamese investigations continue in Bac Lieu province in response to

8

allegations of fraud. U.S. Embassy Hanoi is active in seeking ways to work with local authorities to resolve these cases and has urged them to complete their investigations as expeditiously as possible.

American families have continued to file applications (Form I-600A) to adopt from Vietnam with USCIS despite the current suspension on adoptions. Currently, there are approximately 2,000 approved applications. USCIS is reviewing all the cases and plans to correspond directly with each family to inform them of their options, given that their cases cannot move forward in Vietnam.

At the request of a small number of families, the United States requested that the GVN issue second referrals for families who were unable to complete their adoption because the child died, had serious medical issues, was returned to its birth family, or did not qualify because of fraud. The GVN agreed to second referrals only in cases where the original child died. In trying to identify other cases that might be eligible for a second referral, we learned that there could be up to 60 more cases. On May 31, Mr. Binh confirmed to the DCM that the GVN position is that a second referral would only be available for cases in which the child had died. We have announced to families, who have requested a second referral, that both governments have now agreed that no further second referrals will take place except in the case of the death of child.

The adoption community continues to press for the United States to seek an interim agreement with Vietnam. We will continue to welcome bilateral and multilateral discussions that include a broad representation from all GVN ministries and stakeholders. During Vice Minister Tung's visit, we agreed to his request for discussions in Vietnam last May. However, we had to postpone those talks due to summer staffing gaps in the Embassy and have requested the Vietnamese to respond in writing to the White Paper that we submitted to the government at the time of the suspension of our bilateral agreement. Future discussion should emphasize concrete, systematic changes to address problem areas, including donations and fees, Vietnam's standards for agency accreditation, agreement on the authority and responsibility for investigating irregularities, and the relationship between central and provisional adoption authorities.

Effective change will require both reform and new legislation. We prefer that Vietnam focus on Hague accession rather than a new bilateral agreement. One concern is that Vietnam will try to accede too quickly to the Convention without implementation of adequate law, regulation, and infrastructure. The United States would then be obligated to declare Vietnam adoptions non-compliant. However, prolonged Convention accession could prompt increasing demand from the U.S. adoption community that the United States sign an interim agreement based on partial or superficial reforms.

**Hague Country Summaries**

**BRAZIL**

Brazil is party to the Hague Convention on the Protection of Children and Co-operation in respect of Intercountry Adoption. According to FY 2009 figures, 32 orphans from Brazil were adopted by American citizens. In FY 2008, 46 adoption visas from Brazil were issued.

Although it has historically been difficult for American citizens to adopt from Brazil, post in Rio de Janeiro recently reported that Brazil's Administrative Federal Central Authority's (ACAF) has begun the process of authorizing U.S. Hague accredited adoption service providers (ASPs) to operate in Brazil. According to post, ACAF has interviewed at least seven ASPs to become accredited in Brazil and more interviews are scheduled. It appears likely that ACAF will consider two or three U.S. ASPs to conduct intercountry adoptions with Brazil in the near future. This progress comes after past DVC meetings including a December meeting in Washington, DC with ACAF official, Dr. Patricia Lamego. Post in Rio has worked hard to move this issue forward.

The U.S. adoption community and the Department are optimistic that the adoption process will become easier, once U.S. ASPs are accredited. It is likely that intercountry adoptions will increase given the pending approval(s) of additional ASPs. Brazilian adoption law gives preference to Brazilian citizens and citizens of countries that have implemented the Convention. ACAF, within the Ministry of Human Rights, and the Brazilian State Judiciary Commission of Adoption (CEJA) are the divisions of government responsible for intercountry adoption in Brazil. Each Brazilian state maintains a CEJA that acts as the central adoption authority and is the sole organization authorized to approve foreign adopting parents.

**CAMBODIA**

Cambodia is a member of the Hague Adoption Convention. However, due to fraud, irregularities and an insufficient legal framework to provide safeguards for the protection of children, the former Immigration and Naturalization Service (INS) suspended adoptions from Cambodia on December 21, 2001. This suspension was subsequently reconfirmed by both USCIS and the Department of State for the issuance of Form I-600, *Petition to Classify Orphan as an Immediate Relative*, and Form I-800, *Petition to Classify Convention Adoptee as an Immediate Relative*, respectively. Despite accession to the Convention in 2007, the Royal Government of Cambodia (RGC) remains unable to implement Hague-compliant procedures necessary to meet its treaty obligations.

The new draft adoption law was signed by the King on December 3, 2008. The new law seeks to create a country-wide comprehensive child welfare system and an intercountry adoption process in compliance with the Hague Convention. This is an important first step in Cambodia's expressed commitment to reforming its child welfare system and in seeking to meet its treaty obligations under the Convention. However, additional regulations and procedures will need to be passed and implemented prior to the reopening of intercountry adoptions. In order to be able to establish necessary regulations and standard procedures to implement the new Law on Intercountry Adoption, the Cambodian Ministry of Social Affairs, Veterans and Youth Rehabilitation (MOSAVY) has announced a temporary suspension of the receipt of all new intercountry adoption dossiers until March 2011. At this time it is not possible to estimate when adoptions will be able to resume between the United States and Cambodia.

The Ministry of Social Affairs, Veterans, and Youth Rehabilitation (MOSAVY) has begun to adopt implementing regulations for its new child welfare and inter-country adoption system. MOSAVY has indicated that they will not longer wait for comment by the HBP to implement these new regulations but will consider any comments they may be receive after the prakas are finalized and consider the possibility of amendments. Post has also indicated that the six-month, five province pilot of the new child welfare and alternative care system has suffered delays but is due to start this month.

## CHINA

China is a party to the *Hague Convention on the Protection of Children and Co-Operation in Respect of Intercountry Adoption*. Since 2005, annual adoptions by American parent(s) have decreased more than 60 percent, from an all-time high of nearly 8,000 in 2005 to 3,000 cases last year. This continuing decline is attributed to fewer orphans available for foreign adoption. The average wait time to complete an adoption of a healthy infant is currently over three years.

A rapidly expanding proportion of children now available for inter-country adoption are older and/or with special needs; many families are pursuing this option to benefit from the reduced wait times in these two categories. China's Central Authority for Adoptions (CCAA) prefers to use Convention procedures to process both Hague and transition cases and all PAPs are required to use a U.S. Hague-accredited service provider (ASP) for both transition cases and Convention cases.

In recent years, there have been two well-publicized instances of illegal adoption schemes – in Hunan province in 2005 and in Guizhou province in 2009. Each incident reportedly involved about 80 orphans, but there is evidence to suggest the numbers in the Hunan incident were much higher. The Chinese government reacted decisively in the Hunan

case, fining and imprisoning the perpetrators. There are conflicting reports about what corrective actions may have been taken by the Chinese government in the Guizhou case.

The Political Section at the U.S. Embassy in Beijing recently received an inquiry from the International Cooperation Department of the Ministry of Public Security (MPS) stating that the Guangdong Public Security Bureau was investigating a case of a child who was abducted and believed adopted by an American couple in 2006 from a Hunan orphanage. The inquiry requests the Embassy's cooperation in getting a DNA sample from the child to establish if she is the child the Chinese parents claim was abducted from them. Because this raises very complicated legal and other issues, U.S. Embassy officials are currently seeking additional information from the MPS to be able to provide a detailed response to its request.

Michele Andi Stein was recently arrested and accused of felony child abuse toward her adopted son, adopted from China. Ms. Stein has been charged with one count of felony child abuse, and severe bodily injury. News sources have reported that the child "has a fractured skull and large bruises on the frontal region of his brain." We continue to seek more information on this case and will provide information to CCAA about this case shortly.

## GUATEMALA

Although Guatemala is a party to the Hague Adoption Convention currently, it is not processing adoptions. Guatemala is concentrating on fully implementing the Hague Adoption Convention. Our discussions with Guatemalan officials take place within the context of our concerns about long-standing weaknesses in Guatemala's adoption process and our strong support for Guatemala's full implementation of the Convention.

Following the December 2007 passage of a new adoption law, the Government of Guatemala continued to work to resolve the transition cases – those in process before the new law went into effect – and to establish the regulatory procedures and infrastructure to implement its new "Hague" adoption process. It is still at a relatively early stage in the process. In our judgment, any estimate about when Guatemala will have a Hague process in place and ready to resume intercountry adoptions is very speculative, at best.

While we understand the desire of American citizens to complete their adoptions as quickly as possible, we also recognize the GOG's responsibility to ensure the safety of its children and the integrity of the adoption process. Adoptive parents often request that the Embassy intervene on behalf of their cases. In general, however, the Embassy can advocate only on behalf of groups and general conditions, not individual cases. Adoptive parents need to work with their Guatemalan legal representatives.

The Guatemalan National Council on Adoptions (CNA), the Guatemalan Central Authority for the Hague Adoption Convention – recently announced a limited two-year pilot

program for the intercountry adoption of a small number of older children, groups of siblings, and children with special needs. Twenty Five U.S. Convention-accredited ASPs applied to participate in the pilot program. However, these expressions of interest did not in any way signal that the U.S. Government has found Guatemala's proposed pilot program to be in compliance with the Hague Adoption Convention as no program is yet in place and the details of such program are not yet known. If the CNA selects the United States as one of the 4 participant countries in the pilot program, the U.S. Government will make a determination about whether the program is consistent with Convention standards. CNA has informally noted, however, that its highest priority is to resolve the adoptions still pending under its former adoption process because all of those adoptions have been in process for several years now.

Although the U.S. Government remains deeply concerned about the history of problems in intercountry adoptions from Guatemala and the slow pace of resolving so-called "pipeline" cases, we responded positively to the announcement of the pilot program because of our strong interest in encouraging Guatemala's efforts to reform its adoption system. USCIS-Guatemala reports a little more than 400 remaining transition cases that are moving very slowly as Guatemalan authorities investigate each and every case amid allegations of irregularities that have transpired.

To date, the CNA has provided little detail about how the pilot program would be supported and function. We continue to seek further information about both the pilot program and the participant country selection process. The CNA has indicated that an announcement about the pilot program will be made in June but will not include the existing pipeline cases.

CI has repeatedly explained to prospective adoptive parents and advocates that Guatemala has full authority over these Guatemalan children, but that we continue to advocate for the prompt resolution of these cases. Families complain that the transition procedures are confusing and contradictory. Parents are being told that each case is an independent, private legal matter. Our office along with the U.S. Embassy continues to seek additional information on the general process.

At the 2009 Summit of the Americas, the former First Lady of Guatemala handed Secretary Clinton a packet containing adoption files and copies of MLAT requests for three children adopted by American citizen parents and living in the U.S. who are now alleged by Guatemalan women to be their abducted children. As a result of these allegations, CI/ Adoption, PRI, L/CA and the Guatemalan desk officer have met with Guatemalan Embassy officials to discuss the requests for DNA samples. DOJ has the lead and has met but not yet responded to this request. DAS Bond received a follow-up request on April 15, 2010 from the

13

President of Consejo National De Adopciones (CNA). PRI has drafted an interim reply to inform CNA that a response from DOJ is forthcoming.

A group of American families with pending Guatemalan adoptions, known as the "Guatemala 900" was on the Hill on May 6, 2010 to lobby their Congressional representatives to assist in getting their pending cases resolved. The group has asked UNICEF to call a "Summit" to encourage the Guatemalan Government to take action on the pending cases. While UNICEF believes it is not appropriate for the organization to act as a mediator in this situation, both UNICEF and the U.S. Government are in agreement that both will continue to look for ways to encourage the Guatemalan authorities to process pending cases as promptly as possible.

## MEXICO

Mexico is a party to the Hague Adoption Convention. The process for legally adopting a child in Mexico is long and sometimes difficult, because Mexico has 31 states. Each Mexican state has its own central authority, procedures, and standards. Although this is permissible under the Convention, it makes Mexico a somewhat difficult partner.

The Mexican government explicitly gives preference to Mexican national adopting parents, as required by the Convention. During the past five years, the number of American citizens adopting Mexican children remained steady. In recent years, the number of U.S. adoptions of Mexican children has varied, between 167 and 61 issuances, but trended down. In FY 2008, adoption visas rose to 105, but in FY 2009 issuances dropped to 71.

We frequently receive inquiries from prospective adoptive parents interested in adopting a Mexican relative who may already be in the U.S. These relatives are dismayed to learn that they must undergo a Convention adoption and work with an accredited ASP.

## ROMANIA

Although Romania is party to the Hague Adoption Convention, **Romanian law currently prohibits intercountry adoption except by a child's grandparents, aunts, and uncles.** The Romanian government imposed a moratorium on intercountry adoptions in 2001, formalizing a de facto moratorium that began in December 2000. Between 2001 and June 2004, Romania worked to promulgate new child welfare legislation and reform Romania's adoption system. During this period, Romania continued to approve "pipeline" cases, involving orphans who had already been matched to prospective adoptive parents, as well as some special needs cases.

Draft adoption legislation developed in consultation with the United States, other donor countries, and selected NGOs was ultimately scrapped by the Romanians in favor of a more

14

restrictive law (Law No. 273/2004) that went into effect on January 1, 2005. This law permitted intercountry adoption by a child's biological grandparents only. On March 20, 2009, the Romanian Parliament passed Law No. 49/2009 amending the adoption law. Article 39 of the adoption law was modified to read as follows:

> "Art. 39. – The international adoption of a child who has the domicile in Romania may be granted only in the case where the prospective adoptive parent or one of the spouses of the prospective adoptive family who resides abroad is a relative up to the third grade inclusive, with the child for whom the opening of domestic adoption procedure was granted."

A "relative up to the third grade inclusive" includes grandparents, aunts, and uncles.

Visa statistics tell the story of Romania's changing adoption policies. Embassy Bucharest issued 611 immigrant visas to Romanian children in FY 1999; 1,119 in FY 2000; and 777 in FY 2001. After the moratorium, the embassy issued 169 in FY 2002; 200 in FY 2003; and 57 in FY 2004. And since the new law took effect, the Embassy has issued no more than 3 immigrant visas to Romanian adoptees in any fiscal year.

Pressure from Baroness Emma Nicholson, an outspoken intercountry adoption critic and at the time the European Parliament's Special Rapporteur for Romania's accession to the European Union, influenced Romania's restrictions on intercountry adoption. These policies prompted an outcry in the U.S. adoption community, especially from prospective adoptive parents. Department and other U.S. officials have repeatedly urged the Romanian government to reconsider the suspension and to process to conclusion the cases of 200 American families who had already been matched with a child when the ban was put in place. More broadly, adoption advocates argue that thousands of children still languish in government-run Romanian institutions.

Congressional and public interest in the issue spiked during the lead-up to Secretary Clinton's May 8, 2009, meeting with Romanian Foreign Minister Diaconescu. The Secretary raised intercountry adoption at the meeting, but the Foreign Minister was non-committal. His response was characteristic of the Romanian government's approach to this longstanding issue. At that time, interested members of Congress sent a letter to the Foreign Minister encouraging him to take action.

## SOUTH AFRICA

Intercountry adoptions between South Africa and the United States take place on a limited basis. In FY 2010, only five visas were issued to South African orphans, almost the same number as the prior fiscal year. South African officials view intercountry adoption as a

last resort, preferring instead to increase domestic adoption rates. Although the Government of South Africa (SAG) acceded to the Hague Adoption Convention in 2003, it has not fully established the regulations and infrastructure necessary to meet its obligations under the Convention.

The SAG has designated the Department of Social Development (DoSD) as its Central Authority to the Convention and has provided some of the required legislation to permit intercountry adoptions in Chapters 15 and 16 of the South African Children's Act (2005).

Regarding pending (I-600) cases, South African law currently recognizes only two kinds of adoptions by foreigners: 1) adoptions completed by foreign residents of South Africa, and 2) intercountry adoptions where foreigners are granted guardianship of the child and the full and final adoption takes place in their home country (IR-4 Visa). The first category requires foreigners to reside in South Africa for a minimum of five years. These adoptions are handled by an accredited agency and finalized by the Department of Social Development. The second category is limited to only those citizens of the three countries that have bilateral agreements with South Africa (Botswana, Belgium and Finland).

The SAG has stated that it has no plans to establish new bilateral agreements with any country in the foreseeable future. The USG likewise prefers to use the Hague Convention as the basis for intercountry adoption.

All immigrant visas in South Africa are issued by the American Consulate in Johannesburg.

*Nyda Budig*
Adoption Division
Office of Children's Issues
U.S. Department of State
phone: 202-647-5398
fax:     202-736-9111

# Exhibit 7

# ORIGINAL
## TOMO CCLIV

**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA

| | |
|---|---|
| FONDO | **PROCURADURÍA GENERAL DE LA REPÚBLICA** |
| UNIDAD ADMINSTRATIVA | **SUBPROCURADURIA DE DERECHOS HUMANOS, PREVENCIÓN DEL DELITO Y SERVICIOS A LA COMUNIDAD** |
| ÁREA RESPONSABLE | OFICINA DE INVESTIGACION |
| RESPONSABLE DEL CONTROL DE EXPEDIENTES | ▇▇▇▇▇▇▇ |
| CLAVE Y NOMBRE DE LA SECCIÓN | AVERIGUACION PREVIA |
| CLAVE Y NOMBRE DE LA SERIE | |
| CLAVE Y NOMBRE DE LA SUBSERIE (OPCIONAL) | |
| CLAVE Y NOMBRE DEL EXPEDIENTE | AP/PGR/SDHPDSC/OI/001/2015 |

| | SI | | NO | |
|---|---|---|---|---|
| PÚBLICO | SI | | NO | X |
| INFORMACIÓN RESERVADA | SI | X | NO | |
| INFORMACIÓN CONFIDENCIAL | SI | X | NO | |
| RESTRINGIDO DURANTE SU VIGENCIA | SI | X | NO | |

LA DOCUMENTACION DEL PRESENTE EXPEDIENTE SE INTEGRA CON LAS DIVERSAS ACTUACIONES PRACTICADAS E INFORMACIÓN RECABADA PARA LA INTEGRACION DEL DELITO QUE SE INVESTIGA.

| | | |
|---|---|---|
| AÑO DE APERTURA EXPEDIENTE | 2015 | **INDETERMINADO** |

| | | | | | |
|---|---|---|---|---|---|
| PAPEL X | FOTOGRAFIAS | LIBROS | DISQUETES | CD ROM | ENGARGOLADO |
| VIDEO | OTRO (S) | DESCRIBIR | | | |

## VALOR DOCUMENTAL

| | |
|---|---|
| ADMINISTRATIVO | |
| LEGAL | X |
| CONTABLE | |

## CARÁCTER FUNCIONAL

| | |
|---|---|
| TÉCNICO SUSTANTIVO | |
| DE GESTIÓN INTERNA | |

## PLAZO DE CONSERVACIÓN

| | |
|---|---|
| VIGENCIA COMPLETA | AÑOS |
| ARCHIVO DE TRÁMITE | AÑOS |
| ARCHIVO DE CONCENTRACIÓN | AÑOS |

## CONFORMACIÓN

| | |
|---|---|
| NÚMERO DE LEGAJOS | 254 |
| NÚMERO DE FOJAS | |

ART.110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



Subprocuraduría de Derechos Humanos,
Prevención del Delito y Servicios a la Comunidad
OFICINA DE INVESTIGACION

**AP/PGR/SDHPDSC/OI/001/2015**

**ACUERDO DE DILIGENCIA EN EL QUE SE ORDENA DILIGENCIAS TENDIENTES A SOLICITAR ASISTENCIA JURIDICA INTERNACIONAL AL DEPARTAMENTO DE JUSTICIA DE ESTADOS UNIDOS DE NORTE AMERICA**

-----En la Ciudad de México, siendo las once horas con treinta minutos del día doce de septiembre de dos mil dieciséis, la ▮▮▮▮▮▮▮▮▮▮ , agente del Ministerio Publico de la Federación adscrita a la Subprocuraduría de Derechos Humanos, Prevención del Delito y Servicios a la Comunidad, de la Procuraduría General de la Republica, quien actúa conforme a la ley y con dos testigos de asistencia que al final firman y dan fe, para su debida constancia legal y ---- - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - -
- - - - - - - - - - - - - - - -- - - - - - - - **RESULTANDO** - - - - - - - - - - - - - - - - - - - - -
-------**PRIMERO.-** En relación con la investigación de los hechos en agravio de los estudiantes de la Escuela Normal Rural Isidro Burgos, de Ayotzinapa, esta autoridad ministerial tiene la obligación de indagar respecto de los hechos, por lo que en cumplimiento

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ las bitácoras de conexión de diversas direcciones de vinculación a internet de otros usuarios, sin embargo respondieron ▮▮▮▮ los oficios HSI-2016-8793-LL y HSI-2016-8794-LL, del veintinueve de julio de dos mil dieciséis, en ▮▮▮▮

▮▮▮▮**CUARTO.-** Es de señalar que la información que se obtenga de las bitácoras de conexión es de mucha ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ que-----------------------------------------
-------------------------------------------**CONSIDERANDO**-----------------------------------
--------Que esta Representación Social de La Federación es competente para conocer de los hechos relacionados con la investigación, de conformidad con lo dispuesto en los artículos 1 párrafo tercero, 20 apartado A, párrafo V, 21, 102 apartado "A", 123 párrafo primero, Constitucionales; artículo 1 punto 1, y punto 4, artículo 4 del Tratado de Cooperación entre los Estados Unidos Mexicanos y los Estados Unidos de América, sobre asistencia Jurídica Mutua; 1, 9, 10, 12, y 29, de la Convención de Viena sobre el Derecho de los Tratados entre Estados y Organizaciones Internacionales o entre Organizaciones Internacionales, 1, 2 fracción II, 3 fracción II, y último párrafo, 168, 180, 206 del Código Federal de Procedimientos Penales; así como el artículo 4 fracción I, apartado A, inciso b y 10 fracción X de la Ley Orgánica de la Procuraduría General de la República; 72 del Reglamento de la Ley Orgánica, es de acordarse y se -----------------------------------------------------
-------------------------------------------**A C U E R D A**-------------------------------------
----**PRIMERO.** Gírese oficio al Director General de Procedimientos Internacionales de la Procuraduría ▮▮▮▮

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



Subprocuraduría de Derechos Humanos,
Prevención del Delito y Servicios a la Comunidad
OFICINA DE INVESTIGACION

**AP/PGR/SDHPDSC/OI/001/2015**

de gestionar ante las empresas de redes sociales y remitir a esta autoridad la información respecto a bitácoras de conexión.



| PSEUDONIMO | URL FB | ID FB |
|---|---|---|

----------------------------------------------**C U M P L A S E**----

---- Así lo acordó y firma la [REDACTED]
Público de la Federación, de la Subprocuraduría de Derechos H[...]
y Servicios a la Comunidad, de la Procuraduría General de [...]
testigos de asistencia que al final firman y dan fe. ------------
----------------------------------------------**D A M O S  F E**----------

TESTIGOS DE ASISTENCIA

ART.110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



Subprocuraduría de Derechos Humanos
Prevención del Delito y Servicios a la Comunidad
OFICINA DE INVESTIGACIÓN

**AP/PGR/SDHPDSC/OI/001/2015**

**Oficio Número: SDHPDSC/OI/XXXX/2016**
**Asunto:** Se SOLICITA APOYO PARA DESAHOGO
DE ASISTENCIA JURIDICA.

En la Ciudad de México; a 08 de septiembre del 2016.

Director General de Procedimientos Internacionales
de la Procuraduría General de la República.
P r e s e n t e.

En cumplimiento al acuerdo dictado dentro de la indagatoria citada al rubro y de conformidad
con lo



| PSEUDONIMO | URL FB | ID FB |
|---|---|---|

ART.110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



Subprocuraduría de Derechos Humanos,
Prevención del Delito y Servicios a la Comunidad
OFICINA DE INVESTIGACIÓN

**AP/PGR/SDHPDSC/OI/001/2015**



En sustento a la solicitud que respetuosamente se plantea, se proporcionan los siguientes
datos:

I.- ANTECEDENTES Y RELATORIA DE HECHOS.



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



Subprocuraduría de Derechos Humanos,
Prevención del Delito y Servicios a la Comunidad
OFICINA DE INVESTIGACIÓN

**AP/PGR/SDHPDSC/OI/001/2015**



Atendiendo a lo señalado en el cuerpo del presente ocurso, se solicita de manera atenta que la información y documentación recabada se remita debidamente certificada y apostillada de acuerdo a lo establecido en el artículo 278 del código federal de procedimientos penales, a la Agregaduría Regional de esta Institución correspondiente en los Estados Unidos de América, para su posterior envío a estas oficinas de Investigación, en las oficinas que ocupa esta Oficina de Investigación, cuya dirección es Av. Paseo de la Reforma N° 211-213, piso 15, Colonia Cuauhtémoc, Delegación Cuauhtémoc, Ciudad de México Teléfono (55) 53 46 00 00 ext.

**SUBPROCURADOR DE DERECHOS HUMANOS, PREVENCION DEL DELITO Y SERVICIOS A LA COMUNIDAD**

Elaboró                                          Revisó

Agente del Ministerio Publico de          Directora General Adjunta de la Oficina de
la Federación                                  Investigación
Adscrita a la Oficina de Investigación
de la Subprocuraduría de Derechos Humanos,
Prevención del Delito y Servicios a la Comunidad

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



AP/PGR/SDHPDSC/OI/001/2015

OFICIO: SDHPDSC/OI/003103/2016
ASUNTO: SE SOLICITA COLABORACION
Ciudad de México, 12 de septiembre de 2016.

ERIC WACKERSEN

**AGREGADO JURIDICO DE FEDERAL BUREAU OF
INVESTIGACTION, (FBI), UNITED STATES EMBASSY, MEXICO CITY.**
Av. Paseo de la Reforma, Núm. 305, Colonia Cuauhtémoc,
Delegación Cuauhtémoc, C.P. 06500, Distrito Federal
**P R E S E N T E**

Con fundamento en lo dispuesto por los artículos 14, 16, 21 y 102 apartado "A" de la
Constitución Política de los Estados Unidos Mexicanos; 1° fracción I, 2° fracción II, II, 168,
180, y demás ████████████████████████████████

| PSEUDONIMO | URL FB | ID FB |
|---|---|---|
| | | |

ART.110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

AP/PGR/SDHPDSC/OI/001/2015



Sin más por el momento, reitero a usted mis más altas y distinguidas consideraciones.

**ATENTAMENTE**
**Agente del Ministerio Público de la Federación**
**Adscrita la Oficina de Investigación**
**de la Subprocuraduría de Derechos Humanos,**
**Prevención del Delito y Servicios a la Comunidad**

ART. 110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

**ORIGINAL**
**VOLUME CCLIV**

| | |
|---|---|
| **RECORD GROUP**: | ATTORNEY GENERAL'S OFFICE |
| **ADMINISTRATIVE UNIT**: | DEPUTY ATTORNEY GENERAL FOR HUMAN RIGHTS, CRIME PREVENTION, AND COMMUNITY SERVICES |
| **RESPONSIBLE AREA:** | INVESTIGATIONS OFFICE |
| **RESPONSIBLE FOR CONTROL OF THE FILE** | [EXCISED] |

| | |
|---|---|
| **KEY AND NAME OF THE SECTION** | PRELIMINARY INVESTIGATION |
| **KEY AND NAME OF THE SERIES** | _____ |
| **KEY AND NAME OF THE SUBSERIES (OPTIONAL)** | _____ |
| **KEY AND NAME OF THE FILE** | AP/PGR/SDHPDSC/OI/001/2015 |

**ACCESS**

| | | |
|---|---|---|
| PUBLIC | YES _____ | NO __X__ |
| CLASSIFIED INFORMATION | YES __X__ | NO _____ |
| CONFIDENTIAL INFORMATION | YES __X__ | NO _____ |
| RESTRICTED DURING ITS TERM | YES __X__ | NO _____ |

**CONTENT SUMMARY**

DOCUMENTATION WITHIN THE PRESENT FILE IS COMPRISED OF DIVERSE INVESTIGATIONS UNDERTAKEN AND INFORMATION GATHERED FOR THE INTEGRATION OF THE CRIME UNDER INVESTIGATION.

**BASIC DATES**

YEAR THE FILE WAS OPENED:     2015                              UNDETERMINED

**FORMAT OR MEDIUM**

PAPER __X__   PHOTOGRAPHS ___   BOOKS ___   FLOPPY ___   CD-ROM ___   BINDER ___
VIDEO ___     OTHER(S) _____     DESCRIBE _____

**DOCUMENTARY VALUE**                    **FUNCTIONAL CHARACTER**
ADMINISTRATIVE     _____     TECHNICAL SUPPORT   _____
LEGAL                 _____X_____     INTERNAL MANAGEMENT _____
ACCOUNTING         _____

**RETENTION PERIOD**                      **COMPOSITION**
PERIOD OF CLASSIFICATION     _____ YEARS     SUBSET NUMBER     _254_
ACTIVE ADMINISTRATIVE ARCHIVE _____ YEARS     NUMBER OF PAGES   _____
SEMI-ACTIVE RESERVED ARCHIVE   _____ YEARS

Deputy Attorney General for Human Rights,
Crime Prevention, and Community Services
INVESTIGATIONS OFFICE

**AP/PGR/SDHPDSC/OI/001/2015**

**PROCEDURAL AGREEMENT ORDERING DOCUMENTATION TO BE SUBMITTED TO REQUEST INTERNATIONAL LEGAL ASSISTANCE FROM THE UNITED STATES DEPARTMENT OF JUSTICE**

---. In Mexico City, at 11 am on the 12th day of September of 2016, the [Excised], agent of the Attorney General's Office assigned to the Deputy Attorney General for Human Rights, Crime Prevention, and Community Services, who acts in accordance with the law and with two assisting witnesses who sign and attest for due legal evidence and … ----------------------------------
----------------------------------------------------------------**FIND**--------------------------------------------------------
-----**FIRST**. In relation to the investigation of the acts against the students of the Raúl Isidro Burgos Rural Teachers' School of Ayotzinapa, this ministerial authority is obligated to investigate the acts, so that in compliance
[Excised]

the telecommunication records of various addresses linked to other users, however, responded to documents HSI-2016-8793-LL and HSI-2016-8794-LL, from June 29, 2016 in [Excised]

----**FOURTH**. It should be noted that the information obtained through the telecommunication records is very [Excised]

that----------------------------------------------
----------------------------------------------------**CONSIDERING** ----------------------------------------------------
------That this Representative of the Federation is competent to hear the facts related to the investigation, in accordance with the provisions of articles 1, third paragraph, 20 section A, paragraph V, 21, 102 section "A", 123 first paragraph of the Constitution; article 1 point 1, and point 4, article 4 of the Cooperation Treaty between Mexico and the United States of America regarding Mutual Legal Assistance; 1, 9, 10, 12, and 29 of the Vienna Convention on the Law of Treaties between States and International Organizations or between international Organizations, 1, 2 section II, 3 section II, and last paragraph, 168, 180, 206 of the Federal Code of Criminal Procedures; as well as article 4, section 1, section A, subsection b and 10 section X of the Organic Law of the Attorney General's Office; 72 of the Regulations of the Organic Law, is to be remembered and ----------------------------------------------------------------------------------------
-----------------------------------------------**AGREE**----------------------------------------------------------------

-------**FIRST**.  Issue a notice to the Director General of International Procedures of the Attorney General's Office [Excised]

Deputy Attorney General for Human Rights, Crime Prevention, and Community Services INVESTIGATIONS OFFICE

**AP/PGR/SDHPDSC/OI/001/2015**

to manage before the social media companies and send to this authority the information regarding telecommunication records.

| PSEUDONYM | FB URL | FB ID |
|-----------|--------|-------|
| [Excised] | [Excised] | [Excised] |

--------------------------------------------------------**FULFILLED**--------------------------------------------------
------As such, [Excised] agreed and signed the [Excised]
Public of the Federation, Deputy Attorney General for Human Rights, Crime Prevention, and Community Services of the Attorney General of [Excised]
witnesses in attendance who at the end sign and attest. ---------------------------------------------------
--------------------------------------------------------**WE ATTEST**--------------------------------------------------

WITNESSES IN ATTENDANCE

[Excised]

Deputy Attorney General for Human Rights,
Crime Prevention, and Community Services
INVESTIGATIONS OFFICE

**AP/PGR/SDHPDSC/OI/001/2015**

**SDHPDSC/OI/XXXX2016**
**SUBJECT:** SUPPORT FOR LEGAL ASSISTANCE IS REQUESTED
Mexico City, September 8, 2016

[Excised]
Director General of International Procedures of the Attorney General's Office
PRESENT.

In compliance with the agreement issued within the investigation cited and in accordance with
[Excised]

| PSEUDONYM | FB URL | FB ID |
|-----------|--------|-------|
| [Excised] | [Excised] | [Excised] |

Deputy Attorney General for Human Rights,
Crime Prevention, and Community Services
INVESTIGATIONS OFFICE

**AP/PGR/SDHPDSC/OI/001/2015**

[Excised]

The following data is provided in support of the respectfully presented request:

1. BACKGROUND AND RECORD OF EVENTS

The [Excised]

Deputy Attorney General for Human Rights,
Crime Prevention, and Community Services
INVESTIGATIONS OFFICE

**AP/PGR/SDHPDSC/OI/001/2015**

[Excised]

Considering that which is indicated in the body of this petition, it is respectfully requested that the information and documentation collected be forwarded, duly certified and notarized, in accordance with the provisions of article 278 of the federal code of criminal procedures, to the Regional Attaché Office of this Corresponding institution in the United States of America, to be sent later to these Investigations Offices, at the offices occupied by this Investigative Office, whose address is Av. Paseo de la Reforma N ° 211-213, 1st floor, Colonia Cuauhtémoc, Cuauhtémoc Delegation, Mexico City Telephone (55) 53 46 00 00 ext. [Excised]

DEPUTY ATTORNEY GENERAL FOR HUMAN RIGHTS, CRIME PREVENTION, AND COMMUNITY SERVICES

[Excised]

[Excised]  Agent of the Public Ministry
for Mexico
Assigned to the Investigative Office of the
Deputy Attorney General for Human Rights, Crime
Prevention, and Community Services

Deputy Director General of the
Investigation Office

AP/PGR/SDHPDSC/OI/001/2015


SDHPDSC/OI/003103/2016
SUBJECT: REQUEST FOR COLLABORATION
Mexico City, September 12, 2016

[Excised]
**LEGAL ATTACHÉ OF THE FEDERAL BUREAU OF
INVESTIGATION (FBI), UNITED STATES EMBASSY, MEXICO CITY**
*Av. Paseo de la Reforma, Number 305, Colonia Cuauhtémoc*
*Cuauhtémoc Delegation, C.P. 06500, Federal District*
**Present.**

Based on the provisions of articles 14, 16, 21 and 102 section "A" of the Political Constitution of the United Mexican States; 1st fraction I, 2nd fraction II, II, 168, 180, and others [Excised]

| PSEUDONYM | FB URL | FB ID |
|---|---|---|
| [Excised] | [Excised] | [Excised] |

**AP/PGR/SDHPDSC/OI/001/2015**

[Excised]

Without further ado, I extend to you my highest and most distinguished regards.

**SINCERELY,**
**Agent of the Public Ministry for Mexico**
**Assigned to the Investigative Office**
**of the Deputy Attorney General for Human Rights,**
**Crime Prevention, and Community Services**

[Excised]

# Exhibit 8

**PGR**
PROCURADURÍA GENERAL
DE LA REPÚBLICA

## ORIGINAL
## TOMO CDLXXXIII

| | |
|---|---|
| FONDO | PROCURADURÍA GENERAL DE LA REPÚBLICA |
| UNIDAD ADMINISTRATIVA | SUBPROCURADURÍA DE DERECHOS HUMANOS, PREVENCIÓN DEL DELITO Y SERVICIOS A LA COMUNIDAD |
| ÁREA RESPONSABLE | OFICINA DE INVESTIGACION |
| RESPONSABLE DEL CONTROL DE EXPEDIENTES | LIC. ▆▆▆▆▆▆▆ |
| CLAVE Y NOMBRE DE LA SECCIÓN | AVERIGUACION PREVIA |
| CLAVE Y NOMBRE DE LA SERIE | |
| CLAVE Y NOMBRE DE LA SUBSERIE (OPCIONAL) | |
| CLAVE Y NOMBRE DEL EXPEDIENTE | AP/PGR/SDHPDSC/OI/001/2015 |

### ACCESO

| | | | | |
|---|---|---|---|---|
| PÚBLICO | SI | | NO | X |
| INFORMACIÓN RESERVADA | SI | X | NO | |
| INFORMACIÓN  CONFIDENCIAL | SI | X | NO | |
| RESTRINGIDO DURANTE SU VIGENCIA | SI | X | NO | |

### RESUMEN DEL CONTENIDO

LA DOCUMENTACION DEL PRESENTE EXPEDIENTE SE INTEGRA  CON LAS DIVERSAS ACTUACIONES PRACTICADAS E INFORMACION RECABADOS PARA LA INTEGRACION DEL DELITO QUE SE INVESTIGA.

### FECHAS EXTREMAS

| | | |
|---|---|---|
| AÑO DE APERTURA EXPEDIENTE | 2015 | INDETERMINADO |

### FORMATO Ó SOPORTE

| | | | | | |
|---|---|---|---|---|---|
| PAPEL X | FOTOGRAFIAS | LIBROS | DISQUETES | CD ROM | ENGARGOLADO |
| VIDEO | OTRO (S) | DESCRIBIR | | | |

| ### VALOR DOCUMENTAL | ### CARÁCTER FUNCIONAL |
|---|---|
| ADMINSTRATIVO | TÉCNICO SUSTANTIVO              X |
| LEGAL                          X | |
| CONTABLE | DE GESTIÓN INTERNA |

| ### PLAZO DE CONSERVACIÓN | ### CONFORMACIÓN |
|---|---|
| VIGENCIA COMPLETA ____ AÑOS | NÚMERO DE LEGAJOS              483 |
| ARCHIVO DE TRÁMITE ____ AÑOS | |
| ARCHIVO DE CONCENTRACIÓN ____ AÑOS | NÚMERO DE FOJAS |

| ART.110 FRACC. V,VII LFTAIP MOTIVACIÓN 1 | ART. 113 FRACC I LFTAIP MOTIVACION 2 |
|---|---|

**"Año del Centenario de la Promulgación de la Constitución Política de los Estados Unidos Mexicanos".**

PROCURADURIA GENERAL
DE LA
REPUBLICA

SUBPROCURADURÍA JURÍDICA Y DE ASUNTOS INTERNACIONALES.
COORDINACIÓN DE ASUNTOS INTERNACIONALES Y AGREGADURÍAS.
DIRECCIÓN GENERAL DE PROCEDIMIENTOS INTERNACIONALES.
DIRECCIÓN DE ASISTENCIA JURÍDICA INTERNACIONAL.

EXP. AJI/EUA/352/09-2015-A.

OFICIO Nº DGPI/ **1 5 6 1 / 1 7**

Ciudad de México a, **1 6 JUN 2017**

DIRECTOR DE LA OFICINA DE ASUNTOS INTERNACIONALES DEL DEPARTAMENTO DE JUSTICIA DE LOS ESTADOS UNIDOS DE AMÉRICA.

**URGENTE-RELEVANTE-CONFIDENCIAL**

Hago referencia a la solicitud de asistencia jurídica internacional realizada a esa Oficina de Asuntos Internacionales, por medio del ocurso número **DGPI/0866/16** de fecha 31 de marzo de 2016, por medio del cual se solicitó la asistencia jurídica internacional, tendiente a recabar diversa información y documentación, cuyas constancias serían aportadas a la averiguación previa número



En atención a





| ART. 110 FRACC. V,VII LFTAIP | ART. 113 FRACC I LFTAIP |
|---|---|
| MOTIVACIÓN 1 | MOTIVACION 2 |

FORMA 6-0-1-A

2

**PROCURADURÍA GENERAL
DE LA
REPÚBLICA**

**Oficio No. DGPI/ 1 5 6 1 / 1 7**

Al respecto, le comunico que la autoridad ministerial de la Oficina de Investigación de la Subprocuraduría



1.

• Al

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



FORMA-DGPI-1A

4/3

3

PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/** 1561/17



donde se desprende

ART. 11O
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

4

FORMA C G - T A

44

PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

PROCURADURIA GENERAL
DE LA
REPÚBLICA

Oficio No. DGPI/ 1561/17



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

6

Oficio No. DGPI/ **1561/17**



ABRAHAM    ACEVEDO

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

PROCURADURÍA GENERAL
DE LA
REPÚBLICA





8



**Oficio No. DGPI/ 1561/17**



| ART. 11O |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



9

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ **1561 / 17**

3. El



• El

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURIA GENERAL
DE LA
REPUBLICA

**11**

Oficio No. DGPI/ 1 5 6 1 / 1 7

6. El



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**12**

**Oficio No. DGPI/ 1561 /17**



| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



13

Oficio No. DGPI/ 1 5 6 1 / 1 7

PROCURADURIA GENERAL
DE LA
REPUBLICA

7.



ART. 110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

FORMA-SUIA

5 9

**14**



PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



para

15

Oficio No. DGPI/ **1561 / 17**



necesaria la información para ampliar la investigación o ejercer la acción penal.

El

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURIA GENERAL
DE LA
REPUBLICA

16

Oficio No. DGPI/ 1 5 6 1 / 1 7



ART. 11O
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

57



PROCURADURIA GENERAL
DE LA
REPUBLICA

17

Oficio No. DGPI/ **1561/17**



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



18



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**Oficio No. DGPI/ 1561 / 17**



| ART. 110 FRACC. V, VII LFTAIP MOTIVACIÓN 1 | ART. 113 FRACC I LFTAIP MOTIVACION 2 |



59

19

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1 5 6 1 / 1 7



| ART. 110 | ART. 113 |
| FRACC. V, VII | FRACC I LFTAIP |
| LFTAIP | |
| MOTIVACIÓN 1 | MOTIVACION 2 |



PROCURADURIA GENERAL
DE LA
REPUBLICA

**20**

**Oficio No. DGPI/   1 5 6 1 / 1 7**



ART. 110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



21

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ **1 5 6 1 / 1 7**



**NECESIDAD DE AYUDA**

| No. | INCULPADO | FECHA DE NACIMIENTO |
|-----|-----------|---------------------|
|     |           |                     |
|     |           |                     |
|     |           |                     |

ART. 110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



**22**

PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/** 1 5 6 1 / 1 7

| No. | INCULPADO | FECHA DE NACIMIENTO |
|-----|-----------|---------------------|



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

FORMATO 1 A
63

23



PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/** 1 5 6 1 / 1 7



ART.110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

Case 3:20-cv-06649-JSC   Document 29-4   Filed 04/08/21   Page 92 of 242

24



PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/** 1 5 6 1 / 1 7



| ART. 11O |
| FRACC. V, VII |
| LFTAIP |
| **MOTIVACIÓN 1** |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



**25**



**Oficio No. DGPI/  1 5 6 1 / 1 7**

PROCURADURIA GENERAL
DE LA
REPUBLICA



| ART. 110 |
| FRACC. V,VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



26

PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



27

PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/ 1561 / 17**



**LEGISLACIÓN APLICABLE A LA PRESENTE SOLICITUD**

La presente solicitud se fundamenta en los artículos 1, numerales 1 y 4, inciso b); 2 y 4 numerales 1, 2 y 10 del Tratado de Cooperación entre los Estados Unidos Mexicanos y los Estados Unidos de América sobre Asistencia Jurídica Mutua.

**PROCEDIMIENTO A SEGUIR**



"...continúa al reverso..."

ART.110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

la Reforma
elegación
ta Unidad
6; correos

Sin otro par ███████████████████████ saludo.



SAC: OF-SDHPDSC-01-1060-2017

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

FORMA-221 A

**"Año del Centenario de la Promulgación de la Constitución
Política de los Estados Unidos Mexicanos".**

68

PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**SUBPROCURADURÍA JURÍDICA Y DE
ASUNTOS INTERNACIONALES.
COORDINACIÓN DE ASUNTOS
INTERNACIONALES Y AGREGADURÍAS.
DIRECCIÓN GENERAL DE
PROCEDIMIENTOS INTERNACIONALES.
DIRECCIÓN DE ASISTENCIA JURÍDICA
INTERNACIONAL.**

**EXP. AJI/EUA/352/09-2015-A.**

**OFICIO Nº DGPI/ 1 5 6 1 / 1 7**

**Ciudad de México a, 1 6 JUN 2017**

**SEÑOR**



**DIRECTOR DE LA OFICINA DE ASUNTOS
INTERNACIONALES DEL DEPARTAMENTO DE
JUSTICIA DE LOS ESTADOS UNIDOS DE AMÉRICA.**

**URGENTE-RELEVANTE-CONFIDENCIAL**

Hago referencia a la solicitud de asistencia jurídica internacional realizada a esa
Oficina de Asuntos Internacionales, por medio del ocurso número



En



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURÍA GENERAL
DE LA
REPÚBLICA





1. El

FORMATO 2-A

70



3

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1561 / 17



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

FORMA C G - 1 A

71

4

PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/** 1 5 6 1 / 1 7



2.

| ART. 110 |
| --- |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| --- |
| FRACC I LFTAIP |
| MOTIVACION 2 |

FORMA DGPI-A

72

5

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1 5 6 1 / 1 7



| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |

6

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ **1561 / 17**



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

FORMA C G - 1 A

74

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/  1 5 6 1 / 1 7



| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |

75

8



PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1 5 6 1 / 1 7



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

76



9

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1561 / 17



3.

•

4. El

•

ART. 110
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

77



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

Oficio No. DGPI/ 1 5 6 1 / 1 7



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

FORMA DGPI A

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



. El Juzgado

| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



**12**

PROCURADURÍA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1 5 6 1 / 1 7



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



**13**

PROCURADURIA GENERAL
DE LA
REPUBLICA

**Oficio No. DGPI/ 1 5 6 1 / 1 7**

7.







PROCURADURÍA GENERAL
DE LA
REPÚBLICA

14

Oficio No. DGPI/ 1 5 6 1 / 1 7



• El

8.

9.

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACIÓN 2



PROCURADURIA GENERAL
DE LA
REPUBLICA

**15**

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



11. El

| ART. 110 FRACC. V, VII LFTAIP MOTIVACIÓN 1 | ART. 113 FRACC I LFTAIP MOTIVACION 2 |



FORMA DGPI A

*83*

16

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ **1 5 6 1 / 1 7**



12. El

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURIA GENERAL
DE LA
REPUBLICA

17

Oficio No. DGPI/ 1561 / 17



En

14.

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



18

FORMA DGPI-A

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1561 / 17



15. E                  xt

| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



86

19

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ **1561/17**



**16.** El

**17.** El

| ART. 110 | ART. 113 |
|---|---|
| FRACC. V, VII | FRACC I LFTAIP |
| LFTAIP | |
| MOTIVACIÓN 1 | MOTIVACION 2 |



*E 7*



PROCURADURIA GENERAL
DE LA
REPUBLICA

20

Oficio No. DGPI/ **1 5 6 1 / 1 7**



**18. Las**

| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



21

Oficio No. DGPI/ 1 5 6 1 / 1 7

19.

Público,



| No. | INCULPADO | FECHA DE NACIMIENTO |
|---|---|---|
| | | |

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURIA GENERAL
DE LA
REPUBLICA

**22**

Oficio No. DGPI/ **1 5 6 1 / 1 7**

| No. | INCULPADO | FECHA DE NACIMIENTO |
|-----|-----------|---------------------|



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

FORMA DGPI-A

**23**

**Oficio No. DGPI/** 1 5 6 1 1/ 1 7



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

**24**

PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**Oficio No. DGPI/** 1 5 6 1 / 1 7



ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACIÓN 2



25

9 2



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**Oficio No. DGPI/ 1 5 6 1 / 1 7**



| No. | INCULPADO | FECHA DE NACIMIENTO |
|-----|-----------|---------------------|

ART. 11O
FRACC. V,VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



93



26

PROCURADURIA GENERAL
DE LA
REPUBLICA

Oficio No. DGPI/ 1 5 6 1 / 1 7



| No. | INCULPADO | FECHA DE NACIMIENTO |
|-----|-----------|---------------------|
|     |           |                     |

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2



PROCURADURÍA GENERAL
DE LA
REPÚBLICA

**27**

**Oficio No. DGPI/ 1561 / 17**



| No. | INCULPADO | FECHA DE NACIMIENTO |
|-----|-----------|---------------------|
|     |           |                     |

### LEGISLACIÓN APLICABLE A LA PRESENTE SOLICITUD

La presente solicitud se fundamenta en los artículos 1, numerales 1 y 4, inciso b); 2 y 4 numerales 1, 2 y 10 del Tratado de Cooperación entre los Estados Unidos Mexicanos y los Estados Unidos de América sobre Asistencia Jurídica Mutua.

### PROCEDIMIENTO A SEGUIR



"…continúa al reverso…"

| ART. 110 |
| FRACC. V, VII |
| LFTAIP |
| MOTIVACIÓN 1 |

| ART. 113 |
| FRACC I LFTAIP |
| MOTIVACION 2 |



la Reforma
Delegación
sta Unidad
86; correos

Sin otro particula                                                rdial saludo.

C. c.

SAC: OF-SDHPDSC-01-1060-2017

ART. 110
FRACC. V, VII
LFTAIP

MOTIVACIÓN 1

ART. 113
FRACC I LFTAIP

MOTIVACION 2

**ORIGINAL**
**VOLUME CDLXXXIII**

**RECORD GROUP**:                               ATTORNEY GENERAL'S OFFICE
**ADMINISTRATIVE UNIT**:                    DEPUTY ATTORNEY GENERAL FOR HUMAN RIGHTS,
                                                             CRIME PREVENTION, AND COMMUNITY SERVICES
**RESPONSIBLE AREA:**                       INVESTIGATIONS OFFICE
**RESPONSIBLE FOR CONTROL OF THE FILE**   LIC. [EXCISED]

**KEY AND NAME OF THE SECTION**        PRELIMINARY INVESTIGATION
**KEY AND NAME OF THE SERIES**         _____
**KEY AND NAME OF THE SUBSERIES (OPTIONAL)**   _____
**KEY AND NAME OF THE FILE**            AP/PGR/SDHPDSC/OI/001/2015

**ACCESS**

PUBLIC                                    YES _____                    NO __X__
CLASSIFIED INFORMATION                    YES __X__                     NO _____
CONFIDENTIAL INFORMATION                  YES __X__                     NO _____
RESTRICTED DURING ITS TERM                YES __X__                     NO _____

**CONTENT SUMMARY**

DOCUMENTATION WITHIN THE PRESENT FILE IS COMPRISED OF DIVERSE INVESTIGATIONS UNDERTAKEN
AND INFORMATION GATHERED FOR THE INTEGRATION OF THE CRIME INVESTIGATED.

**BASIC DATES**

YEAR THE FILE WAS OPENED:        2015                         UNDETERMINED

**FORMAT OR MEDIUM**

PAPER __X__   PHOTOGRAPHS ___   BOOKS ___   FLOPPY ___   CD-ROM ___   BINDER ___
VIDEO ___      OTHER(S) _____      DESCRIBE_____

**DOCUMENTARY VALUE**                        **FUNCTIONAL CHARACTER**
ADMINISTRATIVE        _____          TECHNICAL SUPPORT ___X_____
LEGAL                 _____X_____          INTERNAL MANAGEMENT _____
ACCOUNTING            _____

**RETENTION PERIOD**                         **COMPOSITION**
PERIOD OF CLASSIFICATION _____ YEARS        SUBSET NUMBER        __483_
ACTIVE ADMINISTRATIVE ARCHIVE _____ YEARS   NUMBER OF PAGES _____
SEMI-ACTIVE RESERVED ARCHIVE _____ YEARS

"Centennial Year of the Promulgation of the Mexican Political Constitution" .

PROSECUTOR'S OFFICE FOR LEGAL AND
INTERNATIONAL AFFAIRS
COORDINATION OF INTERNATIONAL
AFFAIRS AND ATTACHÉS
GENERAL DIRECTORATE FOR
INTERNATIONAL PROCEEDINGS
DIRECTORATE FOR INTERNATIONAL
LEGAL ASSISTANCE

FILE: AJI/EUA/352/09-2015-A
DOCUMENT NUMBER DGPI/ 1561/17
Mexico City, 16 Jun 2017

[Excised]
**DIRECTOR, OFFICE OF INTERNATIONAL AFFAIRS OF THE
UNITED STATES DEPARTMENT OF JUSTICE**

**URGENT – RELEVANT – CONFIDENTIAL**

I refer to the request for international legal assistance made to the Office of International Affairs through petition number **DGPI/0866/16**, dated March 31, 2016, through which international legal assistance was requested to collect varied information and documentation whose records would be provided to the preliminary investigation number [Excised].

Considering [Excised]

**2**

Document Number **DGPI/1561/17**

In this regard, I can inform you that the ministerial authority of the Deputy Attorney General's Office of Investigations  [Excised]

1.  [Excised]

[Excised]

▪  To [Excised]

**3**

Document Number **DGPI/1561/17**

[Excised]

■ [Excised]

[Excised] it can be inferred [Excised]

**4**

Document Number **DGPI/1561/17**

- [Excised]

**5**

Document Number **DGPI/1561/17**

[Excised]

**6**

Document Number **DGPI/1561/17**

[Excised]

[Excised]        ABRAHAM [Excised]   ACEVEDO  [Excised]
GARC[Excised]
JOSÉ[Excised]
ARMA[Excised]

**7**

Document Number **DGPI/1561/17**

[Excised]

**8**

Document Number **DGPI/1561/17**

[Excised]

**9**

Document Number **DGPI/1561/17**

3. The [Excised]

[Excised]

[Excised]

- The [Excised]

**10**

Document Number **DGPI/1561/17**

[Excised]

▪ [Excised]

▪ The [Excised]

5. [Excised]

**11**

Document Number **DGPI/1561/17**

- [Excised]

6. The [Excised]

**12**

Document Number **DGPI/1561/17**

- [Excised]

The [Excised]

[Excised] CRUZ  [Excised]

**13**

Document Number **DGPI/1561/17**

7. [Excised]

14

Document Number **DGPI/1561/17**

[Excised]

[Excised]
GUERREROS [Excised]

[Excised]   for
[Excised]

**15**

Document Number **DGPI/1561/17**

- [Excised]

[Excised]

[Excised]                                    necessary information to broaden the
investigation or to prosecute.

    The [Excised]

[Excised]

[Excised]

**16**

Document Number **DGPI/1561/17**

[Excised]

**17**

Document Number **DGPI/1561/17**

[Excised]

**18**

Document Number **DGPI/1561/17**

[Excised]

**19**

Document Number **DGPI/1561/17**

[Excised]

[Excised]

[Excised]

[Excised]

17. [Excised]

**20**

Document Number **DGPI/1561/17**

[Excised]

**21**

Document Number **DGPI/1561/17**

19.  [Excised]

[Excised]

[Excised]

**NEED FOR SUPPORT**

[Excised]

| Number | DEFENDANT | DATE OF BIRTH |
|--------|-----------|---------------|
| [Excised] | [Excised] | [Excised] |
| [Excised] | [Excised] | [Excised] |
| [Excised] | [Excised] | [Excised] |

**22**

Document Number **DGPI/1561/17**

| Number | DEFENDANT | DATE OF BIRTH |
|---|---|---|
| [Excised] | [Excised] | [Excised] |

**23**

Document Number **DGPI/1561/17**

[Excised]

**24**

Document Number **DGPI/1561/17**

[Excised]

**25**

Document Number **DGPI/1561/17**

[Excised]

**26**

Document Number **DGPI/1561/17**

[Excised]

**27**

Document Number **DGPI/1561/17**

[Excised]

**LEGISLATION APPLICABLE TO THIS REQUEST**

This request is based on Articles 1, numerals 1 and 4 and subsection b); 2 and 4, numerals 1, 2, and 10 of the Cooperation Treaty between Mexico and the United States of America regarding Mutual Legal Assistance.

**PROCEDURES TO BE FOLLOWED**

[Excised]

"…Continue to reverse…"

[Excised]                                              la Reforma
[Excised]                                              Delegation
[Excised]                                              Unit
[Excised]                                              6; post


    Without further ado [Excised]                    regards.


[Excised]


**SAC: OF-SDHPDSC-01 -1060-2017**

**"Centennial Year of the Promulgation of the Mexican Political Constitution".**

**PROSECUTOR'S OFFICE FOR LEGAL AND
INTERNATIONAL AFFAIRS
COORDINATION OF INTERNATIONAL
AFFAIRS AND ATTACHÉS
GENERAL DIRECTORATE FOR
INTERNATIONAL PROCEEDINGS
DIRECTORATE FOR INTERNATIONAL
LEGAL ASSISTANCE**

**FILE: AJI/EUA/352/09-2015-A
DOCUMENT NUMBER DGPI/ 1561/17
Mexico City, 16 Jun 2017**

Mr.
[Excised]
**DIRECTOR, OFFICE OF INTERNATIONAL AFFAIRS OF THE
UNITED STATES DEPARTMENT OF JUSTICE**

**URGENT – RELEVANT – CONFIDENTIAL**

I refer to the request for international legal assistance made to the Office of International Affairs through petition number [Excised]

In [Excised]

**2**

[Excised]

[Excised]

1.  The [Excised]

**3**

Document Number **DGPI/1561/17**

[Excised]

**4**

Document Number **DGPI/1561/17**

[Excised]

2.  [Excised]

**5**

Document Number **DGPI/1561/17**

[Excised]

**6**

Document Number **DGPI/1561/17**

[Excised]

**7**

Document Number **DGPI/1561/17**

- [Excised]

- [Excised]

- [Excised]

- [Excised]

HERNANDEZ [Excised]

- [Excised]

**8**

Document Number **DGPI/1561/17**

[Excised]

**9**

Document Number **DGPI/1561/17**

3.  [Excised]

- ▪ [Excised]

4.  The [Excised]

**10**

Document Number **DGPI/1561/17**

[Excised]

- ▪ [Excised]

- ▪ [Excised]

5. [Excised]

**11**

Document Number **DGPI/1561/17**

[Excised]

The Court [Excised]

**12**

Document Number **DGPI/1561/17**

- [Excised]

- The [Excised]

- [Excised]

- [Excised]

**13**

Document Number **DGPI/1561/17**

7. [Excised]

[Excised]

[Excised]

[Excised]SE A[Excised]

[Excised]AGUET[Excised]
[Excised]IAS "EL O[Excised]
[Excised]LACIOS [Excised]
[Excised]LIAS "EL [Excised]

[Excised]

**14**

Document Number **DGPI/1561/17**

- [Excised]

- The [Excised]

8. [Excised]

[Excised]

9. [Excised]

**15**

Document Number **DGPI/1561/17**

- [Excised]

[Excised]

11. The [Excised]

**16**

Document Number **DGPI/1561/17**

[Excised]

- [Excised]

- [Excised]

- The [Excised]

12. The [Excised]

**17**

Document Number **DGPI/1561/17**

[Excised]

[Excised]

[Excised]

[Excised]

In [Excised]

14. [Excised]

**18**

Document Number **DGPI/1561/17**

[Excised]

- ▪ [Excised]

15. E[Excised]

**19**

Document Number **DGPI/1561/17**

[Excised]

16. The [Excised]

[Excised]

[Excised]

17. The [Excised]

**20**

Document Number **DGPI/1561/17**

- [Excised]

18. The [Excised]

**21**

Document Number **DGPI/1561/17**

19. [Excised]

[Excised]

[Excised]  Public [Excised]

[Excised]

| Number | DEFENDANT | DATE OF BIRTH |
|---|---|---|
| [Excised] | [Excised] | [Excised] |

**22**

Document Number **DGPI/1561/17**

| Number | DEFENDANT | DATE OF BIRTH |
|--------|-----------|---------------|
| [Excised] | [Excised] | [Excised] |

**23**

Document Number **DGPI/1561/17**

[Excised]

**24**

Document Number **DGPI/1561/17**

[Excised]

**25**

Document Number **DGPI/1561/17**

| Number | DEFENDANT | DATE OF BIRTH |
|---|---|---|
| [Excised] | [Excised] | [Excised] |

**26**

Document Number **DGPI/1561/17**

| Number | DEFENDANT | DATE OF BIRTH |
|---|---|---|
| [Excised] | [Excised] | [Excised] |

**27**

Document Number **DGPI/1561/17**

| Number | DEFENDANT | DATE OF BIRTH |
|---|---|---|
| [Excised] | [Excised] | [Excised] |

### LEGISLATION APPLICABLE TO THIS REQUEST

This request is based on Articles 1, numerals 1 and 4 and subsection b); 2 and 4, numerals 1, 2, and 10 of the Cooperation Treaty between Mexico and the United States of America regarding Mutual Legal Assistance.

### PROCEDURES TO BE FOLLOWED

[Excised]

"…Continue to reverse…"

[Excised]                                          la Reforma
[Excised]                                          Delegation
[Excised]                                          Unit
[Excised]                                          86; post

    Without further ado [Excised]                 regards.

[Excised]

C.c. [Excised]

**SAC: OF-SDHPDSC-01 -1060-2017**

# Exhibit 9



**U.S. Department of Justice**

Criminal Division

---

*Office of Enforcement Operations*                    *Washington, D.C. 20530*

**VIA Electronic Mail**                    March 3, 2021

Ms. Anayansi Diaz-Cortes
Reveal from the Center for Investigative          Request No. CRM-301214312
  Reporting                                       Subject: <u>U.S. v. Vega Cuevas et al.</u>, No.
Suite 200                                          14-CR-705 (N.D. Ill).
1400 65th
Emeryville, CA  94605
adiazcortes@revealnews.org

Dear Ms. Diaz-Cortes:

This is a supplemental final response to your Freedom of Information Act (FOIA) request dated June 9, 2020. In that request, you asked for access to records concerning the above-mentioned subject. Your request is currently in litigation, <u>The Center for Investigative Reporting and Anayansi Diaz-Cortes v. U.S. Department of Justice et al.</u>, Case No. 3:20-cv-06649-JSC (N.D. Cal. 2020).  You should refer to this case number in any future correspondence with this Office.

Please be advised that this Office has decided to neither expressly confirm nor deny the existence of such records pursuant to Exemptions 3, which concerns matters specifically exempted from release by statute, including, in this instance, the Mutual Legal Assistance Treaty with Mexico, U.S.-Mexico, Dec. 9, 1987, TREATY DOC. NO. 100-13 (1991)) and (b)(6) and (b)(7)(C) of the FOIA. 5 U.S.C. § 552(b)(3); 5 U.S.C. § 552(b)(6) and (b)(7)(C). Even to acknowledge the existence of responsive records could reasonably be expected to, for example, violate confidentiality provisions related to a request for Mutual Legal Assistance. In addition, to acknowledge the existence of law enforcement records on another individual could reasonably be expected to constitute an unwarranted invasion of personal privacy. This response should not be taken to mean that records do, or do not, exist. Accordingly, this Office cannot confirm nor deny the existence of records responsive to your request.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. <u>See</u> 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all requesters and should not be taken as an indication that excluded records do, or do not, exist.

For any further assistance and to discuss any aspect of your request, you may contact AUSA Jevechius D. Bernardoni by telephone at (415) 436-7164, by email at Jevechius.Bernardoni@usdoj.gov or by mail at 450 Golden Gate Avenue, Box 36055, San Francisco, CA  94102.

2

Although I am aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, I am required by statute and regulation to inform you of your right to an administrative appeal of this determination. If you are not satisfied with my response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account on the following website: https://foiastar.doj.gov.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Amanda Marchand Jones
Chief
FOIA/PA Unit

# Exhibit 10



**United States Department of State**

*Washington, D.C.  20520*

March 4, 2021

Case No.  F-2020-05832 /
          FL-2021-00022

Ms. Anayansi Diaz-Cortes
Reveal from the Center for Investigative Reporting
1400 65th Street, Suite 200
Emeryville, CA 94608

Dear Ms. Diaz-Cortes:

This is in response to your request, dated June 9, 2020, under the Freedom of Information Act
(the "FOIA"), 5 U.S.C. § 552.

We have determined that we are unable to provide any information in response to your request.
The fact of the existence or non-existence of records related to a request for assistance from the
Mexican Government pursuant to the U.S.-Mexico Mutual Legal Assistance Treaty (the
"MLAT") is exempt from disclosure under Exemption 3 of the FOIA, 5 U.S.C. § 552(b)(3).

In addition, disclosing the existence or absence of records related to a request from the Mexican
Government pursuant to the MLAT, a letter rogatory, or any other form of diplomatic
communication regarding the criminal case *United States of America v. Pablo Vega Cuevas, et
al.*, would reveal information in which particular individuals' privacy interests outweigh any
public interest in disclosure, making that information exempt from disclosure under FOIA
Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and (b)(7)(C).

For your information, Congress excluded three discrete categories of law enforcement and
national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c).  This
response is limited to those records that are subject to the requirements of the FOIA.  This is a
standard notification that is given to all our requesters and should not be taken as an indication
that excluded records do, or do not, exist.

This concludes the processing of your request.  If you have any questions, your attorney may contact Assistant United States Attorney Jevechius D. Bernardoni, at Jevechius.Bernardoni@usdoj.gov or 415-436-7164.  Please refer to the case number, FL-2021-00022, and the civil action number, 20-cv-06649, in all correspondence about this case.

Sincerely,

Jeanne Miller
Chief, Programs and Policies Division
Office of Information Programs and Services

2

# Exhibit 11



# Exhibit 12

Case 3:20-cv-06649-JSC   Document 29-4   Filed 04/08/21   Page 191 of 242

**The New York Times** | https://www.nytimes.com/2018/09/03/world/americas/mexico-missing-students.html

# An Old Sore for Mexico's Next President: The 43 Missing Students

By Paulina Villegas

Sept. 3, 2018

AYOTZINAPA, Mexico — Four years after the disappearance of 43 students in southern Mexico, the case remains unsolved, international human rights groups said Monday, as they called on the next president to conduct a proper investigation.

The case of the missing students prompted global outrage and shook Mexico to its core, plunging President Enrique Peña Nieto's approval ratings to new lows. At a ceremony on Monday at their school in Ayotzinapa, Guerrero, representatives from several rights groups said their disappearance had still not been explained.

The official account, disputed by international experts, is that the students were kidnapped by local police officers who turned them over to a drug gang. The gang killed them and burned their bodies in a nearby garbage dump, leaving no remains.

"The commission does not accept that narrative," said Esmeralda Arosemena de Troitiño, rapporteur for Mexico at the Inter-American Commission on Human Rights. "No more talk about what they describe as 'historic truth,' because it hurts us, it outrages us and the families of the victims simply do not tolerate it."

Ms. Arosemena said the commission hoped that President-elect Andrés Manuel López Obrador, who takes office on Dec. 1, would take advantage of the change in government to open an independent investigation. He defeated the candidate from Mr. Peña Nieto's party in the July election.

Mr. López Obrador has repeatedly said that he is committed to further investigating the case with the help of international human rights organizations and making sure that "justice is done."

"The doors of the country will be opened," he said last month. "There will be no obstruction or obstacles that will keep us from discovering the truth in the Ayotzinapa case."

The rights groups said a new investigation should examine the role of the federal police and the military in the students' disappearance, possible obstruction of the investigation by government officials, and accusations that at least 34 of the 129 people arrested in connection with the case had been tortured.



Empty seats with photographs of the missing students at a graduation ceremony.   Francisca Meza/EPA, via Shutterstock

Representatives from the commission, the United Nations and Mexico's top human rights agency appeared Monday at Escuela Normal Rural Raúl Isidro Burgos, where the missing students, many of them sons of farmers, were training to become rural teachers in hope of escaping lives of poverty. The male-only school has a history of leftist activism, with students using radical tactics like blocking roads and throwing rocks at police officers.

6 Years After 43 Students Vanished in Mexico, a New Search for the Missing Begins - The New York Times

At the school's basketball court, 43 empty chairs were lined up behind the podium to represent the missing young men. A crowd of current students invoked the date the students disappeared, chanting: "September the 26th will not be forgotten. Alive they took them, alive we want them back!"

On that night in 2014, about 100 students left the school to hijack several buses for transportation to a march in Mexico City, a longstanding tradition that was mostly tolerated by bus companies and law enforcement officials.

But this time, police officers and other gunmen pursued the stolen buses and opened fire on the students in a coordinated assault in and around the city of Iguala. Six people were killed and dozens wounded. The 43 missing students, who had been pulled off two of the buses, were last seen being taken away by the police. The remains of only one have been identified.

The case became emblematic of the tens of thousands of disappearances during Mexico's decade-long drug war, bringing protesters into the streets by the thousands and throwing Mr. Peña Nieto's presidency into crisis.

Last week, ahead of his final state of the union address, Mr. Peña Nieto said in a video released on Twitter that his administration stood by the official findings. He said it was understandable the victims' parents could not accept the painful truth — a remark that caused indignation among the victims' families and human rights groups.

International investigators arrived in 2015 at the invitation of the Mexican government. But after they contradicted the official version of events, they said, the government began a campaign of harassment and stonewalling that made it impossible for them to do their work. The investigators left the following year.

In June, a federal court ordered the Mexican government to investigate the case again, calling the first inquiry "neither prompt, effective, independent nor impartial." The court ordered that the new investigation be supervised by a truth commission to be led by Mexico's human rights body and victims' families, who have already waited years for answers.

"Anger is all I can feel," said Delfina de la Cruz, mother of Adán Abraham de la Cruz, who was 24 when he went missing. She was at the school on Monday, along with at least one relative of each of the 43 missing students.

"It's been four years and the government has done nothing," she said. "All we can hope for is for the international experts to help us, because no one else will."

# Exhibit 13

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 194 of 242

DISPATCH

# For Mexico's President, Forced Disappearances Could Make or Break the Justice System

A new investigation into the 2014 Ayotzinapa case may bring more answers but doesn't guarantee real changes.

BY MADELEINE WATTENBARGER | OCTOBER 4, 2019, 7:34 PM

MEXICO CITY—On Sept. 26, several thousand people marched through downtown Mexico City behind a Mexican flag spattered in red paint and marked with the slogan "Ayotzinapa Vive." They marched to mark the fifth anniversary of the disappearance of 43 students from the Raúl Isidro Burgos Teachers' College in Ayotzinapa, in the southwestern state of Guerrero. The students' parents led the way, holding photos of their disappeared children.

The parents of the 43 students have marched in Mexico City on the 26th of each month since their sons disappeared. After five years of botched investigations, the Ayotzinapa case remains unresolved, and the students' whereabouts are unknown. They had been attacked by police on the street of Iguala, Guerrero. Six people died that night, 43 went missing, and it remains unclear who is responsible: municipal, state, or federal police; gangs; the army; or several of those forces in coordination.

Since entering office in December, Mexican President Andrés Manuel López Obrador has emphasized his commitment to justice for the disappeared. As part of the ongoing investigation reopened under López Obrador's government, Mexico's undersecretary of human rights, Alejandro Encinas, said last week that the attorney general would open a line of investigation into the officials who had been in charge of the case under the prior administration of President Enrique Peña Nieto. But even if it finds malfeasance, the ongoing investigation is taking on a monumental task if it is to substantively address the impunity plaguing the Mexican justice system, particularly in the growing number of cases of forced disappearance.

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

4/7/2021      The ongoing investigation... is taking on a monumental task. Ayotzinapa anniversary: AMLO and Mexico's enforced disappearance justice crisis

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 195 of 242

# The ongoing investigation is taking on a monumental task.

The officials to be investigated include a former attorney general, Jesús Murillo Karam, and the former head of the Criminal Investigation Agency, Tomás Zerón de Lucio, who said that local police had turned the students over to a local drug gang, who then burned the students' bodies in a dump in the town of Cocula.

Their handling of the case was widely criticized by the students' families and human rights groups. The Interdisciplinary Group of Independent Experts, which the Mexican government and the Inter-American Commission on Human Rights had called on to investigate the case, also found problems in the official story. The town dump revealed no signs of a fire of that size, several of the confessions involved in constructing the story had been extracted under torture, and much of the evidence had been mismanaged. The chain of custody of one piece of evidence in the case—a fragment of bone recovered from a plastic bag by the river—could not be verified.

Although the Interdisciplinary Group of Independent Experts and independent journalists long believed that the military and federal government may have been involved in the students' disappearance, until recently, the state has been slow to investigate the military's involvement. Yet some evidence does point to it. Several security cameras from a security base in Iguala captured footage around the attacks, but the full videos have not been turned over as evidence in the investigation. The journalist Anabel Hernández presents a detailed reconstruction in her 2016 book *A Massacre in Mexico* that alleges the disappearance resulted from collusion between drug cartels and security forces.

The alleged involvement of high levels of the state in the incident makes it a particularly significant challenge for López Obrador. He took office late last year having made ambitious promises to eradicate corruption and transform Mexico. One of his first actions was to sign an order guaranteeing to the parents of the Ayotzinapa students that there will not be impunity in the disappearances. He created a Truth and Justice Commission to take on the case, working closely with the families to pursue new lines of investigation with respect to the students' location. Just this month, members of the Interdisciplinary Group of Independent Experts, who had wrapped up their work in 2016, returned to Mexico to continue supporting the commission's work. At the same time, the attorney general is undertaking the judicial investigation of the case, including the probes of former officials.

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

The resolution of the Ayotzinapa case implies two parallel tasks: first, finding out where the students are, and second, bringing the perpetrators of the crime to justice. "The commission is principally of a humanitarian character," said Félix Santana Ángeles, the technical secretary of the Commission. "We are trying to respond to the question of where are those young men." To that end, Santana Ángeles said, the commission is conducting searches for the students both alive (in hospitals and detention centers) and dead (in clandestine graves). Following tips by informants, they have investigated over 200 different sites since the commission was created. Currently, experts are searching for the students in a dump in the municipality of Tepecoacuilco, Guerrero, a town about 10 miles from Iguala.

## The resolution of the Ayotzinapa case implies two parallel tasks: first, finding out where the students are, and second, bringing the perpetrators of the crime to justice.

Maria Luisa Aguilar, from the Miguel Agustín Pro Juárez Human Rights Center, which has worked closely with the families of the 43 students, said that the relationship between the families and the López Obrador administration is different than with the previous administration. "There's a very significant turn in terms of the theory of the case and the way the dialogue has been handled," she said. Despite investigators disqualifying the Peña Nieto government's account of events, his administration continued backing the official account until the end. In contrast, López Obrador has acknowledged the inadequacy of that account and worked closely with the families to find the true version of events. Aguilar said that the work of the Truth Commission is now more coordinated with various institutions, including the secretary of defense, who was previously reluctant to participate.

Still, irregularities remain in the management of the case. Encinas told press several weeks ago that a judge had released from prison a key suspect in the case, adding to a list of several dozen suspects released, despite the investigation remaining underway.

A common refrain in the Sept. 26 march was, "*No son 43, son muchos mas*," "There aren't just 43, there are many more." In fact, the Ayotzinapa case has brought the ongoing crisis of forced disappearance in Mexico into the public eye. Over 40,000 people have been disappeared since the beginning of Mexico's drug war in 2008, with

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.

Amid accusations of impunity, Mexico grapples with the case of 43 forced disappearance of 43 s...

with murders reaching record rates. López Obrador famously claimed that his government would operate on an agenda of "*abrazos, no balazos*"—"hugs, not bullets." He claimed that he would demilitarize the country, given the widespread human rights abuses resulting from the military's deployment in the drug war. But his creation this year of the National Guard, consisting of police who undergo military training, has instead brought armed forces into the streets again.

Irene Tello Arista, the director of Impunidad Cero, a think tank focused on impunity in Mexico, questioned whether López Obrador's commitment to addressing impunity in the Ayotzinapa case will carry over to the Mexican justice system as a whole. Tello Arista said that the treatment of the Ayotzinapa case could change the paradigm for how the government treats what she calls "networks of macrocriminality"—the criminal involvement of high-level officials, authorities, and security forces, whether by collusion or omission. The investigation of Murillo Karam and Zerón de Lucio could set a precedent for how the government takes on high-level officials' involvement in serious crimes.

So far, though, the investigation has focused only on those who were directly involved in the attacks in Iguala, rather than examining the case up the chain of command. "It's worrying that they are still trying to go after the material authors but not the intellectual authors," Tello Arista said. "They need to go after not just those accused of kidnapping, but also those who gave the orders, whether the municipal police, state police or army."

Last week's march ended in a rally in Mexico City's central square, where the parents of the 43 students spoke on a stage. Several directly invoked the government, calling for continued commitment to the case. "We want to say to the new government that they need to support the investigation commission, the prosecutor, the experts who are returning," said Maria Elena Guerrero. Another parent commented on the difference between dealing with the López Obrador administration and its predecessors—but issued a note of caution. "There's a dialogue," he said, "but we won't trust them until we see the facts, which will speak for themselves."

**Madeleine Wattenbarger** is a journalist based in Mexico City, where she writes about human rights, politics, and culture. Twitter: @madeleinewhat

**TAGS:** LAW, MEXICO, NORTH AMERICA, SECURITY

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our Privacy Policy for more information.



Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 198 of 242

By using this website, you agree to our use of cookies. This use includes personalization of content and ads, and traffic analytics. Review our **Privacy Policy** for more information.

# Exhibit 14



United States Department of Justice

THE UNITED STATES ATTORNEY'S OFFICE

NORTHERN DISTRICT *of* ILLINOIS

U.S. Attorneys » Northern District of Illinois » News

**Department of Justice**

U.S. Attorney's Office

Northern District of Illinois

FOR IMMEDIATE RELEASE                            Wednesday, December 10, 2014

# Eight Defendants Charged With Distributing Heroin In Chicago Area On Behalf Of Guerrero Unidos Mexican Drug Cartel

CHICAGO — An Aurora man who allegedly led the Chicago area cell of the Guerrero Unidos Mexican drug trafficking cartel is among eight defendants who are facing federal narcotics charges here for their alleged roles in distributing kilogram quantities of heroin, federal law enforcement officials announced today.  The investigation, led by the Chicago DEA, resulted in the seizure of approximately 68 kilograms of heroin, nine kilograms of cocaine, and more than $500,000 in cash since August 2013.

The alleged cell leader, PABLO VEGA CUEVAS, 40, and his brother-in-law, ALEXANDER FIGUEROA, 37, both of Aurora, were arrested yesterday morning in southeast Oklahoma, and three other defendants were arrested in the Chicago area.  Arrest warrants were issued for three additional defendants, including one who is believed to be in Mexico.  Also yesterday, DEA agents and local police seized several automobiles and executed four federal search warrants at residences in Aurora, Chicago, and Rockford, as well as at a business tied to Vega, Salude Bienstar, in Aurora.

According to a 131-page complaint affidavit unsealed yesterday, Vega worked with various narcotics sources in Mexico to import wholesale amounts of heroin and cocaine from Mexico to Illinois, often concealing the narcotics in commercial passenger buses that traveled from Mexico to Chicago.  Vega's organization stored drugs at warehouses in Aurora and Batavia, distributed drugs to wholesale customers, and collected cash proceeds on behalf of the Guerrero Unidos, the charges allege.

"This operation strikes at a major Mexican drug trafficking organization that is alleged to have routinely distributed large quantities of heroin and cocaine throughout the Midwest," said Dennis Wichern, Special Agent-in-Charge of the Chicago Field Division of the Drug Enforcement Administration.  "These arrests will have a significant impact on the supply and distribution of heroin and cocaine in the Chicago area," he said.

Vega and Figueroa appeared yesterday in Federal Court in Oklahoma and were ordered transferred to Chicago in custody.  Arrested in the Chicago area yesterday were: ELISEO BETANCOURT PEREIRA, 50, of Aurora; ROBERTO SANCHEZ, 39, of Chicago; and ISAIAS MANDUJANO, 29, of Rockford.  Those three appeared before U.S. Magistrate Judge Sidney I. Schenkier and remain in federal custody pending detention hearings that were scheduled for Thursday and Friday.

Arrest warrants remain outstanding for: WILFREDO FLORES-SANTOS, 43, of North Aurora; JOSE RODRIGUEZ, 31, of Chicago; and ARTURO MARTINEZ, 33 or 34, who is believed to be in Mexico.

Case: 3:20-cv-06649-JSC   Document: 29-4   Filed: 04/08/21   Page: 201 of 242

According to the complaint affidavit, on Aug. 21, 2013, law enforcement officers discovered and seized approximately $200,000 in cash during a traffic stop of an individual in Chicago.  A subsequent search of the individual's residence yielded 12 kilograms of heroin and nine kilograms of cocaine, as well as an additional $231,000, all of which the individual had delivered and picked up on behalf of a courier for Vega's organization.  On June 7 of this year, approximately 25 kilograms of heroin and 60 grams of cocaine were seized from Rodriguez after Figueroa and Betancourt allegedly distributed the heroin to him.  Three days later, approximately 31 kilograms of heroin were seized from another individual allegedly supplied by Figueroa and Betancourt.

All of the defendants except Mandujano were charged with conspiring between August 2013 and November of this year to possess and distribute a kilogram or more of heroin.  The charge carries a mandatory minimum sentence of 10 years and a maximum of life in prison and a $10 million fine.  Mandujano was charged with possession with intent to distribute 100 grams of more of heroin in April of this year, which carries a mandatory minimum sentence of five years and a maximum of 40 years in prison and $5 million fine.  If convicted, the Court must impose a reasonable sentence under federal statutes and the advisory United States Sentencing Guidelines.

The arrests and charges were announced by Zachary T. Fardon, United States Attorney for the Northern District of Illinois, and Mr. Wichern, of the DEA.  Police departments in Aurora, North Aurora, Addison, Arlington Heights, Chicago, Oak Lawn, Oswego, and Prospect Heights assisted in the investigation, as well as the Cook County Sheriff's Police and the Internal Revenue Service Criminal Investigation Division.  The investigation was conducted under the umbrella of the Organized Crime Drug Enforcement Task Force (OCDETF).

The government is being represented by Assistant United States Attorneys Nicole Kim and Georgia Alexakis.

The public is reminded that a complaint contains only charges and is not evidence of guilt.  The defendants are presumed innocent and are entitled to a fair trial at which the government has the burden of proving guilt beyond a reasonable doubt.

Complaint

---

**Component(s):**
USAO - Illinois, Northern

Updated July 27, 2015

# Exhibit 15

4/7/2021                    Years After 43 Mexican Students Vanished, a Victim's Remains Are Found - The New York Times

**The New York Times** | https://www.nytimes.com/2020/07/07/world/americas/mexico-43-missing-students-remains.html

# Years After 43 Mexican Students Vanished, a Victim's Remains Are Found

The identification of one victim's remains is the first sign of progress in years in a case that traumatized Mexico and became a symbol of corruption and injustice.

By Kirk Semple, Paulina Villegas and Natalie Kitroeff

July 7, 2020

MEXICO CITY — Nearly six years after 43 college students disappeared in rural Mexico, the government announced the first major breakthrough in its investigation on Tuesday: Forensic scientists have identified the remains of one of the students.

Bone fragments found near where the students disappeared have been tested by Institute of Genetics at the University of Innsbruck, in Austria, and identified as the remains of Christian Alfonso Rodríguez Telumbre, one of the students, said Omar Gómez Trejo, the special prosecutor assigned to the case. He added that forensic experts from Argentina had confirmed the findings.

The discovery marked a fresh sign of progress toward solving a case that traumatized Mexico and became a symbol of rampant corruption in the country's justice system. It has long been assumed that the missing students were killed, and various people in authority have been implicated, but no one has been put on trial and the motive remains a mystery.

"We have broken the pact of impunity and silence that surrounded" the case, Mr. Trejo said at a news conference. He added, "today we tell the families and society that the right to the truth will prevail."

The discovery was a victory for President Andrés Manuel López Obrador, who had promised to prioritize the investigations — and who desperately needs a political boost amid a plummeting economy, soaring crime and a coronavirus pandemic that continues to worsen in Mexico.

The announcement came on the eve of Mr. López Obrador's visit with President Trump in Washington — a trip for which the Mexican president was roundly criticized at home, because of the American president's harsh language about Mexico and Mexicans.

For the missing students' relatives, who for years have demanded a more robust government investigation into their loved ones' whereabouts, the identification represented a long-awaited step toward closure. Mr. Telumbre is only the second to be found, and the first since December, 2014, when a bone fragment was identified as belonging to another missing student, Alexander Mora.



Clemente Rodriguez, father of Christian Alfonso Rodriguez, searching the outskirt of Iguala, Mexico, with relatives and classmates of the 43 missing students from Ayotzinapa, in 2015.   Miguel Tovar/LatinContent, via Getty Images

"For Christian's family this is devastating news, and for the rest of the families it is the materialization of their worst fears that this might have been all of the students' destiny," said Santiago Aguirre, director of Centro Prodh, a human rights organization that represents the families.

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 204 of 242

They expect it to be "the beginning of a new and serious investigation that once and for all clarifies what happened to every single one of the students," he said.

The students were undergraduates at a teachers' college in the town of Ayotzinapa in the southern state of Guerrero. The night they disappeared — Sept. 26, 2014 — they were in the process of commandeering buses to carry their peers to a demonstration in Mexico City, a time-honored tradition among students at their college and one that was mostly tolerated by the bus companies.

But their escapade quickly devolved into a long, harrowing and chaotic night of terror and violence that involved law-enforcement and other gunmen, according to two reports released by an international panel of investigators several years ago.

By daybreak, six people were dead in the city of Iguala, dozens were wounded and the 43 students had vanished.

Even in a country often wracked by violence, the incident horrified people and spurred huge, nationwide protests demanding that the government solve the mystery and end corruption and impunity.

In 2015, after months of investigation, the administration of then-President Enrique Peña Nieto concluded that the students had been kidnapped by police officers working on behalf of a criminal group, which in turn killed them, burned their bodies in a trash dump and disposed of their ashes in a river.

A demonstration to mark the fourth anniversary of the 43 college students'
disappearance in Mexico City in 2018.   Rodrigo Arangua/Agence France-Presse — Getty Images

But the panel of international investigators, experts in forensics and human rights who examined the case for a year at the invitation of the Mexican government, thoroughly discredited the government's findings.

The panel said the authorities had tried to thwart its work, questioning the integrity of the Mexican criminal justice system and the government's commitment to finding the truth.

They determined that suspects had given testimony under torture or under otherwise "cruel, inhumane or degrading treatment." The experts also questioned the Mexican authorities' handling of evidence and their failure to pursue certain promising lines of inquiry.

It later emerged that the experts, in addition to suffering a campaign of harassment and interference, had been targeted by spyware purchased by the Mexican government.

Mr. Aguirre, the lawyer representing the families, said on Tuesday that an anonymous call led investigators to a specific spot in Cocula, a town near Iguala, where the remains were found — about half a mile from the garbage dump. More remains are likely to be found in that location, he said.

The new discovery "breaks away from the narrative of a lie" by the former government that was meant to foreclose further investigation, said Mr. Trejo, the special prosecutor.

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 205 of 242

After taking office in July 2018, Mr. López Obrador quickly began to make good on his campaign promise to redress his predecessor's mishandling of the case. His first official decree, signed two days after his inauguration, established a special presidential commission to support the families of the victims and get to the bottom of the case.

He has since invited the international panel of experts to return to assist with the investigation, and the country's independent attorney general has created a special investigative unit dedicated to solving the case.

President Andrés Manuel López Obrador of Mexico alongside officials charged with human rights and the Ayotzinapa case. The president promised to resolve the painful mystery.  Sashenka Gutierrez/EPA, via Shutterstock

In the past year, investigators have combed numerous sites looking for evidence, and have sought the arrests of more than 50 people in connection with the case. Many are former government officials who were involved in the investigation during Mr. Peña Nieto's term; some have been accused of torture, forced disappearance and obstruction of justice.

Among the suspects is Tomás Zerón, who had been the chief of criminal investigations in the attorney general's office during Mr. Peña Nieto's term and was investigated for his handling of witnesses and evidence. Officials say Mr. Zerón fled the country months ago prompting an Interpol notice for his arrest.

# Exhibit 16



Advocacy for Human Rights in the Americas

ENGLISH    ESPAÑOL (SPANISH)

✎ **24 FEB 2016 | COMMENTARY | NEWS**

## Ayotzinapa Fact Sheet: Investigating the Enforced Disappearance of 43 Students in Mexico

by **Maureen Meyer**

## What happened the night the students disappeared?

On September 26, 2014, a group of students studying to be teachers at a rural college (known in Mexico as a "*normal*") in Ayotzinapa, Guerrero (*Escuela Normal Rural Raúl Isidro Burgos*) commandeered commercial passenger buses in the nearby city of Iguala, Guerrero. The students intended to use the buses to travel to Mexico City to participate in a march to commemorate a 1968 student massacre. Commandeering passenger buses is a traditional practice of students from the rural colleges, or "*normales,*" throughout Mexico; the practice is common, widely recognized, and largely tolerated. In previous incidents authorities in Guerrero had taken action to prevent students from taking buses, but the practice had never been met with lethal force or sustained pursuit.

The students left Ayotzinapa traveling in two buses that they had previously commandeered. They had no intention of going to Iguala, and went only because the driver of another bus they were attempting to commandeer at a toll booth outside of the city said he had to drop off his passengers at the Iguala bus station. At the Iguala station, the students decided to commandeer three buses. In total, the students used five buses that evening. After leaving the Iguala station, the students started heading for the highway in order to return to Ayotzinapa. They took different routes when leaving the bus station and were therefore traveling in three separate groups: one group of students contained three buses; the other two buses were traveling alone.

In a series of coordinated attacks that took place over the course of three hours, all three groups of students were pursued and intercepted by security forces in the area. The attacks were carried out primarily by municipal police from Iguala and the neighboring city of Cocula, at times with the participation of Federal Police, state police, and investigative police, and with the knowledge of the army. Authorities continued to use lethal force even after the buses were stopped and the students were offloaded. As a result of the attacks, six people were killed and over 40 people were injured, some gravely. Among the victims were students, passersby, members of a youth soccer team, and teachers and other individuals that came to the students' aid. During the attacks, municipal police detained 43 of the students who have not been seen since. The active participation of state authorities in the students' disappearance deems it an "enforced disappearance."

To date, the fate of only one of the 43 students has been confirmed. In December 2014, through DNA testing, a specialized lab at the University of Innsbruck in Austria identified a sample of remains that belong to Alexander Mora Venancio.

## What is the Group of Experts?

Following the attacks on the students, the Mexican government, the victims' families and their legal representatives requested technical assistance from the Inter-American Commission on Human Rights in the investigation of the case. In November 2014, the three parties signed an  agreement  that formed an Interdisciplinary Group of Independent Experts (*Grupo Interdisciplinario de Expertos Independientes*), whose official  mandate  was to work with Mexican authorities to: search for the disappeared students, develop lines of investigation, provide attention to the victims, and address the broader problem of enforced disappearances in Mexico. The Group of Experts is made up of five individuals: Carlos Martín Beristain (Spain), Angela Buitrago (Colombia), Francisco Cox Vial (Chile), Claudia Paz y Paz (Guatemala), and Alejandro Valencia Villa (Colombia), all of whom are  internationally recognized  for their exemplary work in the areas of criminal investigations, human rights, and attention to victims.

The Group of Experts began working in March 2015 and had an initial mandate of six months with the possibility of extension. In October 2015, the Mexican government agreed to  renew  the Experts' mandate for an additional six months. The Group of Experts' mandate will expire at the end of April 2016.

## Who are the Argentine forensic experts working on the case?

The  Argentine Forensic Anthropology Team   (*Equipo Argentino de Antropología Forense*, EAAF) is a nongovernmental, independent team established in the 1980s that provides forensic services in cases of human rights violations worldwide. The EAAF has a history of providing forensic assistance to Mexican authorities. The EAAF worked with Mexican authorities and victims' families to  identify  the remains of women and girls in Ciudad Juárez and Chihuahua City after a wave of female homicides in the 1990s and 2000s. Currently the EAAF is working with Mexican organizations and the government on the  forensic commission  tasked with identifying migrant remains found in mass graves in San Fernando, Tamaulipas and Cadereyta, Nuevo Leon.

At the request of the victims' families and their legal representatives, and with the Mexican government's agreement, the EAAF began working on the investigation of the 43 disappeared students in early October 2014, about a week after the students were forcibly disappeared.

## What has the Group of Experts found?

One of the most important contributions of the Group of Experts' work on the case has been to  scientifically disprove  the Mexican government's original theory that after their detention by municipal police, the 43 disappeared students were handed over to members of the criminal group *Guerreros Unidos* who killed them and burned their remains in a trash dump in Cocula. This scientific analysis was included in its  preliminary report  made public on September 6, 2015, in which the Group of Experts also proposed new lines of investigation for the case. Below is a  summary  of the main findings of this report.

*The students were not burned at the trash dump.*  The Group of Experts hired an internationally recognized fire specialist to examine the Cocula trash dump where the students were allegedly murdered and burned. This analysis did not uncover any evidence of a fire large enough to cremate 43 bodies, nor evidence that sufficient materials were available to fuel a fire long enough and large enough to burn the bodies. A fire of such dimensions would have set fire to the vegetation surrounding the trash site. Satellite images from the night of the students' disappearance provided to the Experts by the Mexican government do not show evidence of a fire in the trash dump the night the Mexican government claims the students were killed and incinerated, nor anywhere near this area. Additionally, a meteorological study revealed moderate rainfall in the area on the night of the students' disappearance.

*The motive for the attacks may be related to drug trafficking.* The Mexican government originally concluded that authorities attacked the students in order to prevent them from protesting a local political event in Iguala; however the Group of Experts found that bythe time the students arrived in Iguala, the event was already over. The Experts concluded that a possible motive for the massive and sustained attack against the students was their unintentional intervention in an operation of the *Guerreros Unidos* drug trafficking organization, which uses passenger buses to smuggle drugs to the United States. The state of Guerrero is a large producer of poppy and Iguala is an important hub for the northbound trafficking of heroin, specifically to Chicago, Illinois. Given the high level of coordination of the local police forces in the attacks, the extreme violence used against the students, and the focus on preventing the buses from leaving the city, the Experts consider that a logical motive for the attack may be that the students unintentionally commandeered a bus containing heroin or bulk cash and recommend that this hypothesis be investigated further.

*All of the security forces in the area were aware of the attacks but did not intervene to protect the students.* Through the use of a communication system, called C-4, the Federal Police, state police, municipal police, and military officials in and around Iguala were aware of the multiple attacks against the students yet did not come to their aid. Recordings from the C-4 communications show that, prior to the attacks, security officers knew of the students' intentions to commandeer buses

and had monitored their movements even before they arrived in Iguala. There are also reports of the presence of security forces at the crime scenes during various points in the night. For example, testimonies point to federal and investigative police being present where one of the buses was attacked by municipal police; a military intelligence agent also arrived shortly after this bus had been stopped; all of the students who were in this bus are disappeared. Additionally, the Experts conclude that the operation against the students had to have been centrally coordinated, given its sustained nature and the involvement of several patrols and two different municipal police forces (from Iguala and Cocula).

## What has the EAAF found?

On February 9, 2015, after conducting its own forensic analysis of the Cocula trash dump, the EAAF concluded that there is no scientific evidence to support the theory that the students had been killed and burned at the site. The EAAF's findings and the Group of Experts' findings constitute two outside reports that did not find a scientific basis for the Mexican government's theory about the trash dump. The EAAF's main findings are:

- Through satellite imagery and soil samples, the EAAF concluded that multiple, smaller-scale fires have occurred at the trash dump since at least 2010; however, there is no evidence of a fire large enough to incinerate 43 bodies.

- Only one plant sample collected showed minimal signs of fire damage and the remaining samples showed no signs of fire damage. Similarly, tree stumps analyzed at the location where the Mexican government claims the students were burned showed little to no signs of fire damage.

- The EAAF recovered thousands of small bone fragments at the trash dump, belonging to at least 19 individuals, that had endured severe fire damage; however there is no evidence linking these remains to the 43 students. Rather, the EAAF concludes that the trash dump had been the site of previous incinerations of human remains over time.

- The bullets and casings recovered at the trash dump do not correspond to the firearms that the alleged perpetrators from *Guerreros Unidos* claim to have used to kill the students. Testimonies given by the alleged perpetrators specifically mention the use of hand pistols (.9mm and .38 super) and the use of one AK-47-type rifle to kill the students. However, 87% of the bullets and casings recovered at the scene do not correspond to the weapons mentioned in the testimony; only 16 casings correspond to the weapons specified. Additionally, the casings were not recovered at the location where the alleged perpetrators said they shot the students.

Furthermore, the EAAF highlights two serious concerns that call into question the Mexican government's handling of evidence and protection of a scene under criminal investigation.

- Between at least November 7 and 28, 2014, the trash dump was left completely unguarded and open to public entry. Photos circulated on the Internet show members of the general public at the trash dump during this time. This is concerning as evidence could have been harmed or manipulated.

- On November 15, 2014, investigators from Mexico's Attorney General's Office conducted an inspection of the trash dump without notifying the EAAF. During this inspection, the government investigators recovered 42 bullet casings that were found grouped together in conditions that suggest that the casings were deliberately placed in a specific location. The EAAF also states that the casings were found in an area of the trash dump that had already been inspected by the EAAF and government investigators prior to the November 15 discovery.

## What actions are needed in order to advance the investigation?

*Investigate the missing fifth bus and the use of buses to traffic drugs.* The Experts found that only four of the five buses the students used on the night of their attack were included in the federal government's original investigation. On the night of the attack, federal police intercepted this fifth bus, offloaded the students, and escorted the bus away from Iguala. The federal government had omitted this bus from its investigation despite testimony from the students regarding its existence, its inclusion in the initial investigation handled by Guerrero state authorities, and video footage of the bus. The fifth bus seen on video surveillance cameras during the night of the attack and described by the students does not match the bus that authorities later presented to the Group of Experts to examine. The Group of Experts hypothesizes that this missing fifth bus could have contained hidden drugs or money belonging to the *Guerreros Unidos* criminal organization.

Currently, the United States Department of Justice has a case concerning eight defendants charged with distributing heroin in the Chicago-area on behalf of the *Guerreros Unidos*. The defendants used commercial passenger buses to conceal and transport drugs from Mexico to Chicago, Illinois. Through the Mutual Legal Assistance Treaty (MLAT) that Mexico has with the United States, Mexico's Attorney General's Office is able to request that the Department of Justice share information about the Chicago investigation and incorporate it in the investigation of the students' disappearance. The Group of Experts had strongly recommended that Mexico's Attorney General's Office submit the MLAT request and this was finally done on February 15, 2016.

The Chicago case could provide insight into how the *Guerreros Unidos* trafficked heroin from Iguala to Chicago, the bus companies they used, and the owners of said companies. Additionally, as part of the Chicago case investigations, U.S. authorities obtained court-authorized interceptions of the communications from various cell phones and Blackberry devices used by several individuals associated with the *Guerreros Unidos*, including the alleged leader of the *Guerreros Unidos'* Chicago cell. The attacks against the students and their disappearance occurred in the evening of September 26, 2014 and the early morning of September 27, 2014; U.S. authorities were intercepting communications during these dates. Information provided through the MLAT will reveal to Mexican authorities whether these intercepted communications contain information related to the students' disappearance.

*Maintain one sole investigation regarding the students' disappearance.* In a February 2016 report on their activities, the Group of Experts expressed concerns about the fragmentation of parts of the investigation into the students' disappearance. Although the case has been officially transferred to the prosecutor's office for human rights, the office responsible for investigating cases of organized crime continues to open separate investigations that are relevant to the case. For example, suspects believed to have been involved with the students' disappearance were recently detained, but they were charged with other crimes, such as drug possession or the illegal possession of weapons. Because these investigations are separate from the students' case, the Experts have not had full access to them and they are unable to assess whether information in these investigations could be relevant to the students' disappearance.

Moreover, parts of these detainees' testimonies that support the trash dump theory have been leaked to the media, but the information provided in the leaked testimonies has not been corroborated. The Group of Experts has requested that the Mexican Attorney General's Office investigate the source of the leaked information. The theory about the trash dump has been scientifically disproven by two independent expert reports. It is important that all authorities within the government fully recognize this and commit to pursuing new lines of investigation.

*Allow the Group of Experts to be present in interviews with the military.* Mexican authorities have repeatedly denied the Group of Experts' access to the soldiers based in Iguala, Guerrero. The military, through the C-4 communication system, was aware of the students' movements that evening and the multiple attacks on the students. According to testimonies, during the evening a group of soldiers entered the police station and searched the cells where some of the students were said to have been taken. A military intelligence agent was also present at the scene of one of the attacks on the students and witnessed their detention by municipal police; he reported his observations back to his superiors over the C-4 system and took photos and video on a cellular phone. These communications and evidence have yet to be provided to the Mexican authorities. The military has also not granted access to C-4 communications from two specific periods during the night of the attacks.

The Group of Experts has been able to directly interview other federal authorities, as well as state and municipal authorities, victims, witnesses, and the accused. Although soldiers have provided testimonies to Mexican officials, the Experts have a series of questions that they would like to ask soldiers and they are requesting to, at a minimum, be present when the federal prosecutors conduct these interviews with the soldiers.

*Continue to search for the disappeared students.* It has been scientifically proven that the students were not killed and burned in the trash dump; therefore, authorities must continue to search for the disappeared students elsewhere. The Group of Experts has proposed different areas to conduct the search and the Mexican government is examining these areas.

*Investigate the obstruction of justice.* Authorities involved in the original, flawed investigation of the 43 students' disappearance should be investigated for possible obstruction of justice and cover up attempts. Medical reports by Mexico's Attorney General's Office show that 70% of the detainees in the case had injuries indicative of torture or mistreatment. Given that the majority of the government's evidence to support its theory about the trash dump was based on the confessions of the detained suspects, the confirmation of torture would further undermine the credibility of the government's original investigation and raise concerns about coerced confessions. *The Wall Street Journal* recently highlighted the case of one of the key detained suspects who reported he was tortured.

| f SHARE | ⅃ TWEET |
|---------|---------|

**SIGN UP TO GET THE LATEST ON ANALYSIS & POLICY**

SIGN UP

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 211 of 242

**Related Content**

**Mexico's Militarized Migration Crackdown**    **Members of Congress Urge Support for Human Rights in Mexico in Letter to Secretary Bli**    **Places Asylum Seekers at Risk**    **Holding Mexico's Cartels & Caste**

23 MAR 21    WOLA STATEMENT    4 MAR 21    PRESS RELEASE    22 JAN 21    PODCAST



MEXICO

**Mexico Faces a Test for its Anti-Corruption and Justice Reform Efforts**

25 NOV 20    COMMENTARY

1666 Connecticut Ave NW, Suite 400
Washington, DC 20009

Tel: (202)797-2171

**HELP US CREATE REAL IMPACT**

DONATE

🔍 Click here to search all of WOLA's analysis    SEARCH

**ABOUT US**

Our Mission
Our Impact
Staff
History
Board of Directors
Finances

**PROGRAMS**

Central America
Colombia
Cuba
Mexico
South America
Venezuela
Citizen Security
Drug Policy
Women and Incarceration
Migration & Border Security
Defense Oversight

**ANALYSIS**

Publications
Commentary
Videos
Podcast

**NEWS**

Latest News
Press Room

**GET INVOLVED**

Events
Internships
Jobs
Donate
Contact
The WOLA Human Rights Awards & Benefit Gala

Washington Office on Latin America, 1666 Connecticut Ave NW, Suite 400, Washington, DC 20009

# Exhibit 17

# Alleged head of Chicago branch of Mexican drug cartel arrested

🌐 **reuters.com**/article/us-usa-mexico-drugs/alleged-head-of-chicago-branch-of-mexican-drug-cartel-arrested-idUSKBN0JO2CU20141210

By Mary Wisniewski

2 Min Read

CHICAGO (Reuters) - The alleged head of the Chicago-area branch of a Mexican drug cartel faces federal charges with seven others for a plot that involved carrying heroin and cocaine from Mexico to the United States in passenger buses, prosecutors said on Wednesday.

Pablo Vega Cuevas, 40, who prosecutors say leads the local cell of the Guerreros Unidos cartel, and his brother-in-law, Alexander Figueroa, 37, both of Aurora, Illinois, were arrested on Tuesday in Oklahoma, and three others were arrested in the Chicago area. Arrest warrants have been issued for three others, including one believed to be in Mexico.

The investigation led to the seizure of 68 kg of heroin, 9 kg of cocaine and more than $500,000 in cash, prosecutors said.

Advertisement

"These arrests will have a significant impact on the supply and distribution of heroin and cocaine throughout the Midwest," Dennis Wichern, special agent-in-charge of the Chicago division of the U.S. Drug Enforcement Administration, said in a statement.

Vega worked with narcotics sources in Mexico to import wholesale amounts of narcotics, concealed in commercial passenger buses to Chicago, prosecutors said.

The drugs were stored in warehouses in the western suburbs of Aurora and Batavia, and cash proceeds collected on behalf of Guerreros Unidos, according to prosecutors.

Mexico has arrested Guerreros Unidos members for suspected involvement in the kidnapping of dozens of student teachers who disappeared in September and are feared massacred.

Lawyers for Vega and Figueroa were not immediately known. Lawyers for the three men arrested in the Chicago area were not available for comment.

Vega, Figueroa and five other defendants were charged with a conspiracy heroin trafficking charge, which carries a sentence of 10 years to life in prison and a $10 million fine. An eighth defendant, Isaias Mandujuano, faces a lesser trafficking charge and could receive five to 40 years in prison and a $5 million fine if convicted.

Reporting by Mary Wisniewski; Editing by Peter Cooney

Our Standards: <u>The Thomson Reuters Trust Principles.</u>

More From Reuters

# Exhibit 18

NOVEMBER 25, 2014

# CHAIRMAN MENENDEZ JOINS GROUP OF BIPARTISAN SENATORS IN LETTER TO SEC. KERRY ON MISSING MEXICAN STUDENTS

WASHINGTON, DC – In a letter sent to Secretary of State John Kerry on Tuesday, a group of 14 Senators including Foreign Relations Committee Chairman Bob Menendez (D-NJ), wrote to express their deep concern for the lives of the 43 young students that disappeared on September 26th in the State of Guerrero, Mexico. The Senators call for additional attention on "strengthening the investigative and forensic capacity of Mexican law enforcement and its ability to serve victims of crime, violence, and human rights abuses."

In addition to Menendez, the letter was signed by: Sens. Richard Durbin (D-IL); Ben Cardin (D-MD); Tom Udall (D-NM); Cristopher Coons (D-DE); Tim Kaine (D-VA); Patrick Leahy (D-VT); Edward Markey (D-MA); Dianne Feinstein (D-CA); Christopher Murphy (D-CT); Marco Rubio (R-FL); Mark Kirk (R-IL); Barbara Boxer (D-CA); and Cory Booker (D-NJ).
A copy of the November 25 letter to Secretary of State John Kerry is below and online.


Dear Secretary Kerry:


We write to express our profound concern for the lives of the 43 young students that disappeared on September 26th in the State of Guerrero, Mexico. After more than a month of continuous investigations by Mexican authorities, it is disconcerting that the fate

of these students remains uncertain, even as mounting evidence implies that they have become the latest victims of the country's drug-related violence.

In the midst of this crisis, we urge you to do everything possible to support the Mexican government by making additional investigative and forensic resources available to assist in locating the missing students. Even if our worst fears are confirmed, we ask that you assist the Mexican government in its efforts to bring all those responsible to justice and to ensure positive post-mortem identifications that allow families to begin their grieving and healing process.

As thousands of frustrated Mexicans gather throughout the country to protest against impunity, we are concerned that the situation in Guerrero is symptomatic of a larger issue that has been endemic to Mexico in recent years. We are deeply troubled by the reports of multiple clandestine mass graves that have been found throughout the search process. According to the Mexican Attorney General's Office, there are more than 22,000 people who disappeared or went missing over the past decade, and who remain unaccounted for. This number constitutes one of the largest in the hemisphere and one that can't be ignored.

At a time when President Peña Nieto has taken great strides to reform Mexico's economic and energy sectors, it is imperative that attention also be focused on strengthening the investigative and forensic capacity of Mexican law enforcement and its ability to serve victims of crime, violence, and human rights abuses. It is critical that the United States stand in partnership with these efforts to ensure justice for the 43 young students and for the tens of thousands of Mexicans that have gone missing.

In closing, our hearts go out to the families of the missing students and we once again reiterate our request for support to our Mexican partners during this time of crisis.

Sincerely,

1. Menendez               9. Feinstein

2. Durbin                 10. Murphy

3. Cardin                 11. Rubio

4. Udall                  12. Kirk

5. Coons                  13. Boxer

6. Kaine                  14. Booker

7. Leahy

8. Markey


                                    ###


## PRESS CONTACT

adam_sharon@foreign.senate.gov

# Exhibit 19

# Congress of the United States
## Washington, DC 20515

August 9, 2016

The Honorable John Kerry
Secretary of State
2201 C Street, NW
Washington, DC 20520

Dear Mr. Secretary:

We write to express our concern about the ongoing human rights crisis in Mexico and the continuing lack of justice for thousands of victims. We urge you to put strengthening the rule of law and defending human rights at the top of our bilateral agenda with Mexico. Given the significant U.S. support for Mexico's security forces, we remain troubled by the 27,000 unresolved cases of people who have disappeared in Mexico since 2007, and the slow pace of reform in the military, law enforcement, and justice sectors. Finally, as detailed in a recent Amnesty International report, Mexico's persistent use of torture in criminal investigations is particularly disturbing. We encourage you to raise with Mexican authorities the importance of respecting human rights, completing competent investigations, and bringing to justice those who violate human rights.

The Mexico section of the Department of State's 2015 Human Rights Report notes: *"The most significant human rights-related problems included law enforcement and military involvement in serious abuses, such as unlawful killings, torture, and disappearances. Impunity and corruption in the law enforcement and justice system remained serious problems."* The prevalence of human rights violations in Mexico and the alarmingly low number of perpetrators held accountable for these crimes have also been documented by Mexico's National Human Rights Commission (CNDH), the Inter-American Commission on Human Rights (IACHR), and United Nations' human rights bodies.

There is no better example than the unresolved case of the 43 students who disappeared while in the custody of Mexico's security forces in the town of Iguala, Guerrero State, in September 2014. Despite the high level international scrutiny that the case has garnered, the Government of Mexico has made little progress in securing justice for these families, calling into question its commitment to uphold human rights.

While we applauded the Government of Mexico's inviting an Interdisciplinary Group of Independent Experts to assist Mexican authorities in the investigation, we remain troubled that Mexico let the Experts' mandate lapse without following up on many of the recommendations. The Experts' April 24, 2016 final report reiterated the lines of investigation that should be explored. The report also highlighted how the Government of Mexico impeded the investigation and obstructed justice, including strong indications that evidence was tampered with and suspects tortured to coerce confessions.

At the same time, we appreciate the Department of State's statement supporting the Experts' work. We share the hope expressed in the statement that *"Mexican authorities will carefully consider the report's recommendations, evaluate suggested actions to address the issue of forced disappearances, provide support to the victims' families, and continue their efforts to bring the perpetrators of this terrible crime to justice."* We also support efforts by the Government of Mexico, the Inter-American Commission on Human Rights, and students' families to develop a mechanism to follow up on the Experts' work and ensure progress is made in the investigation.

We believe that the United States' ongoing engagement with the Government of Mexico on this case is critical to discovering what happened to the 43 students and holding the perpetrators accountable, including Mexican officials who have obstructed the investigation.

As Mexico strengthens its legal framework to address disappearances, we encourage you to raise our concerns about the thousands of cases in which justice has not been done, including the Iguala, Tlatlaya, and Oaxaca cases (the latter two are described briefly below). We also urge you to actively explore how we can collaborate with Mexican authorities to improve their capacity to register and search for the disappeared, eliminate the pervasive use of torture, and to investigate and prosecute those responsible for these crimes.

In the Tlatlaya case, 22 civilians were massacred by Mexican soldiers in June 2014. After an exhaustive investigation, Mexico's National Commission on Human Rights concluded that 12 to 15 of the civilians were extra-judicially executed by Mexican soldiers and that soldiers subsequently altered the crime scene to make it appear as if the victims were killed in a confrontation. Given the forensic evidence and eyewitness testimonies in this case, it is unfortunate that in May 2016 a Mexican federal civilian judge ordered the release of the remaining three soldiers who faced charges related to this crime.

Equally troubling are reports of at least eight people killed and more than 100 injured during violent clashes on June 19, 2016, between the Mexican Federal Police and protesters in Oaxaca. Mexican authorities should employ force proportionate to the circumstances; government security forces should not attack teachers who are expressing dissatisfaction with government policies. Instead, we encourage the government to foster a dialogue with the Oaxacan teachers, and to fully investigate how the protesters were killed in the clashes.

We welcome the Mexican Attorney General's Office's (PGR) commitment to prosecute and punish the perpetrators of the crimes committed in Tlatlaya. However, it is troubling that since 2007—despite thousands of complaints submitted to Mexico's National Commission on Human Rights against the Mexican Army—only two soldiers have been convicted by civilian courts for grave human rights violations. We are also seriously concerned that in the Iguala incident, the PGR's medical reports found that 70 percent of the detainees had injuries indicating torture or mistreatment. Nationally, the PGR reported that torture cases more than doubled between 2013 and 2014. This meshes with a just released Amnesty International report that details Mexican security forces' persistent use of sexual violence against women as a form of torture. Despite the widespread use of torture in Mexico, the Government of Mexico reported only 15 convictions of federal agents for this crime since 2003.

We commend the Government of Mexico for taking important legislative steps to advance human rights protections and to reform its criminal justice system. However, having good laws

on the books does not ensure justice; Mexican authorities must enforce the law and respect human rights.  Mr. Secretary, as you work to continue to strengthen the United States' important relationship with our ally and neighbor, we strongly encourage you to emphasize the need for Mexico to effectively combat these human rights abuses.  Thank you again for leading the State Department in this difficult work and we look forward to hearing from you.


Sincerely,


ALAN LOWENTHAL
Member of Congress


DONALD S. BEYER, JR.
Member of Congress

EARL BLUMENAUER
Member of Congress


SUZANNE BONAMICI
Member of Congress

CORRINE BROWN
Member of Congress


CHERI BUSTOS
Member of Congress

MICHAEL E. CAPUANO
Member of Congress


TONY CÁRDENAS
Member of Congress

DAVID N. CICILLINE
Member of Congress


EMANUEL CLEAVER, II
Member of Congress

STEVE COHEN
Member of Congress

JOHN CONYERS, JR.
Member of Congress

SUSAN DAVIS
Member of Congress

DANNY K. DAVIS
Member of Congress

PETER DEFAZIO
Member of Congress

ROSA L. DELAURO
Member of Congress

MARK DESAULNIER
Member of Congress

LLOYD DOGGETT
Member of Congress

DONNA F. EDWARDS
Member of Congress

KEITH ELLISON
Member of Congress

SAM FARR
Member of Congress

RUBEN GALLEGO
Member of Congress

RAUL GRIJALVA
Member of Congress

LUIS V. GUTIERREZ
Member of Congress

JANICE HAHN
Member of Congress

ALCEE L. HASTINGS
Member of Congress

MICHAEL M. HONDA
Member of Congress

SHEILA JACKSON LEE
Member of Congress

HANK JOHNSON
Member of Congress

WILLIAM R. KEATING
Member of Congress

ROBIN KELLY
Member of Congress

JOSEPH P. KENNEDY, III
Member of Congress

DANIEL T. KILDEE
Member of Congress

RICK LARSEN
Member of Congress

BRENDA L. LAWRENCE
Member of Congress

BARBARA LEE
Member of Congress

JOHN LEWIS
Member of Congress

TED W. LIEU
Member of Congress

MICHELLE LUJAN GRISHAM
Member of Congress

BEN RAY LUJAN
Member of Congress

STEPHEN F. LYNCH
Member of Congress

BETTY MCCOLLUM
Member of Congress

JIM MCDERMOTT
Member of Congress

JAMES P. MCGOVERN
Member of Congress

GRACE F. NAPOLITANO
Member of Congress

ELEANOR HOLMES NORTON
Member of Congress

BETO O'ROURKE
Member of Congress

SCOTT PETERS
Member of Congress

CHELLIE PINGREE
Member of Congress

MARK POCAN
Member of Congress

JARED POLIS
Member of Congress

CHARLES B. RANGEL
Member of Congress

LUCILLE ROYBAL-ALLARD
Member of Congress

BOBBY L. RUSH
Member of Congress

LINDA T. SÁNCHEZ
Member of Congress

LORETTA SANCHEZ
Member of Congress

JAN SCHAKOWSKY
Member of Congress

ADAM B. SCHIFF
Member of Congress

JOSÉ E. SERRANO
Member of Congress



ADAM SMITH
Member of Congress

MARK TAKANO
Member of Congress

PAUL D. TONKO
Member of Congress

NORMA J. TORRES
Member of Congress

CHRIS VAN HOLLEN
Member of Congress

JUAN VARGAS
Member of Congress

MARC A. VEASEY
Member of Congress

MAXINE WATERS
Member of Congress

PETER WELCH
Member of Congress

JOHN YARMUTH
Member of Congress

# Exhibit 20

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 229 of 242

SEPTEMBER 29, 2016

# CARDIN CALLS FOR JUSTICE ON 2ND ANNIVERSARY OF MEXICAN STUDENTS' DISAPPEARANCE

WASHINGTON – **U.S. Senator Ben Cardin (D-Md.), Ranking Member of the Senate Committee on Foreign Relations,** *entered the following statement into the Congressional Record this week to mark the second anniversary of the disappearance of 43 students in Guerrero, Mexico:*

"Mr. President, I rise today to observe the second anniversary of the forced disappearance of 43 students in the Mexican state of Guerrero, a tragedy that continues to haunt the students' families and friends.  I also rise to speak to the endemic challenges posed by cases of missing and disappeared persons across Mexico, and to appeal to President Peña Nieto and Mexico's political leaders to be more responsive and transparent on this critical issue.

"On the evening of September 26, 2014, in a series of events that the New York *Times* has characterized as a 'night of terror', local police from the town of Iguala turned their weapons on the civilian population and colluded with the criminal organization known as the Guerreros Unidos to target and terrorize students from the Escuela Normal Rural Raúl Isidro Burgos, which is a teachers' college.  By the end of that night, six people were killed, 25 were injured, and 43 students were forcibly "disappeared" in a tragic story that has echoed around the globe.

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 230 of 242

"As links between the U.S. and Mexico abound, and given the more than 33 million Mexican-Americans and Mexicans residing in the United States, the disappearance of the 43 students has been felt deeply throughout our country.

"Whether it's in California, Texas, Arizona, Illinois, New York or Maryland, almost all of our States are home to large, dynamic Mexican-American communities that remain in contact with friends and families throughout Mexico.  Many of our constituents have direct and personal ties to the tragedy that took place in Iguala and the broader crisis of unresolved disappearances in Mexico.

"In the two years since the disappearance of the 43 students, it is important to recognize that there have been critical advances in the investigations.  Moreover, I want to recognize the Government of Mexico's decision to work with the Inter-American Commission on Human Rights (IACHR) to create an Interdisciplinary Group of Independent Experts (GIEI, by its initials in Spanish), which has provided invaluable technical assistance for the investigation as well as key recommendations to strengthen ongoing investigative efforts.

"It's imperative to note, however, that the GIEI faced repeated obstacles such as restricted access to key documents and individuals, and found significant inconsistencies in the Mexican government's investigation, including incidents of mishandled evidence.

"It's also important to note that the Experts found evidence which indicates that members of the federal and state police may have joined the local police in colluding with the criminal organizations involved in the disappearance of the students.  In addition, members of the Mexican Army's 27th Battalion were discovered to have been at the scene of the crime and closely involved in the fatal events of that night.  And we cannot overlook the fact that two full years after the students' disappearance, there has not been a single criminal conviction in the case.

"For these reasons, I urge President Peña Nieto and his administration to take all necessary steps to make operational a special follow-up mechanism for the investigation the IACHR established in July.  This follow-up mechanism will include two IACHR-appointed advisors responsible for working with Mexican authorities and monitoring further action on the Group of Experts' recommendations.

"Continued progress on this case is critical.  My staff has met directly with the families of the 43 students, and we cannot let their call for justice end in impunity.  So whether it includes pursuing new leads, discarding flawed theories, granting broader access to case files, or removing officials who have obstructed the investigation, I appeal to President Peña Nieto and his administration to ensure that the investigation has the full political backing and sufficient resources to achieve the needed results.

"I also want to speak to how the case of the 43 students is representative of the endemic challenge of missing and disappeared peoples across Mexico.  According to its own statistics, since 2007, the Mexican government has documented more than 28,000 cases of missing and disappeared people.  In fact, in the months after the students' disappearance, as investigators and families of disappeared persons fanned out across Guerrero state, they encountered numerous mass graves of victims of unknown crimes and carnage.  So the resolution of this case is particularly symbolic as it would give hope to the thousands of Mexican families who have relatives who have disappeared.

"I want to recognize President Peña Nieto's decision to submit draft legislation last December for a General Law to Prevent and Punish the Crime of Disappearances, which would establish obligations for federal, state, and local authorities and improve coordination across jurisdictions.  I appeal to Members of the Mexican Senate and Chamber of Deputies to pass this important legislation.  By prioritizing this issue and providing increased budgetary, forensic, and technological resources, Mexican authorities can ensure justice for the tens of thousands of Mexican families who have suffered the disappearance of a friend or loved one.

"Finally, I want to call upon the State Department and our Embassy in Mexico City to use their diplomatic discussions with the Mexican government to offer all relevant assistance and to underscore the importance of learning the truth about the disappearance of the 43 students and the broader issue of missing and disappeared people.  We must stand ready to support of our Mexican partners as they pursue justice in these critical cases, which have touched the lives of too many Mexicans and, in turn, our constituents here in the United States.

# # #

PRESS CONTACT

Sean Bartlett 202-224-4651

# Exhibit 21

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 234 of 242

# Congressman Lowenthal and Seven House Colleagues Call for Truth and Justice on the 6th Anniversary of Mexican Students' Disappearance

September 25, 2020   | Press Release

Congressman Alan Lowenthal (CA-47) today, joined with his House colleagues Ruben Gallego (AZ-07), Raúl M. Grijalva (AZ-03), Eleanor Holmes Norton (DC-AL), James P. McGovern (MA-02), Ilhan Omar (MN-05), Albio Sires (NJ-08) and Norma J. Torres (CA-35) to issue the following statement marking the sixth anniversary of the forced disappearance of 43 students from Ayotzinapa, Guerrero, Mexico:

"On the sixth anniversary of the disappearance of 43 students from Ayotzinapa Rural Teacher's College at the hands of Mexican security forces in Guerrero, Mexico, our thoughts are with the students' families, who face another year without answers about their loved one's disappearance. At this difficult time brought on by the COVID pandemic, we recognize the recent progress made in the investigation and urge the Lopez Obrador administration to use this momentum to bring truth and justice to the case.

"The Commission for Truth and Justice established by President Andres Manuel Lopez Obrador and led by Undersecretary for Human Rights and Migration Alejandro Encinas Rodríguez deserves praise for coordinating with the students' families and their legal representatives to further the investigation. We further recognize the United Nations Office of the High Commissioner for Human Rights and the Inter-American Commission on Human Rights' Group of Experts, which has provided critical international oversight and technical assistance.

"The Special Investigation and Litigation Unit within Mexico's National Prosecutor's Office (FGR), led by special prosecutor Omar Gomez Trejo, has led to important arrest warrants against top government officials for torture and obstruction of justice in the investigation during the previous administration. The unit was also instrumental in the recent identification of the remains of one of the students, Christian Alfonso Rodríguez Telumbre.

"While we rightly applaud this progress, more must be done to strengthen the legal accusations against several detainees and to investigate members of the security forces at all levels for their role in the students' disappearance. For this work to move forward, we hope that the FGR's special unit continues to receive the financial support and autonomy that has been instrumental in its

success so far.

"Though the recent progress made in the Ayotzinapa case should be celebrated, we remain concerned about the broader crisis of disappearances in Mexico. The 43 students are among the more than 73,000 people who have disappeared in the country since 2006. We express our support for the Mexican government's efforts to strengthen the National Search Commission and the establishment of the Extraordinary Mechanism for Forensic Identification. The Mexican government should ensure that the resources dedicated to the broader disappearance crisis are sufficient to meet its overwhelming scope.

"Mexico remains an essential neighbor and ally to the United States. As the Mexican government works to bring answers to the families of the disappeared, we believe U.S. support for these efforts should continue to be a key element of our bilateral cooperation. We further call on our Departments of State and Justice to support Mexican authorities in their work to resolve the case of the 43 students and in initiatives to strengthen Mexico's criminal justice system.

"We recognize the tireless efforts of the families of the disappeared in pursuing truth and justice. We shall continue to endeavor to uphold human rights in both of our countries."

# Exhibit 22

# Congress of the United States
## Washington, DC 20515

Marcelo Ebrard Casaubon
Minister of Foreign Affairs of Mexico
In care of the Embassy of Mexico in the United States
1911 Pennsylvania Avenue NW
Washington DC 20006

25 September 2019

Dear Minister Ebrard,

We write to express our ongoing concern regarding the unresolved case of the 43 students from Ayotzinapa, Guerrero, Mexico who were forcibly disappeared while in the custody of Mexican security forces five years ago on September 26, 2014. We recognize that since taking office last December, President Andrés Manuel López Obrador has made resolving the Ayotzinapa case a priority for his administration, and that his government has taken significant steps to strengthen support for the families of the victims.

We believe that the president's creation of a Commission for Truth and Justice to supervise the Ayotzinapa case—chaired by Alejandro Encinas Rodríguez, the Undersecretary for Human Rights and Migration—represents an important step to move the case forward. We particularly commend the important role given to the victims' families and the civil society organizations that legally represent them in the Commission, as this provides the families with a direct mode of participation in the case.

We also commend the fact that the Mexican government has welcomed the United Nations Office of the High Commissioner for Human Rights (OHCHR) and the Inter-American Commission on Human Rights (IACHR) to provide additional international assistance and oversight for the case. We note that this includes the involvement of members of the IACHR's Interdisciplinary Group of Independent Experts (GIEI) that gave important technical assistance in the investigation from 2015 to 2016. We believe this international engagement is paramount for continuing with the investigation into the students' disappearance and for monitoring ongoing inquiries into possible irregularities and obstruction of justice committed by public officials within the former Attorney General's Office (*Procuraduría General de la República*, PGR) during the original Ayotzinapa investigation. This includes the alleged arbitrary detention and torture of dozens of suspects to coerce confessions.

PRINTED ON RECYCLED PAPER

We were also pleased to learn about the June 2019 creation of a Special Investigation and Litigation Unit for the Ayotzinapa Case within the FGR to continue with the investigation into the whereabouts of the students and those responsible for this crime. We understand that the families of the victims and the civil society organizations accompanying them have widely welcomed the appointment of Omar Gómez Trejo to lead the Special Unit. It is our hope that, going forward, Mr. Gómez Trejo and the Special Unit are given the resources and autonomy needed to advance in the investigation.

While we applaud recent progress made in the Ayotzinapa case, we are concerned by the lack of any convictions for those responsible for this crime and the recent absolution of a key suspect in the case given the irregularities in the evidence presented against him, including evidence obtained through torture. We further note that this case is only one of more than 47,000 registered disappearance cases in the country. We remain concerned that the vast majority of these cases remain unresolved, with most victims still missing. We recognize the Mexican government's commitment to fully implementing the General Law on Disappearances passed in 2017, supporting the work of the National Search Commission, and addressing the national emergency in the forensic examination of human remains in the country.

In this regard, families of the disappeared and Mexican human rights organizations have expressed to staffers from several of our congressional offices areas where the United States can support Mexico's efforts to address disappearances. This includes providing additional forensic assistance for identifying the more than 26,000 human remains and tens of thousands of bone fragments that have been recovered from clandestine graves throughout the country, as well as technical assistance for implementing the 2017 disappearances law. We welcome a conversation with Mexican officials about these possible avenues of collaboration.

As the Mexican government works to address this disappearances crisis, we are committed to supporting this important effort to bring truth and justice to the families of the 43 forcibly disappeared students from Ayotzinapa and the thousands of other families across the country desperately searching for answers about the fate of their missing loved ones. We recognize and appreciate Mexico as an important neighbor and ally, and we remain committed to working with the Mexican government to promote respect for human rights in both of our countries.

Sincerely,

Alan Lowenthal
Member of Congress

Raúl M. Grijalva
Member of Congress

Ilhan Omar
Member of Congress

James P. McGovern
Member of Congress

Eleanor Holmes Norton
Member of Congress

José E. Serrano
Member of Congress

Barbara Lee
Member of Congress

Albio Sires
Member of Congress

Norma J. Torres
Member of Congress

Jesús "Chuy" García
Member of Congress

CC:  Alejandro Encinas Rodríguez, Undersecretary for Human Rights and Migration, Ministry of the Interior
Sara Irene Herrerías Guerra, Special Prosecutor for Human Rights, National Prosecutor's Office
Ambassador Martha Bárcena Coqui, Embassy of Mexico in the United States

# Exhibit 23

4/8/2021    Congressional briefing on disappeared Mexican students peers into Mexican government investigation | Congresswoman Norma Torres

Case 3:20-cv-06649-JSC Document 29-4 Filed 04/08/21 Page 241 of 242

## 117th Congress in Review



💼 **1,880** Constituent Cases Helped

✉️ **123,882** Responses to Letters, Emails, Calls

💲 **1,840,000** Returned to Constituents

💲 **554,241,435** Money Invested

## Congressional briefing on disappeared Mexican students peers into Mexican government investigation

May 26, 2016 | In The News

Office of Congressman Alan Lowenthal, Orange County Breeze

Orange County Breeze (http://www.oc-breeze.com/2016/05/25/86397_congressional-briefing-disappeared-mexican-students-peers-mexican-government-investigation/)

Congressman Alan Lowenthal (CA-47) today joined with Congresswoman Norma Torres (CA-35) and Congressmen Jeff Duncan (SC-03), Jim McGovern (MA-32), Joe Pitts (PA-16), and Albio Sires (NJ-08), in welcoming the Interdisciplinary Group of Independent Experts (GIEI) to Capitol Hill to provide a Congressional briefing on the unexplained disappearance in September 2014 of 43 Mexican student teachers from Ayotzinapa, Mexico.

Known as the "Group of Experts," the GIEI assisted the Government of Mexico's investigation in the disappearance. Four of the GIEI experts — Claudia Paz y Paz, Francisco Cox, Carlos Beristain, and Angela Buitrago — discussed their work with the Congress Members, problems encountered during the investigation, and the group's final report that was released on April 24, 2016.

"The GIEI final report is critical to understanding why after two years we still have no one being held accountable for the disappearance of these students," Congressman Lowenthal said. "It shines a light on the avenues of inquiry never followed in the investigation and the almost certainty that the Mexican government engaged in evidence tampering and the torture of suspects in its failed attempt to solve these crimes.

"The only conclusion that one can draw from the report is the Mexican justice system, beyond these 43 cases, needs a systematic overhaul. It is beyond frustrating that the Mexican government has not acknowledged the recommendations in this report that could lead to a more effective, successful, and equitable criminal justice system in Mexico."

The GIEI's mandate ended on April 30 with key questions unresolved, although the experts expressed hope that the Government of Mexico will continue to pursue investigative leads that they suggested. Santiago Aguirre, a lawyer with the non-governmental organization Centro Prodh, represented the victims' families at the briefing and provided additional insights on the unresolved tragedy.

"The disappearance of the 43 students has been incredibly traumatic for the families of the victims and for the Mexican people," Congresswoman Torres said. "The failure of the official investigation to find out what happened only makes the pain worse. What the Group of Experts have done to help get to the

bottom of this terrible case is truly remarkable, and now it is the responsibility of the Mexican government to follow the leads the Group of Experts identified and ensure a thorough, complete, and transparent investigation. The Mexican people deserve nothing less"

Thursday's briefing, the latest in a series of Congressional actions supporting efforts to determine the fate of the 43 Mexican citizens, was held in collaboration with the Tom Lantos Commission on Human Rights and the House Foreign Affairs Committee's Subcommittee on the Western Hemisphere, and in conjunction with the Washington Office on Latin America (WOLA).

Last June, more than eighty Members of the U.S. Congress signed a letter to Secretary of State Kerry urging him to advocate with the Government of Mexico to uncover the truth of what happened in Ayotzinapa. In October, Congressman Lowenthal, in collaboration with the Washington Office on Latin America and the Woodrow Wilson Center, hosted the GIEI experts at an event where the experts updated the public on the progress of the investigation.

"I'd like to thank my good friend from California for his efforts to shed light on this terrible crime," Congressman Sires said. "Finding out what really happened to those 43 students almost two years ago is not only important to bring closure to the victims' families but is a true test of Mexico's commitment to reforming its justice system and erasing a culture of impunity for violent crimes. I support Congressman Lowenthal's unwavering commitment to protecting human rights all over the world and hope we can work together with our partners in Mexico to settle this matter once and for all."